KELLUM, Judge.
The appellant, Alan Eugene Miller, an inmate on death row at Holman Correctional Facility, appeals the circuit court’s denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P.
In June 2000, Miller was convicted of capital murder in connection with the deaths of Lee Michael Holdbrooks, Christopher S. Yancy, and Terry Lee Jarvis. The murders were made capital because they were committed “by one act or pursuant to one scheme or course of conduct.” See § 13A-5-40(a)(10), Ala.Code 1975. Following the penalty phase of Miller’s trial, the jury recommended, by a vote of 10-2, that Miller be sentenced to death. The circuit court accepted the jury’s recommendation and sentenced Miller to death.
This Court affirmed Miller’s conviction and sentence on direct appeal. See Miller v. State, 913 So.2d 1148 (Ala.Crim.App. 2004). The Alabama Supreme Court denied certiorari review on May 27, 2005, and this Court’s certificate of judgment was issued that same day. The United States Supreme Court subsequently denied certiorari review in January 2006. Miller v. Alabama, 546 U.S. 1097, 126 S.Ct. 1024,163 L.Ed.2d 867 (2006).
*353 On May 19, 2006, Miller, through counsel, filed a timely Rule 32 petition in the Shelby Circuit Court. The State answered Miller’s petition. On April 4, 2007, Miller filed the amended Rule 32 petition that is the subject of this appeal, in which he reasserted and expanded the claims asserted in his original Rule 32 petition. In the amended petition, Miller claimed, among other things, that he received ineffective assistance of trial and appellate counsel.
On April 18, 2007, the State filed an answer and a motion to dismiss Miller’s amended petition, and Miller responded. Following a hearing on the State’s motion to dismiss, the circuit court entered a written order dismissing all Miller’s claims, except his claims of ineffective assistance of appellate counsel.
On February li — 14, 2008, an evidentiary hearing was conducted on Miller’s claims of ineffective assistance of appellate counsel. Miller presented the testimony of the following witnesses: Mickey Johnson, Miller’s trial counsel; Dr. Charles Scott, the psychiatrist retained to evaluate Miller before trial; Barbara Miller, Miller’s mother; George Carr, Jr., Alicia Sanford, Cheryl Ellison, Samuel Brian Miller, Richard Miller, and Jacob Connell, various Miller family members; and Dr. Catherine Boyer, Miller’s psychologist for his Rule 32 proceeding. The State presented the testimony of Dr. Harry McClaren, another psychologist who examined Miller before trial who reviewed additional documents for the Rule 32 proceedings, and Ronnie Black-wood, Miller’s other trial counsel.[1] Because more time was needed to present evidence, the hearing had to be continued.
The evidentiary hearing resumed on August 6, 2008. Miller presented the testimony of his appellate counsel, Billy Hill. The State presented the testimony of Miller’s other appellate counsel, Haran Lowe.
Following the evidentiary hearing, counsel for the respective parties submitted post-hearing briefs for the circuit court’s consideration. On May 5, 2009, the circuit court denied Miller’s petition in a 157-page order. Miller subsequently filed an objection to the court’s order, which the circuit court denied. This appeal followed.
In the original opinion affirming Miller’s conviction and death sentence, this Court set out the facts of the crime. See Miller, 913 So.2d at 1154-57.

Standard of Review

“ ‘Postconvietion relief is even further removed from the criminal trial than is discretionary direct review. It is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature. See Fay v. Noia, 372 U.S. 391, 423-424, 83 S.Ct. 822, 841, 9 L.Ed.2d 837 (1963). It is a collateral attack that normally occurs only after the defendant has failed to secure relief through direct review of his conviction. States have no obligation to provide this avenue of relief....’
“Pennsylvania v. Finley, 481 U.S. 551, 556-57, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987).
“ ‘[P]ostconvietion state collateral review itself is not a constitutional right, even in capital cases. Murray v. Giarratano (1989), 492 U.S. 1, 109 S.Ct. 2765,106 L.Ed.2d 1; Pennsylvania v. Finley (1987), 481 U.S. 551,107 S.Ct. 1990, 95 L.Ed.2d 539. A post-conviction proceeding is not an appeal
phase, died in 2002. (R. 29.) *354 of a criminal conviction, but, rather, a collateral civil attack on the judgment. See State v. Crowder (1991), 60 Ohio St.3d 151, 573 N.E.2d 652. Postcon-viction review is a narrow remedy, since res judicata bars any claim that was or could have been raised at trial or on direct appeal.’
“State v. Steffen, 70 Ohio St.3d 399, 410, 639 N.E.2d 67, 76 (1994).”
James v. State, 61 So.3d 357, 362 (Ala. Crim.App.2010).
According to Rule 32.3, Ala. R.Crim. P., Miller has the sole burden of pleading and proof. Rule 32.3, Ala. R.Crim. P., provides:
“The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The State shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.”
(Emphasis added.) “Preponderance of the evidence” is defined as:
“The greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other.”
Black’s Law Dictionary 1220 (8th ed. 2004).
Though we reviewed the claims on Miller’s direct appeal for plain error, the plain-error standard of review does not apply to a postconviction petition attacking a capital-murder conviction and death sentence. See Ferguson v. State, 13 So.3d 418, 424 (Ala.Crim.App.2008); Waldrop v. State, 987 So.2d 1186 (Ala.Crim.App.2007); Hall v. State, 979 So.2d 125 (Ala.Crim.App.2007); Gaddy v. State, 952 So.2d 1149 (Ala.Crim.App.2006). “In addition, ‘[t]he procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.’ ” Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995). When reviewing the circuit court’s ruling on the claims raised in Miller’s postconviction petition, we apply an abuse-of-discretion standard. Gaddy, 952 So.2d at 1154.
Finally, we note that in reviewing Miller’s claims in appeal, this Court may take judicial notice of this Court’s records from Miller’s direct appeal to this Court. Hull v. State, 607 So.2d 369, 371 n. 1 (Ala.Crim.App.1992).
I.
Miller argues that the circuit court erred in adopting, with only minor modifications, the State’s proposed order denying his Rule 32 petition. (Miller’s brief, at 14-18; Miller’s reply brief, at 8-11.)
Following the evidentiary hearing on Miller’s Rule 32 petition, the parties submitted post-hearing briefs. The State also submitted a proposed order denying Millers’ Rule 32 petition, which was essentially a reformatted version of the State’s post-hearing brief. Miller filed a reply brief. In his reply brief, Miller did not object to the fact that the State had submitted a proposed order for the court’s consideration, nor did he file a proposed order.
On May 5, 2009 — several months after the submission of the post-hearing briefs and the State’s proposed order — the circuit court entered, an order denying Miller’s Rule 32 petition. The court’s order *355 adopted the State’s previously submitted proposed order, with very few modifications. Miller filed an objection to the circuit court’s adopting the State’s proposed order as its order. The circuit court denied Miller’s objection by the following written order:
“The Court denies ‘Petitioner’s Objection to the Court’s Adoption of the State’s Legal and Factual Assertions to Deny the Amended Rule 82 Petition.’
“The Court spent many hours carefully listening to the testimony presented in the hearing on the petition. The Court read, and often re-read, each of the submissions offered by the Petitioner and the State. The Court carefully weighed each of the arguments put forth in all the submissions. The Court found none of the Petitioner’s arguments persuasive when considered together with the testimony given at the hearing and the argument made by the State. Contrary to the assertions of the Petitioner, case law is clear and unambiguous that adopting in whole or in part an order proposed by the State is not error. Hooks v. State [21 So.3d 772] (Ala.Crim.App.2008).
“For the Foregoing [reasons] the ‘Objection’ is denied.”
(C. 2117; 2131.)
On appeal, Miller reasserts his argument that his due-process rights were violated by the circuit court’s adopting the State’s proposed order denying his petition for postconviction relief. Miller contends that because the circuit court adopted the State’s proposed order, which was filed before the circuit court received Miller’s post-hearing reply brief, neither he nor this Court “can have any confidence in the trial court’s after-the-fact assurance that it read each of the submissions offered by the parties and [that the court] carefully weighed the arguments before finding ‘none of the Petitioner’s arguments [to be] persuasive.’” (Miller’s brief, at 17-18.) Miller maintains that the circuit court ceded its duty to independently review and assess his claims; therefore, he asserts, this Court should review his claims de novo and we should afford no deference to the circuit court’s findings.
In the recent case of Ray v. State, 80 So.3d 965 (Ala.Crim.App.2011), this Court addressed the assertion that the circuit court erred in adopting the State’s proposed order denying his Rule 32 petition. We rejected Ray’s claim, reasoning:
“ ‘While the practice of adopting the state’s proposed findings and conclusions is subject to criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Hubbard v. State, 584 So.2d 895 (Ala.Cr.App.1991); Weeks v. State, 568 So.2d 864 (Ala.Cr.App.1989), cert. denied, [498] U.S. [882], 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 184 (1990); Morrison v. State, 551 So.2d 435 (Ala.Cr.App.), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990).’
“Bell v. State, 593 So.2d 123, 126 (Ala.Crim.App.1991). See also Dobyne v. State, 805 So.2d 733, 741 (Ala.Crim.App.2000); Jones v. State, 753 So.2d 1174, 1180 (Ala.Crim.App.1999).
“More recently in Hyde v. State, 950 So.2d 344 (Ala.Crim.App.2006), we stated:
‘“[T]his Court has repeatedly upheld the practice of adopting the State’s proposed order when denying a Rule 32 petition for postconviction relief. See, e.g., Coral v. State, 900 So.2d 1274, 1288 (Ala.Crim.App.2004), *356 overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala.2005), and the cases cited therein. “Alabama courts have consistently held that even when a trial court adopts verbatim a party’s proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous.” McGahee v. State, 885 So.2d 191, 229-30 (Ala.Crim.App.2003).’
“950 So.2d at 371.
“However, the Alabama Supreme Court has admonished that ‘appellate courts must be careful to evaluate a claim that a prepared order drafted by the prevailing party and adopted by the trial court verbatim does not reflect the independent and impartial findings and conclusions of the trial court.’ Ex parte Ingram, 51 So.3d 1119, 1124 (Ala.2010).
“In Ingram, the Supreme Court held that the circuit court’s adoption of the State’s proposed order denying postcon-viction relief was erroneous because, it said, the order stated that it was based in part on the personal knowledge and observations of the trial judge when the judge who actually signed the order denying the postconviction petition was not the same judge who had presided over Ingram’s capital-murder trial. ‘[T]he patently erroneous nature of the statements regarding the trial judge’s “personal knowledge” and observations of Ingram’s capital-murder trial undermines any confidence that the trial judge’s findings of fact and conclusions of law are the product of the trial judge’s independent judgment....’ Ingram, 51 So.3d at 1125.
“Our first opportunity to consider this issue after the Supreme Court’s decision in Ingram came in James v. State, 61 So.3d 357 (Ala.Crim.App.2010) (opinion on application for rehearing). We upheld a circuit court’s order, adopted verbatim from the State’s proposed order, over a claim that in adopting the State’s order the circuit court had violated Ingram and the United States Supreme Court’s opinion in Jefferson v. Upton, - U.S. -, 130 S.Ct. 2217, 176 L.Ed.2d 1032 (2010). We stated:
“ ‘The main concerns the Supreme Court found objectionable in Ingram are not present in this case; here, the same judge presided over both James’s trial and the Rule 32 proceedings. Also, as we noted in our previous opinion in this case, the circuit court allowed both “parties to submit proposed orders.”
“‘In Jefferson v. Upton, [— U.S. -, 130 S.Ct. 2217 (2010),] the United States Supreme Court remanded Jefferson’s habeas corpus proceedings to the lower court for that court to determine whether the state court’s factual findings warranted a presumption of correctness. The Supreme Court in granting relief stated:
“ ‘ “Although we have stated that a court’s ‘verbatim adoption of findings of fact prepared by prevailing parties’ should be treated as findings of the court, we have also criticized that practice. Anderson [v. City of Bessemer City ], 470 U.S. [564] at 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 [(1985)]. And we have not considered the lawfulness of, nor the application of the habeas statute to, the use of such a practice where (1) a judge solicits the proposed findings ex parte, (2) does not provide the opposing party an opportunity to criticize the findings or to submit his own, or (3) adopts findings that contain internal evidence suggesting that the judge *357 may not have read them. Cf. id., at 568, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518; Ga.Code of Judicial Conduct, Canon 3(A)(4) (1993) (prohibiting ex parte judicial communications).” ’
“James v. State, 61 So.3d at 385 (on rehearing).
“Here, the circuit judge who signed the order denying postconviction relief was the same judge who presided over Ray’s guilt and penalty proceedings— the judge who sentenced Ray to death. None of the concerns the Supreme Court stressed in Ingram are present in this case. Moreover, for the reasons detailed in this opinion, we hold that the circuit court’s findings are not ‘clearly erroneous.’ ”
Ray, 80 So.3d at 971-72.
Shortly after this Court released Ray, the Alabama Supreme Court released its opinion in Ex parte Scott, [Ms. 1091275, March 18, 2011] — So.3d-(Ala.2011). In Scott, the Alabama Supreme Court held that a circuit court’s order summarily dismissing a Rule 32 petition, which adopted verbatim the State’s answer to the Rule 32 petition, violated the requirement that the order reflect the circuit court’s independent findings and conclusions of law.
In Scott, after the State filed its answer to Scott’s Rule 32 petition, the circuit court requested and received an electronic copy of the State’s answer. The circuit court subsequently issued a written order summarily denying Scott’s Rule 32 petition. The circuit court’s order essentially adopted verbatim the State’s answer to the Rule 32 petition.
Scott filed an objection to the circuit court’s order, which the circuit court denied. This Court affirmed the circuit court’s order denying Scott’s Rule 32 petition. Scott v. State, [Ms. CR-06-2233, March 26, 2010] — So.3d -(Ala.Crim.App.2010). The Alabama Supreme Court granted Scott’s petition for a writ of certio-rari and held that the circuit court’s adoption of the State’s answer to the Rule 32 petition conflicted with its decision in Ex parte Ingram, 51 So.3d 1119 (Ala.2010). The Court reasoned:
“Scott argues that the trial court’s order contains the same citation to case-law that had been overruled by this Court two years before the entry of the trial court’s order and the same typographical errors as contained in the State’s answer. Moreover, Scott contends that because the trial court adopted nearly verbatim the State’s answer as its order, the order is infected with the adversarial zeal of the State’s counsel. Thus, Scott argues that the trial court’s order cannot reflect the independent and impartial findings of the trial court and cannot be the product of the trial court’s independent judgment. As for Scott’s claim that the presence in the trial court’s order of the same typographical errors contained in the State’s answer is evidence that the trial court’s order is not a product of the independent judgment of the trial court, we note that Scott has directed this Court to only two examples of such typographical errors appearing in the approximately 58 pages of text that constitute the State’s answer and the trial court’s order. This Court recognized in Ex paite Ingram[, 51 So.3d 1119 (Ala.2010),] that sometimes minor errors find their way into orders drafted by trial courts. We do not consider the few typographical errors at issue here, by themselves, as sufficient evidence upon which to base a conclusion that the trial court’s order is not a product of the trial court’s independent judgment. The fact that the same typographical errors appear in the same locations in both the State’s answer and the trial court’s order does, *358 however, bolster this Court’s conclusion reached infra that the trial court’s order is not a product of its independent judgment. We also note that the State’s answer and the trial court’s order are both 58 pages in length. Again, although this fact alone is insufficient evidence upon which to base a conclusion that the order is not a product of the trial court’s independent judgment, it bolsters this Court’s conclusion reached infra that the trial court’s order is not a product of its independent judgment.
“Further, Scott notes that in adopting the State’s answer the trial court repeated in its order the State’s citation to and reliance upon Williams v. State, 788 So.2d 108 (Ala.Crim.App.2000), a case that had been overruled by this Court approximately two years before the trial court entered its order in this case. In Ex parte Taylor, 10 So.3d 1075 (Ala.2005), this Court by implication overruled the Court of Criminal Appeals’ holding in Williams that ‘ “a finding of no manifest injustice under the ‘plain error’ standard on a direct appeal serves to establish a finding of no prejudice under the test for ineffective assistance of counsel provided in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).’”
Williams, 788 So.2d at 133 (quoting State v. Clark, 913 S.W.2d 399, 406 (Mo.Ct.App.1996) (footnote omitted)). The trial court did not cite Williams for purposes of that holding; rather, it is clear that Williams was cited in support of the trial court’s conclusion that Scott had failed to satisfy his burden of pleading under Rule 32. There is no error in citing and relying upon a case for a particular proposition of law when that case has been reversed on a ground other than the specific proposition of law being relied upon. The trial court’s citation to Williams in this ease does not rise to the level of a material and obvious error as contemplated by the holding in Ex parte Ingram, supra. Accordingly, we do not consider the trial court’s citation to Williams as evidence indicating that the trial court’s order is not a product of the trial court’s independent judgment.
“More troubling is Scott’s contention that because the trial court adopted verbatim the State’s answer as its order, the order is infected with the same adversarial zeal of the State’s counsel as is the answer. Scott contends that, although an order prepared by a party for the proposed adoption by the trial court purports to be disinterested, the adversarial zeal of counsel all too often infects the adopted order of the trial court, which is supposed to contain disinterested findings. See Cuthbertson v. Biggers Bros., Inc., 702 F.2d 454 (4th Cir.1983). Scott contends that an answer is a pleading that never is prepared with the pretense of impartiality. We agree. As Scott contends, an answer, by its very nature, is adversarial and sets forth one party’s position in the litigation. It makes no claim of being an impartial consideration of the facts and law; rather, it is a work of advocacy that exhorts one party’s perception of the law as it pertains to the relevant facts. The Court of Criminal Appeals acknowledged the nature of the State’s answer in this case, stating that ‘the pleading clearly advocated and sought summary dismissal of the majority of Scott’s claims.’ Scott v. State, — So.3d at
[[Image here]]
“This Court stated in Ex parte Ingram that the ‘appellate courts must be careful to evaluate a claim that a prepared order drafted by the prevailing party and adopted by the trial court verbatim does not reflect the indepen *359 dent and impartial findings and conclusions of the trial court.’ Ex parte Ingram, 51 So.Bd at 1124 (emphasis added). Here, we do not even have the benefit of an order proposed or ‘prepared’ by a party; rather the order is a judicial incorporation of a party’s pleading as the ‘independent and impartial findings and conclusions of the trial court.’ Id. at 1124. The first and most fundamental requirement of the reviewing court is to determine ‘that the order and the findings and conclusions in such order are in fact those of the trial court.’ Id. at 1124. The trial court’s verbatim adoption of the State’s answer to Scott’s Rule 32 petition as its order, by its nature, violates this Court’s holding in Ex parte Ingram. Accordingly, we must reverse the Court of Criminal Appeals’ judgment insofar as it affirms the trial court’s adoption of the State’s answer as its order, and we remand the ease to the Court of Criminal Appeals with directions to remand the case to the trial court for that court to reverse its order dismissing Scott’s Rule 32 petition and to enter a new order in light of this opinion.”
— So.3d at-.
The fact situation in this case is distinguishable from the fact situations in Ex parte Ingram and Ex parte Scott. Here, the circuit judge who denied Miller’s Rule 32 petition did not preside at Miller’s trial; however, in the order denying Miller’s Rule 32 petition the court did not profess to have personal knowledge of the performance of Miller’s trial counsel. Furthermore, the circuit court in this case did not base its order denying Miller’s Rule 32 petition upon the State’s initial answer to the Rule 32 petition. Rather, after numerous pleadings, and after the evidentiary hearing on Miller’s Rule 32 claims, the court allowed submission of post-hearing briefs. The State submitted with its post-hearing brief a proposed order denying the petition. As stated above, Miller neither objected in his reply brief to the possibility of the circuit court’s adopting the State’s proposed order, nor did he file a proposed order. Although the State’s proposed order was filed before Miller submitted his reply brief, this does not mean that the circuit court ignored the arguments subsequently presented in Miller’s reply brief. In fact, the circuit court did not issue its final order until several months after Miller filed his reply brief. Furthermore, in response to Miller’s objection to the court’s adopting the State’s proposed order, the circuit court specifically affirmed that it had considered all the pleadings filed by the parties and that it had “carefully weighed each of the arguments put forth in all the submissions” before rendering its decision. (C. 2117, 2131.)
In light of these facts, we are confident that the circuit court’s order is its own and not merely an unexamined adoption of a proposed order submitted by the State. Moreover, for the reasons set forth below, we hold that the circuit court’s findings are not “clearly erroneous.”
II.
During his direct appeal, Miller was represented by two new attorneys who were appointed following his conviction. Miller argues that his appellate counsel rendered ineffective assistance in the motion-for-new-trial proceedings and on appeal. Although Miller presents numerous claims and subclaims of ineffective assistance of appellate counsel in his brief, and even though he often commingles claims and/or presents those claims in a different context in his brief than he presented the claims in his amended petition, Miller’s arguments on appeal can essentially be grouped into four parts.
*360 First, Miller claims that because of time constraints and the lack of an available trial transcript when appellate counsel filed the motion for a new trial, his appellate counsel should not have presented ineffective-assistance-of-trial-counsel claims in the motion for a new trial. (Miller’s brief, 11(A), at 24-28; Miller’s reply brief, at 11.) Miller maintains that his appellate counsel’s ill-informed decision to raise ineffective-assistance-of-trial counsel claims in the motion for a new trial precluded those claims being later considered in a Rule 32 petition, as evidenced by the fact that the circuit court dismissed Miller’s Rule 32 ineffective-assistance-of-trial-counsel claims. (Miller’s brief, at 27.)
Second, Miller argues that having made the decision to present claims of ineffective assistance of trial counsel in the motion-for-new-trial proceedings, appellate counsel had an obligation to thoroughly investigate those claims, which, Miller maintains, his appellate counsel failed to do. (Miller’s brief, 11(B)(1) at 28-33; Miller’s reply brief, at 11-13.)
Third, Miller asserts that his appellate counsel failed to adequately argue and support the ineffective-assistance-of-trial-counsel claims that were presented in the hearing on the motion for a new trial and on appeal. (Miller’s brief, 11(B)(2), at 33-124; Miller’s reply brief, at 13-38.) In that portion of his argument, Miller incorporates a number of his claims of ineffective assistance of trial counsel, and he argues that had his appellate counsel properly presented those ineffective-assistance-of-trial-counsel claims at the hearing on the motion for a new trial, he would have prevailed on those claims.
Fourth, Miller contends that his appellate counsel failed to present numerous additional allegations of ineffective assistance of trial counsel in the motion for a new trial. Miller alleges that had his appellate counsel properly raised and supported those additional claims in the motion-for-new-trial proceedings and on appeal, he would have been entitled to relief. (Miller’s brief, 11(C), at 124-48; Miller’s reply brief, at 39.)
Before addressing Miller’s specific claims, we set forth the general principles of law regarding ineffective-assistance-of-counsel claims.
When reviewing claims of ineffective assistance of counsel, we apply the standard articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on a claim of ineffective assistance of counsel, the petitioner must establish: (1) that counsel’s performance was deficient; and (2) that the petitioner was prejudiced by the deficient performance. 466 U.S. at 687; Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
“ ‘Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide *361 range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.” See Michel v. Louisiana, [350 U.S. 91], at 101 [ (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.’
“Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (citations omitted). As the United States Supreme Court further stated:
“ ‘[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.’
“Strickland, 466 U.S. at 690-91.
“In Jones v. State, 753 So.2d 1174 (Ala.Crim.App.1999), we stated:
“ ‘While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, “this duty only requires a reasonable investigation.” Singleton v. Thigpen, 847 F.2d 668, 669 (11th Cir.(Ala.) 1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See Strickland [v. Washington ], 466 U.S. [668] at 691, 104 S.Ct. [2052] at 2066, 80 L.Ed.2d 674 [(1984)]; Morrison v. State, 551 So.2d 435 (Ala.Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel’s obligation is to conduct a “substantial investigation into each of the plausible lines of defense.” Strickland, 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). “A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.” Id., 466 U.S. at 686, 104 S.Ct. at 2063.
“ ‘ “The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.”
“‘Id., 466 U.S. at 691, 104 S.Ct. at 2066.’
“753 So.2d at 1191.
“ ‘The purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992) (“We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.”). We recognize that “[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or *362 even brilliant hr another.” Strickland, [466 U.S. at 693,] 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or “what is prudent or appropriate, but only what is constitutionally compelled.” Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).’
“Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir.2000) (footnote omitted).”
Ray, 80 So.3d at 975-76.
With the above principles in mind, we turn to Miller’s specific allegations of ineffective assistance of appellate counsel presented on appeal.
A.
As noted above, Miller first claims that because of judicially imposed time constraints and the lack of an available trial transcript at the time the new-trial motion was filed, his appellate counsel should not have presented ineffective-assistance-of-trial-counsel claims in the motion for a new trial. (Miller’s brief, 11(A), at 24-28; Miller’s reply brief, at 11.) Miller maintains that appellate counsel’s “ill-informed” decision to assert claims of ineffective assistance of trial counsel in the motion for a new trial precluded those claims being later considered in a Rule 32 petition, as evidence by the fact that the circuit court summarily dismissed Miller’s Rule 32 ineffective-assistance-of-trial-counsel claims.
The State maintains that this claim is not properly before this Court because it was not presented in Miller’s amended Rule 32 petition — Miller’s claim in his amended Rule 32 petition was that his appellate counsel were ineffective in their investigation and presentation of the claims of ineffective assistance of trial counsel that were presented in the motion for a new trial and on appeal, not that it was ineffective per se to assert claims of ineffective assistance of trial counsel in the motion for a new trial. (C. 352-56.) However, Miller’s present claim was addressed in the evidentiary hearing and in the circuit court’s order denying the petition. Accordingly, under these circumstances, this claim is before this Court for our consideration.
The circuit court found that Miller failed to prove that his appellate counsel were ineffective for presenting ineffective-assistance-of-counsel claims in the motion-for-new-trial proceedings and that Miller failed to establish that he was prejudiced by appellate counsel’s decision to do so. We quote extensively from the circuit court’s order denying relief on this claim:
“In Ex parte Jackson, 598 So.2d 895 (Ala.1992), the Supreme Court of Alabama created a mechanism through which newly appointed appellate attorneys could raise ineffective assistance of trial counsel claims in a motion for new trial and on appeal. In particular, the court created an exception to the requirement, set forth in Rule 24.1(b) of the Alabama Rules of Criminal Procedure, that a motion for new trial must be filed ‘no later than thirty (30) days after sentence is pronounced.’ Id. at 897. The exception provided that newly appointed appellate attorney could file a motion, within fourteen days of being appointed to extend the 30-day time period for filing the motion for new trial. Id. Once that motion, known as a ‘Jackson motion,’ was filed, the attorney automatically would have thirty days ‘from *363 the date the reporter’s transcript is filed’ to file a motion for new trial. Id. The court reasoned that this exception was necessary because it would enable new counsel to raise ‘all appropriate issues before the trial court,’ including claims alleging that the defendant’s trial counsel were ineffective. Id. at 897-898.
“Acknowledging that the Jackson mechanism had created more problems in practical application than it solved, the Supreme Court of Alabama, in Ex parte Ingram, 675 So.2d 868, 865 (Ala.1996), overruled Jackson only ‘to the extent that it allows newly appointed appellate counsel to move to suspend the Rule 24.1(b), Ala. R.Crim. P., 30-day jurisdictional time limit for new trial motions.’ The Court did, however, strongly encourage trial judges ‘to attempt to facilitate newly appointed appellate counsel’s efforts to make new trial motions based upon an alleged lack of ineffective counsel before the Rule 24.1(b) time limit expires.’ Id. Because the Court overruled Jackson only to the extent that it permitted a newly appointed attorney to move to suspend the Rule 24.1(b) time limit for filing a motion for new trial, the Court, in Ingram, left intact Jackson’s, holding that the ‘failure to include a reasonably ascertainable issue in a motion for new trial will result in a bar to further argument of the issue on appeal and in post-conviction proceedings.’ Jackson, 598 So.2d at 897 (emphasis added.)
“After the Supreme Court of Alabama issued its decision in Ingram, the Court amended Rule 32 of the Alabama Rules of Criminal Procedure by adopting Rule 32.2(d). That rule was adopted to address claims of ineffective assistance of counsel. Rule 32.2(d) of the Alabama Rules of Criminal Procedure provides that, ‘Any claim that counsel was ineffective must be raised as soon as practicable, either at trial, on direct appeal, or in the first Rule 32 petition, whichever is applicable.’ See V.R. v. State, 852 So.2d 194, 199 n. 1 (Ala.Crim.App.2002).
“In Russell v. State, 886 So.2d 123, 125-26 (Ala.Crim.App.2003), the Alabama Court of Criminal Appeals held that the appellant’s ineffective assistance of trial counsel claims were procedurally barred from review, under Rule 32.2(a) of the Alabama Rules of Criminal Procedure, because they reasonably could have been presented in a motion for new trial and on direct appeal. In reaching that result, the court held that a Rule 32 petitioner’s ineffective assistance of trial counsel claims will be procedurally barred from review if the transcript of the trial was prepared in time for appellate counsel to raise those claims in a timely filed motion for new trial. Id. at 126. Cf. V.R., 852 So.2d at 202 ([‘A] defendant is not precluded ... from raising an ineffective assistance of trial counsel claim for the first time in a Rule 32 petition if the trial transcript was not prepared in time for appellate counsel to have reviewed the transcript to ascertain whether such a claim was viable and to present the claim in a timely filed motion for a new trial.’).
“In short, Alabama law provides that a defendant must raise ineffective assistance of trial counsel claims as soon as ‘practicable.’ See Ala. R.Crim. P. 32.2(d). In addition, a Rule 32 petitioner’s ineffective assistance of trial counsel claims will be procedurally barred from review, under Rule 32.2(a) of the Alabama Rules of Criminal Procedure, if newly appointed appellate counsel had the trial transcript and raised (or reasonably could have raised) ineffective assistance of trial counsel claims in the trial court. That is precisely what occurred here.
*364 “On July 31, 2000, the trial court sentenced Miller to death. [Direct Appeal, C. 89-90.] During the sentencing hearing, the trial court stated that new counsel would be appointed for Miller’s appeal. [Direct Appeal, R. 1473-74.] Mr. William R. Hill, Jr. and Mr. J. Haran Lowe, Jr. (‘appellate counsel’) were subsequently appointed and filed a motion for new trial on or about August 1, 2000. [Direct Appeal, C. 93-94.] In addition, appellate counsel filed a ‘Motion for the State of Alabama to Provide Transcript of Record.’ [Direct Appeal, C. 91-92.] On August 25, 2000, appellate counsel filed an amended motion for new trial alleging various claims including a claim that Miller’s due process rights were violated because of the ineffectiveness of trial counsel. [Direct Appeal, C. 7, 95-97.] On August 30, 2000, the trial court granted a joint motion to continue the hearing on Miller’s motion for new trial until October 13, 2000 in order for the transcript of Miller’s trial to be completed. [Direct Appeal, C. 108-10.] After the trial court granted Miller funds for expert assistance, the hearing on the motion for new trial was again continued until December 7, 2000. [Direct Appeal, C. 7,132.]
“The trial court conducted hearings on Miller’s motion for new trial on December 7, 2000 and January 31, 2001. [Direct Appeal, Motion for New Trial Hearing, R. 4-176.] During the December 7, 2000 hearing, Miller, through appellate counsel, called his trial counsel, Mickey Johnson, at the hearing and questioned him extensively regarding his preparation for and performance during his trial as well as his trial strategies. [Motion for New Trial Hearing, R. 4-110.] On January 31, 2001, Miller presented the testimony of Dr. Bob Wendorf, a clinical psychologist, to critique Dr. Scott’s testimony during the penalty phase of Miller’s trial. [Direct Appeal, Motion for New Trial Hearing, 111-156.] Miller also called Aaron McCall from the Alabama Prison Program to discuss the role and availability of mitigation expert assistance. [Direct Appeal, Motion for New Trial Hearing, R. 157-175.] After the hearing, Miller filed a brief in support of motion for new trial and provided arguments in support of his claims of ineffective assistance of counsel. [Direct Appeal, C. 114-25.]
On February 21, 2001, the trial court denied Miller’s motion for new trial. [Direct Appeal, C. 132.] Miller subsequently filed a brief on appeal in the Alabama Court of Criminal Appeals, in which he raised a number of ineffective assistance of trial counsel claims. On remand from the Court of Criminal Appeals, the trial court entered a written order providing specific findings of fact regarding the claims raised in Miller’s motion for new trial.[2] In that order, the trial court addressed Miller’s ineffective assistance of trial counsel claims at length: 1) that trial counsel admitted Miller’s guilt during the guilt phase opening statements, 2) that trial counsel failed to present an insanity defense during the guilt phase, 3) that trial counsel failed to move for a change of venue, 4) that trial counsel failed to present a defense during the guilt phase of trial, 5) that trial counsel undermined the mitigation case during the penalty phase *365 opening statement, 6) that trial counsel failed to object to victim impact testimony during the penalty phase, 7) that trial counsel failed to adequately investigate and present a penalty phase defense, and 8) that trial counsel failed to challenge the constitutionality of the heinous, atrocious, and cruel aggravating circumstance.
“In reviewing those claims, the trial court found all of Miller’s claims of ineffective assistance of trial counsel to be without merit.... Thus, the trial court thoroughly reviewed and considered the evidence that was presented at the hearing on Miller’s motion for new trial. Based both on the trial court’s review of that evidence and personal knowledge of what transpired during his trial, the trial court rejected Miller’s ineffective assistance of trial counsel claims and denied relief.
“On return from remand, the Court of Criminal Appeals affirmed Miller’s capital murder conviction and death sentence. Miller v. State, 913 So.2d 1148 (Ala.Crim.App.2004). In its decision, that Court thoroughly reviewed and rejected his ineffective-assistance-of-trial-counsel claims. Miller, 918 So.2d at 1161-63.
“As shown above, Miller, through appellate counsel, moved this Court to continue the hearing on his motion for new trial until the trial transcript was completed to allow for a full review of his ineffective assistance of trial counsel claims. [Direct Appeal, C. 108-09.] Given that the trial court appointed appellate counsel to represent Miller on or about August 1, 2000 and the hearing on Miller’s motion for new trial were not held until December 7, 2000 and January 31, 2001, nearly six months passed between the trial court’s appointment of appellate counsel and the completion of the hearing on Miller’s motion for new trial. As appellate counsel Hill testified during the Rule 32 hearing, this lengthy period of time was utilized to study the transcript of Miller’s trial, review trial counsel’s files, conduct legal research, discuss strategy with appellate counsel Lowe, interview Miller, talk with Miller’s mother and otherwise prepare to litigate Miller’s ineffective-assistance of-trial-eounsel claims. [August 2008 Rule 32 Hearing, R. 13, 60-62.]
“Thus, Miller’s newly appointed appellate counsel had a copy of his trial transcript,[3] engaged in an in depth investigation of his ineffective assistance of trial counsel claims, and fully litigated those claims at the hearing on his motion for new trial.”
(C. 1959-67.) (Emphasis in original.)
The circuit court’s findings of fact and conclusions of law are supported by the record. However, we need not determine whether appellate counsel’s performance was deficient because even if we were to assume for the sake of argument that Miller’s appellate counsel should not have asserted claims of ineffective assistance of trial counsel in the motion for a new trial without having sufficient time to prepare a comprehensive case to support those claims, Miller is still due no relief because, as discussed throughout the remainder of this opinion, Miller has failed to establish the requisite prejudice.
“A defendant claiming ineffective assistance of counsel in violation of the Sixth Amendment must demonstrate that: (1) counsel’s performance was deficient, and (2) the deficient performance *366 prejudiced the outcome of the proceedings. See Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. ‘Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.’ Id. ...
“Because the failure to demonstrate either deficient performance or prejudice is dispositive of the claim against the petitioner, ‘there is no reason for a court deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing on one.’ Strickland 466 U.S. at 697, 104 S.Ct. at 2069. Accordingly, we may consider whether the petitioner suffered prejudice as a result of counsel’s alleged errors without first evaluating the adequacy of counsel’s performance. See id.; see also McClain v. Hall, 552 F.3d 1245, 1251 (11th Cir.2008) (“We may decline to decide whether the performance of counsel was deficient if we are convinced that [the petitioner] was not prejudiced’). In fact, the Supreme Court has made clear that ‘[t]he object of an ineffectiveness claim is not to grade counsel’s performance’ and therefore, ‘[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.’ Strickland, 466 U.S. at 697,104 S.Ct. at 2069.”
Windom v. Secretary, Dep’t of Corr., 578 F.3d 1227, 1248 (11th Cir.2009), cert. denied, Windom v. McNeil, — U.S. -, 130 S.Ct. 2367, 176 L.Ed.2d 566 (2010).
B.
In the second part of his argument, Miller contends that having made the decision to present ineffective-assistance-of-trial-counsel claims in the motion for a new trial, appellate counsel had an obligation to thoroughly investigate those claims, which, he claims, appellate counsel failed to do. (Miller’s brief, 11(B)(1), at 28-33; Miller’s reply brief, at 11-15.)
Specifically, Miller alleges that his appellate counsel’s investigation of trial counsel’s representation was deficient because, he claims: (1) appellate counsel did not speak with trial counsel or review the court file or trial counsel’s files, nor did appellate counsel speak to any trial witnesses or members of Miller’s family in preparation for the motion for a new trial; (2) appellate counsel met with Miller only twice before the hearing on the motion for a new trial; (3) appellate counsel did not spend adequate time preparing for the hearing on the motion for a new trial; (4) appellate counsel did not interview or speak with Miller’s family, friends, or coworkers before the hearing and therefore counsel did not learn of possible mitigating evidence that could have been, but was not, presented at trial; (5) appellate counsel failed to interview Dr. Scott, who testified as the mitigation witness, and therefore appellate counsel did not learn of trial counsel’s alleged incompetence in dealing with Dr. Scott; (6) appellate counsel were ineffective in failing to gather and evaluate documents that had not been gathered by trial counsel, including Miller’s medical records, educational records, employment records, Department of Human Resources records, Miller family mental-health and criminal records, and files and reports of the State’s psychological experts; and therefore, (7) appellate counsel did not effectively evaluate trial counsel’s performance or establish prejudice based on trial counsel’s inadequate performance.
Although Miller limits this portion of his argument in his brief to the adequacy of his appellate counsel’s investigation of the claims presented in the motion-for-new-trial proceedings, in his amended Rule 32 *367 petition he alleged that his appellate counsel’s investigation and presentation of the claims were deficient. (C. 352-56.) As a result, the circuit court addressed the whole of appellate counsel’s performance with regard to the post-sentencing proceedings, i.e., the court addressed appellate counsel’s investigation, preparation, and the presentation of the ineffective-assistance-of-trial-counsel claims in the motion-for-new-trial proceedings and on appeal. Because the portion of the circuit court’s order addressing this claim does not lend itself to piecemeal exception, we set forth the circuit court’s findings as a whole with regard to the performance prong of appellate counsel’s assistance in the new trial proceedings:
“In paragraphs 280-288 [C. 352-56] of his amended petition, Miller alleges that his appellate counsel were ineffective during their investigation and preparation for his motion for a new trial and on direct appeal. Miller claims that his appellate counsel were ineffective in the following areas: 1) that his appellate counsel did nothing to independently investigate his case (Paragraphs 282-83) [C. 352-53], 2) that appellate counsel were ineffective in arguing that trial counsel was ineffective for withdrawing the insanity defense and failing to present evidence in the guilt phase to negate intent (paragraph 284) [C. 353-54], 3) that appellate counsel failed to obtain medical records for Miller and his family and failed to have Miller independently examined by a mental health expert (Paragraphs 285-86) [C. 354-55], 4) and that appellate counsel failed to raise additional claims of error during the motion for new trial such as trial counsel’s allegedly ineffective performance during voir dire (Paragraphs 287)[C. 355-56.]
“Miller’s claim is denied because he has failed to prove that his appellate counsel’s performance during the motion for new trial hearing and on direct appeal was deficient and unreasonable. Miller also failed to demonstrate that appellate counsel’s performance was not the product of a strategic decision.
“Miller’s appellate counsel went to great lengths to fully investigate the issue of ineffectiveness of trial counsel during the hearing on Miller’s motion for new trial. After being appointed as appellate counsel for Miller and filing a motion for new trial, appellate counsel obtained several continuances for the hearing on the motion for new trial in order for the trial transcript to be prepared. [Direct Appeal, C. 132.] Appellate counsel utilized this time to investigate, research and prepare to present several claims of ineffective assistance of trial counsel.
“Appellate counsel Billy Hill testified at the Rule 32 hearing that during this time before the trial transcript was completed, he met with Miller in the Shelby County jail an obtained general family background information. [August 2008 Rule 32 Hearing, R. 13, 15.] Hill also testified that he reviewed reports of trial counsel’s conduct in the local newspapers and both Hill and appellate counsel Haran Lowe testified that they interviewed and discussed the trial with Barbara Miller, Alan’s mother. [August 2008 Rule 32 Hearing, R. 22, 30, 84.] During the interview with Ms. Miller, appellate counsel was alerted to the possible history of mental illness in Miller’s family. [August 2008 Rule 32 Hearing, R. 30-31.] As a result, appellate counsel attempted to obtain access to the mental health records of Miller’s grandfather and father from Bryce Hospital but was unsuccessful. [August 2008 Rule 32 Hearing, R. 34, 86.]
“Hill and Lowe received the trial transcript on November 2, 2000, studied the *368 transcript and identified potential errors and defects in trial counsel’s performance. [August 2008 Rule 32 Hearing, R. 23, 84-85.] After examining the transcript, appellate counsel conducted legal research, reviewed Dr. Scott’s report of his evaluation of Miller, acquired and reviewed [lead] trial counsel Johnson’s entire case file, and gathered newspaper articles about Miller’s trial that were written in the Shelby County area. [August 2008 Rule 32 Hearing, R. 60.] Finally, Hill testified that they interviewed Johnson in preparation for the hearing on the motion for new trial. [August 2008 Rule 32 Hearing, R. 36.]
“Based on this investigation and after spending a great deal of time thinking about Miller’s case, Hill testified that he identified several major concerns regarding trial counsel’s performance. [August 2008 Rule 32 Hearing, R. 41-43, 58.] Specifically, Hill stated that he was concerned about trial counsel Johnson’s failure to present a mental capacity argument during the guilt phase, that Johnson dropped the insanity defense, that Johnson had a ‘defeatist attitude’ and that there was significant pre-trial publicity. [August 2008 Rule 32 Hearing, R. 41-42.] Accordingly, Hill testified that he focused on preparing to present those claims that would provide the strongest argument for relief during the hearing on the motion for new trial. [August 2008 Rule 32 Hearing, R. 63.]
“To address the specific concerns regarding trial counsel’s performance, Hill called Johnson to testify during the December 7, 2000, hearing. [Direct Appeal, Motion for New Trial Hearing, R. 4-110.] During the evidentiary hearing, Hill stated his strategic purpose for calling Johnson [was]: 1) to emphasize statements made by Johnson before trial that were prejudicial, 2) to show that essentially no mitigation testimony was presented, and 3) that trial counsel did not present mental health evidence during the case in chief. [August 2008 Rule 32 Hearing, R. 43.]
“A review of appellate counsel’s questioning of Johnson during the December 7, 2000 motion for new trial hearing demonstrates that Hill thoroughly examined Johnson on those issues. The focal point of Hill’s examination of Johnson centered on Johnson’s strategy during the guilt phase of Miller’s trial. [Motion for New Trial Hearing, R. 14-17, 29-37.] Hill specifically asked Johnson whether he actually had a theory of defense to the charge of capital murder. [Motion for New Trial Hearing, R. 14.] After Johnson stated that the evidence of guilt was too overwhelming, Hill then probed Johnson on why he did not have Dr. Scott ‘make an examination as to whether or not his delusional diagnosis could have impacted his ability to form a specific intent’ so that a manslaughter defense could have been argued during the guilt phase. [Motion for New Trial Hearing, R. 16.] Hill then elicited testimony from Johnson that he did not use the readily available evidence in Dr. Scott’s report that Miller was in a delusional state, made no attempts to shoot witnesses, made no attempt to cover up the crime, and that Miller did not understand what was going on to argue during the guilt phase that Miller could not form specific intent necessary to sustain a conviction for capital murder. [Motion for New Trial Hearing, R. 28-29, 36-37.] Finally, in response to Hill’s questioning, Johnson agreed that he had ‘conceded the guilt phase of this case.’ [Motion for New Trial Hearing, R. 35.]
“Next, Hill introduced reports from a number of newspapers, including the Birmingham News, which preceded Miller’s trial. [Motion for New Trial Hear- *369 mg, R. 50.] Hill then questioned Johnson on why he was not concerned that comments Johnson made in the Birmingham News regarding the withdrawal of the insanity plea could have been prejudicial. [Motion for New Trial Hearing, R. 52.] Hill then asked Johnson whether he was aware of the extensive coverage of Miller’s case and why Johnson did not move for a change of venue. [Motion for New Trial Hearing, R. 54.]
“Finally, Hill questioned Johnson regarding his trial strategy during the penalty phase, Johnson’s investigation of mitigating evidence and the presentation of mitigation evidence during the penalty phase. [Motion for New Trial Hearing, R. 17-25, 65-70.] Johnson testified that his strategy during the penalty phase involved presenting the testimony of Dr. Scott to demonstrate that Miller suffered from a diminished capacity. [Motion for New Trial Hearing, R. 17-18.] Hill then repeatedly questioned Johnson on the reasons he did not present additional mitigating evidence such as testimony concerning Miller’s bad relationship with his father, the testimony of Miller’s family members, specifically his mother, Barbara Miller, concerning Miller’s background and evidence of Miller’s grandfather’s psychiatric issues. [Motion for New Trial Hearing, R. 20-24, 65-68.]
“In a further attempt to prove the trial counsel was ineffective in the presentation of mental health evidence, appellate counsel sought and were granted funds to hire Dr. Bob Wendorf, a clinical psychologist who testified at the January 31, 2001 hearing on Miller’s motion for new trial. [Direct Appeal, C. 132.] Appellate counsel Hill stated that he made a strategic decision to call Dr. Wendorf in order to show that based on the information available in Dr. Scott’s report, there were additional psychological diagnoses that could have pertained to Miller that were not pursued by trial counsel. [August 2008 Rule 32 Hearing, R. 44, 70.] Specifically, based on the information contained in Dr. Scott’s report that Miller described himself as being in a dream state during the shootings, Dr. Wendorf testified that such actions were consistent with symptoms of a dissociative disorder such as post-traumatic stress disorder or multiple personality disorder. [Motion for New Trial Hearing, R. 144-46.] Hill then elicited from Dr. Wendorf that the effects of such disorders could have had an impact on the ability to form intent. [Motion for New Trial Hearing, R. 147.]
“Finally, in an effort to prove that trial counsel had not presented adequate mitigation evidence during the penalty phase, appellate counsel called Aaron McCall, an employee of the Alabama Prison Project to testify during the January 31, 2001 hearing. [Motion for New Trial Hearing, R. 157-175.] Hill testified during the evidentiary hearing that the strategic purpose for calling McCall was to prove that a qualified mitigation expert witness was available to conduct a full mitigation investigation of Miller’s life. [August 2008 Rule 32 Hearing, R. 49.] In fact, in an effort to demonstrate that mitigation experts were available at the time of Miller’s trial, appellate counsel Lowe introduced a letter sent by McCall to trial counsel Johnson in August of 1999 in which the Alabama Prison Project offered services and assistance in providing mitigating evidence for the trial. [Motion for New Trial Hearing, R. 158-60.]
“The evidence presented during the Rule 32 evidentiary hearing demonstrates that both appellate counsel vigorously investigated Miller’s case in *370 preparation for presenting a ease of ineffective assistance of counsel and adequately presented such claims during the December 7, 2000 and January 31 2001 hearings on Miller’s motion for new trial. Miller has not met the burden of demonstrating that his appellate counsel’s performance was deficient under the first Strickland prong. Miller has failed to establish that appellate counsel’s performance was so unreasonable that no competent counsel would have investigated and presented claims of ineffective assistance of trial counsel during the motion for new trial hearing and on direct appeal in the manner in which appellate counsel Hill and Lowe presented Miller’s case. See Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir.2001).
“Contrary to Miller’s claims in paragraph 282 of his amended petition that appellate counsel did not interview family members, Hill and Lowe specifically stated that they interviewed Barbara Miller in preparation for the hearing on the motion for new trial. [August 2008 Rule 32 Hearing, R. 30, 84.] Contrary to Miller’s claims that appellate counsel did not obtain any documents pertaining to Miller’s life and background, both of his appellate counsel testified that they unsuccessfully attempted to obtain Miller’s family psychiatric records. [August 2008 Rule 32 Hearing, R. 34, 86.] Simply because appellate counsel were unsuccessful in obtaining these records does not demonstrate deficient performance. Furthermore, even if the mental health records of Miller’s family members were obtained, Miller has failed to establish that a competent attorney would have introduced such records. Both Hill and Lowe testified that in their extensive experience defending capital murder cases, neither had introduced the psychiatric or medical records of a defendant’s extended family. [August 2008 Rule 32 Hearing, R. 69, 103.]
“Furthermore, although Hill testified that he did not interview other family members or accumulate other documents, Miller failed to present any evidence during the evidentiary hearing as to why appellate counsel did not conduct further interviews or obtain more of Miller’s records. Miller failed to question appellate counsel on the strategic reasons for how appellate counsel conducted their investigation in this regard. There is a strong presumption that counsel’s performance was within the ‘wide range of reasonable professional assistance.’ Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir.2001). ‘An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [because] where the record is incomplete or unclear about [counsel’s] actions, [the court] will presume that he did what he should have done, and that he exercised reasonable professional judgment.’ Chandler v. United States, 218 F.3d 1305, 1315, n. 15 (11th Cir.2000). Because the record is silent as to why appellate counsel did not interview more of Miller’s family members and obtain additional educational, mental, or employment records, this Court must presume that appellate counsel acted reasonably in representing Miller. For that reason, Miller’s claims should be denied.
“Although Miller claims that appellate counsel ineffectively argued that trial counsel failed to present mental health evidence during the guilt phase that would have negated the intent for capital murder, Hill specifically questioned Johnson on his failure to present evidence of Miller’s mental condition during the guilt phase. [August 2008 Rule 32 Hearing, R. 64.] Hill testified that *371 he and Lowe made a strategic decision to challenge trial counsel’s performance in this regard during the guilt phase. [August 2008 Rule 32 Hearing, R. 66.] Hill’s strategy involved demonstrating that there was evidence within Dr. Scott’s report that suggested Miller did not appreciate the nature and quality of his acts, that this evidence would be significant in mounting a defense to capital murder charges, and that this evidence was not presented during the guilt phase. [August 2008 Rule 82 Hearing, R. 64-64.] Appellate counsel’s strategic choices after conducting extensive legal research and review of the trial transcript and Dr. Scott’s report should not be found to be deficient. See Boyd v. State, 746 So.2d 864, 375 (Ala.Crim.App.1999) (‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’) The ultimate result that appellate counsel’s strategy to attempt to demonstrate ineffective assistance of trial counsel was unsuccessful does not prove deficient performance of appellate counsel. See Davis v. State, [9 So.3d 539, 550 (Ala.Crim.App.2008)] (“‘The fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel.” ’) (quoting Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir.2000)).
“Finally, Miller has not proved that appellate counsel were deficient under Strickland for failing to present additional claims of ineffective assistance of trial counsel during the motion for new trial hearing that have been raised by current post-conviction counsel. [C. 355-56.] To constitute effective assistance, ‘an attorney is not required to raise every conceivable constitutional claim available at trial and on appeal.’ Boyd, 746 So.2d at 376. Moreover, Hill testified during the evidentiary hearing that he had strategic reasons for presenting specific issues of ineffective assistance of trial counsel; Hill testified that he focused on presenting the strongest claims during the motion for new trial hearing. [August 2008 Rule 32 Hearing, R. 63.] Hill testified that he made strategic decisions to focus on trial counsel’s failure to present evidence during the guilt phase, trial counsel’s failure to move for change of venue, and trial counsel’s failure to effectively challenge the aggravating circumstance presented during the penalty phase. [August 2008 Rule 32 Hearing, R. 66-67.] Miller has failed to establish that no competent counsel would have pursued such strategies.
“For these reasons mentioned above, Miller has failed to meet his burden of proof of establishing that his appellate counsel’s performance was deficient under Strickland; therefore Miller’s ineffective assistance of appellate claims are without merit. Accordingly, these claims are denied.”
(C. 1977-1989.)
The circuit court’s finding that Miller failed to prove that his appellate counsel’s performance was deficient is supported by the record. In any event, the circuit court also denied Miller relief on this claim because Miller failed to establish that he was prejudiced by his appellate counsel’s performance, which bring us to the third part of Miller’s argument.
C.
In the third portion of his argument, Miller claims that had appellate counsel adequately argued and supported the claims of ineffective assistance of trial counsel that were addressed in the motion for new trial proceedings and on appeal, he would have been entitled to relief. (Mil *372 ler’s brief, II(B)(2)(a)-(d) at 33-124; Miller’s reply brief at 15-39.)
Before addressing Miller’s specific allegations, we set forth a summary of the evidence that was presented during the hearing on the motion for a new trial:
“At the hearing on Miller’s motion for a new trial, Mickey Johnson, Miller’s [lead] trial counsel, testified. Johnson stated that when he was appointed to represent Miller on the day of the shootings, he had been practicing law for 25 years. He met with Miller shortly after Miller was apprehended and again later that night. That same day, Johnson also met with several Pelham police officers and with Miller’s mother.
“Johnson had litigated five or six capital-murder cases before he was appointed to represent Miller. Roger Bass was initially appointed cocounsel; however, when Bass withdrew, Ronnie Blackwood was appointed to serve as cocounsel.
“Johnson met with Miller on a number of occasions before trial. Before forming a strategy for Miller’s case, Johnson reviewed all of the investigative reports, diagrams, statements, photographs, videotapes, and scientific reports; he also talked with his client. Johnson filed a motion requesting funds for an independent psychological evaluation of Miller. The trial court granted his motion, and Johnson retained Dr. Charles Scott from the University of California to evaluate Miller. After talking with Dr. Scott and reviewing Dr. Scott’s written report, Johnson determined that there was insufficient evidence to raise an insanity defense during the guilt phase. In his opinion, it was better to present Dr. Scott’s testimony during the penalty phase because presenting his testimony at the guilt phase would have negated Dr. Scott’s credibility and lessened the potential impact of the evidence during the penalty phase. Johnson made this decision after reviewing the reports from other mental-health evaluations of Miller, which were consistent with Dr. Scott’s findings.
“After reviewing the evidence, Johnson made a strategic decision to concentrate his efforts and defense on the penalty phase of the trial. In his opinion, the State’s evidence of Miller’s guilt ‘was too overwhelming to seriously contest,’ given that he had no valid legal defense for the guilt phase. Accordingly, Johnson decided to concentrate on saving Miller’s life.
“Johnson focused his efforts during the guilt phase on maintaining credibility with the jury. In accordance with this strategy, he admitted to the jury early on in the proceedings that the evidence of Miller’s guilt was strong because he wanted to lessen the impact of the evidence against Miller. Johnson felt that his duty during the guilt phase was to make the State meet its burden of proof.
“During the penalty phase, Johnson presented a diminished-capacity defense. Through Dr. Scott’s testimony, he presented two mitigating circumstances. He also argued the undisputed mitigating circumstance of no prior criminal history. During the penalty phase, Johnson argued that the State had failed to prove any aggravating circumstances. He also wanted to point out to the jury that the mitigating circumstances were undisputed. Johnson hoped that the jury was looking for a reason not to recommend the death penalty, and that his arguments would give the jury a sound legal basis for recommending a sentence of life imprisonment without the possibility of parole.
*373 “Before the penalty phase, Johnson talked with Miller’s parents and other family members. He considered calling them as witnesses. However, after talking with Miller’s family, he determined that it was best to present Miller’s social and family history through Dr. Scott’s testimony. In Johnson’s opinion, Dr. Scott was a credible witness. Johnson also believed that the support Miller had from his family members during trial was affecting the jury in a positive way. Johnson believed that the jurors sympathized with Miller’s family and he did not want to detract from this sympathy by putting family members on the stand.
“Miller presented testimony from two other witnesses in support of his motion for a new trial. Dr. Bob Wendorf, a clinical psychologist, testified that based on his review of Dr. Scott’s report, he believed there were other possible mitigating factors Johnson could have presented. Miller also elicited testimony from Aaron McCall -with the Alabama Prison Project. McCall indicated that he had sent Johnson a letter in August 1999, offering his services in Miller’s case. However, McCall testified, Johnson never responded to his letter.”
Miller, 913 So.2d at 1159-60.
Miller maintains that his appellate counsel failed to properly present and support the following claims in the motion for a new trial: (1) that trial counsel were ineffective for not presenting a mental disease- or-defect defense during the guilt phase of the trial; (2) that trial counsel’s opening statement at the guilt phase of the trial prejudiced Miller; (3) that trial counsel were ineffective in failing to adequately investigate and present available mitigating evidence during the penalty phase of the trial; and (4) that trial counsel’s penalty-phase opening statement prejudiced Miller.
In order to establish that his appellate counsel were ineffective in the manner in which they presented the claims of ineffective assistance of trial counsel in the new-trial proceedings and on appeal, Miller had to first establish that his underlying claims of ineffective assistance of trial counsel had merit. See Payne v. State, 791 So.2d 383, 401 (Ala.Crim.App.1999), cert. denied, 791 So.2d 408 (Ala.2000) (“Because Payne has failed to establish that his ineffective-assistance-of-trial-counsel claim is meritorious, he has failed to prove by a preponderance of the evidence that his appellate counsel was ineffective for failing to present this claim.”). Therefore, even though Miller’s claims of ineffective assistance of trial counsel were precluded, Miller reasserted many of those claims in support of his argument that had his appellate counsel sufficiently presented and supported those claims in the new-trial proceedings and on appeal,' he would have been entitled to relief. In fact, a majority of the circuit court’s order denying Miller’s Rule 32 petition is addressed to the underlying claims of ineffective assistance of trial counsel. See Covington v. State, 671 So.2d 109, 110 (Ala.Crim.App.1995) (holding that even though a claim of ineffective assistance of trial counsel is barred, the claim must be examined in order to assess appellate counsel’s performance). Thus, we turn to Miller’s specific claims regarding his trial counsel.
1.
Miller contends that his trial counsel were ineffective for “withdrawing the insanity defense and then failing to present available mental health evidence during the trial’s guilt phase.” (Miller’s brief, 11(B)(2)(a), at 33-68; Miller’s reply brief, at 15-23.) As addressed above, appellate counsel asserted in the hearing on the motion for a new trial that Miller’s trial counsel were ineffective for withdrawing *374 his plea of not guilty by reason mental disease or defect. The circuit court denied Miller relief on this claim. On direct appeal, this Court also rejected Miller’s claim that his trial counsel were ineffective for withdrawing his mental-disease-or-defeet plea because we found that Miller’s trial counsel’s decision was “made after a thorough investigation of the relevant law and facts of Miller’s case.” Miller, 913 So.2d at 1161.
Trial counsel’s decision to withdraw the plea of not guilty by reason of mental disease or defect was made after his mental-health experts Dr. Scott and Dr. Barbara McDermott, the psychologist Dr. Scott engaged to assist him, determined that Miller did not meet Alabama’s legal definition of “insanity” at the time the crimes were committed. Miller argues that Dr. Scott’s and Dr. McDermott’s evaluations were incomplete because, he claims, trial counsel failed to provide them with sufficient factual and legal information with which to conduct their evaluations. Thus, he contends, trial counsel’s decision to withdraw the not-guilty-by-reason-of-mental-defect plea was unreasonable because it was based upon incomplete evaluations. He argues that had appellate counsel adequately argued and supported this claim in the motion-for-new-trial proceedings and on appeal, he would have been entitled to relief.
When denying relief on this claim, the circuit court stated:
“In paragraphs 138-147 of his amended petition, Miller claims that his trial counsels’ decision to withdraw the insanity defense was unreasonable. Miller alleges that trial counsels’ reliance on Dr. Scott and Dr. McDermott’s evaluations in deciding to withdraw the not guilty by reason of insanity plea was ineffective because he claims trial counsel did not provide Dr. Scott with adequate background information to support the evaluation. [Amended Rule 32 Petition, C. 308.] Miller also claims that Dr. Scott’s ultimate conclusion that Miller was not insane was ‘equivocal’ and that trial counsel should have provided additional information and documents to Dr. Scott and sought additional expert opinion. [Amended Rule 32 Petition, C. 310.]
“This Court denies Miller’s claim because he has failed to meet his burden of proof of demonstrating that his trial counsel’s performance was deficient under Strickland, 466 U.S. at 688, Ala.R.Crim. P. 32.7(d). Miller’s trial counsel could not be deficient for withdrawing the insanity defense because none of the psychological or psychiatric experts who evaluated Miller before trial concluded that Miller met the legal definition for insanity.
“Miller, through counsel, originally pled not guilty by reason of mental disease or defect. [Direct Appeal, C. 1.] To qualify under the legal definition of insanity, Miller bore the burden or demonstrating that he ‘was unable to appreciate the nature and quality or wrongfulness of his acts.’ Ala.Code § 13A-3-1. However, as demonstrated during trial and the [Rule 32] evidentiary hearing, none of the four mental health experts who examined Miller concluded that he was unable to appreciate the nature and quality of his actions. [Direct Appeal, R. 1384; Motion for New Trial Hearing, R. 72-74; February 2008 Rule 32 Hearing, R. 248.]
“Dr. James Hooper, a psychologist at the Taylor Hardin Medical Facility, first evaluated Miller and concluded in his report on October 8, 1999 that Miller ‘does not have a mental illness that would have compromised his understanding of the nature, quality, or *375 wrongfulness of his behavior.’ [Miller’s Rule 32 Exhibit, 29-0211.] Dr. Harry McClaren, a psychologist hired by the State of Alabama, also evaluated Miller to determine whether Miller qualified under Alabama’s insanity statute. On December 2, 1999, Dr. McClaren ultimately concluded that Miller did not meet the legal definition of insanity and that there was no evidence that he was unable to appreciate the nature and quality of his actions. [Miller’s Rule 32 Exhibit, 27-0033.]
“Finally, as noted above, trial counsel retained Dr. Charles Scott, a psychiatrist, for the purpose of determining whether Miller was legally insane at the time of the shootings. Dr. Scott engaged in an extensive evaluation of Miller including a three-day assessment of Miller himself, interviews of family members, and the examination of numerous documents and reports. [Direct Appeal, R. 1345-48.] Dr. Scott also retained Dr. Barbara McDermott to administer various psychological tests to Miller. [February 2008 Rule 32 Hearing, R. 316] However, after concluding this investigation, Dr. Scott stated in his report that in his opinion, Miller was not unable to appreciate the nature and quality of his actions or the wrongfulness of his conduct. [Miller’s Rule 32 Exhibit, 29-0022; Direct Appeal, R. 1384, February Rule 32 Hearing, R. 251.]
“Thus, trial counsel could not have provided any expert opinion testimony to credibly argue to the jury that Miller was legally insane. Any argument that Miller was legally insane could have been effectively rebutted from Miller’s own expert’s conclusion that he was not insane. [Direct Appeal, R. 1384.] Johnson testified that he was aware of each of these reports and that neither Dr. Hooper’s, nor Dr. McClaren’s, nor Dr. Scott’s reports conflicted on the issue of Miller’s sanity at the time of the offense. [Motion for New Trial Hearing, R. 73-74; February 2008 Rule 32 Hearing, R. 251.] Johnson testified that after receiving Dr. Scott’s report, he discussed the findings with Dr. Scott and ultimately decided to withdraw the insanity defense on May 24, 2000 [February 2008 Rule 32 Hearing, R. 91-92.] Johnson stated during the [Rule 32] evidentiary hearing that if any of the four doctors who evaluated Miller had declared that Miller was insane at the time of the offense, such a finding would have altered his strategy and that he would have used that opinion as part of his defense. [February 2008 Rule 32 Hearing, R. 248.]
“Trial counsel’s decision to withdraw the insanity plea was not an unreasonable decision. The withdrawal of the insanity defense was the product of a strategic decision made after both consultation with a mental health expert hired for the express purpose of evaluating Miller’s sanity and consideration of additional investigation and expert opinions. Based on the unequivocal conclusions of all four examining doctors that Miller was not unable to appreciate the wrongfulness of his actions at the time of the offense, trial counsel’s decision to withdraw the not guilty by reason of insanity plea was not deficient and entirely reasonable based on the information and evidence available to trial counsel. Therefore, this claim should be denied.
“This claim is also denied because Miller has failed to meet his burden of proof demonstrating that he was prejudiced by his trial counsel’s performance. See Strickland, 466 U.S. at 695, Ala.R.Crim. P. 32.7(d). Miller was not prejudiced by his trial counsel’s withdrawal *376 of the insanity plea because no evidence has been presented during the evidentia-ry hearing that Miller could not appreciate the wrongfulness of his actions and therefore would have been eligible for a not guilty by reason of mental defect or insanity plea.
“Although Miller now claims that his trial counsel should have presented more information to Dr. Scott or obtained additional expert opinion regarding Miller’s sanity, the record indicates that even if such additional measures were taken, the result would be the same: that Miller does not meet the requirements for insanity under Alabama law. At the evidentiary hearing, Dr. [Catherine] Boyer [Miller’s Rule 32 psychologist] testified that in her opinion, Miller experienced a dissociative episode at the time of the shootings and that this opinion would be important as a mental health professional in determining whether Miller was sane or insane at the time of the shootings. [February 2008 Rule 32 Hearing, R. 719-20.]
“However, incredibly, Dr. Boyer never testified that in her opinion, Miller was legally insane at the time of the shootings. When pressed on this crucial question by counsel for the State, Dr. Boyer stated ‘I really don’t know if I can answer it.’ [February 2008 Rule 32 Hearing, R. 757.]) Most importantly, Dr. Boyer testified that after her complete investigation, if she had been called to testify as to Miller’s sanity at the time of trial, she would have had no opinion. [February 2008 Rule 32 Hearing, R. 758.] Therefore, Miller has failed to present any evidence that a mental health expert would have been available to testify at trial that Miller was insane at the time of the shootings.
Miller also failed to present any evidence during the evidentiary hearing that conflicts with the evidence and expert opinion regarding Miller’s sanity at the time of trial. Dr. Scott never testified that his opinion at the time of trial that Miller was not unable to appreciate the nature and quality or wrongfulness of his actions had changed. Although Dr. Scott stated that it was ‘possible’ that had he obtained additional information and conducted additional testing relating to a dissociated disorder his diagnosis could have changed, he failed to testify that such information did in fact change his opinion. [February 2008 Rule 32 Hearing, R. 364.] Like Dr. Boyer, Dr. Scott never testified that in his opinion, Miller met the requirements for insanity under Alabama law.
“Equally as important in determining that Miller was not prejudiced by the withdrawal of the insanity plea was the testimony of Dr. McClaren during the [Rule 32] evidentiary hearing. Before trial in the fall of 1999, Dr. McClaren was hired to conduct a forensic psychological evaluation of Miller. [February 2008 Rule 32 Hearing, R. 773.] After conducting his evaluation, Dr. McClaren concluded that Miller was a ‘non psychotic man of average intelligence.’ [February 2008 Rule 32 Hearing, R. 778.] Dr. McClaren also concluded that Miller was not insane under Alabama law at the time of the offense. [February 2008 Rule 32 Hearing, R. 780.]
After becoming involved in the case again for purposes of this Rule 32 proceeding, Dr. McClaren testified that he reviewed additional testimony, the reports of Dr. Scott and Dr. McDermott, additional psychological testing, school records as well as the testimony during the evidentiary hearing. [February 2008 Rule 32 Hearing, R. 783-84.] Dr. McClaren then testified that after his review of this new information, nothing had changed his opinion that Miller was *377 not legally insane at the time of the shootings. [February 2008 Rule 32 Hearing, R. 792-93.]
“The testimony of all three mental health experts during the evidentiary hearing as well as the evidence contained in the mental health reports issued during the trial and the trial record itself are consistent: all indicate that Miller was not unable to appreciate the nature and quality or wrongfulness of his actions. No testimony has even been presented during trial or in this Rule 32 proceeding that Miller was insane at the time of the shootings under Alabama law. Therefore, Miller has failed to demonstrate a reasonable probability that the outcome of his proceeding would have been different had trial counsel not withdrawn the insanity plea because the record resoundingly evidences that Miller was in fact not insane at the time of the shootings. Accordingly, because Miller has failed to demonstrate prejudice under Strickland, this claim is denied.”
(C. 2029-2037.)
The record supports the circuit court’s conclusion that trial counsel made a strategic decision to withdraw the plea of not guilty by reason of mental disease or defect after consulting with a psychiatrist who evaluated Miller for the express purpose of determining whether Miller suffered from a mental disease or defect at the time of the shootings and after also considering the results of evaluations by three other mental-health experts, each of whom concluded that Miller did not meet Alabama’s definition of “insanity” at the time of the shootings. “This is precisely the type of strategic choice, based on counsel’s examination of the relevant facts and legal principles, that our cases have deemed to be virtually unchallengeable.” Key v. State, 891 So.2d 353, 376 (Ala.Crim.App.2002). As the circuit court in Key aptly noted:
“‘[T]he day a lawyer is supposed to come in here and make motions and enter pleas for which he or she has no basis and in fact their education, training, experience, and their life’s experience and their discussions with their [expert] provide them with no basis and you can say that that’s incompetency[,] that’s going to be a dark day in our legal system.’ ”
891 So.2d at 376.
a.
Within the argument that Miller’s trial counsel were ineffective for withdrawing his not-guilty-by-reason-of-mental-disease- or-defect plea, Miller lists various documents and information that, he claims, his trial counsel should have furnished to Dr. Scott in order for Dr. Scott’s sanity evaluation to be complete. Specifically, Miller contends that his trial counsel should have provided Dr. Scott with: (1) Miller’s files from evaluation performed at the Taylor Hardin Secure Medical Facility; (2) Dr. McClaren’s report and files; (3) the tape of Miller’s police interrogation; (4) comprehensive information concerning the Miller’s family mental-health history; and (5) comprehensive information concerning the physical trauma inflicted on Miller by his father. (Miller’s brief, Issue II(B)(2)(a)(i)(A)-(E), at 38-50; Miller’s reply brief, at 15-23.)
Miller’s claim that his trial counsel should have provided Dr. Scott with the above-mentioned documents was presented in a different context in the amended Rule 32 petition. In his petition, Miller presented these allegations within his claim that his trial counsel were ineffective because counsel failed to investigate certain mental-health evidence. (Miller’s amended Rule 32 petition, claim 1(A)(1)(d), C. 295- *378 305.) We note this fact because that is the context in which this claim was addressed by the circuit court in its order denying relief. (C. 2009-26.)
Regardless, the gist of Miller’s assertion is that his trial counsel should have done more, i.e., trial counsel should have provided more information to Dr. Scott for his consideration in assessing Miller’s mental health at the time of the crimes. Accordingly, the circuit court correctly began its analysis by examining what Miller’s trial counsel did do. See Chandler v. United States, 218 F.3d 1305, 1320 (11th Cir.2000) (“Although Petitioner’s claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact.”). The circuit stated the following in this regard:
“Contrary to Miller’s claims, as the Court of Criminal Appeals has previously held regarding this issue on direct appeal, ‘[t]his is not a case where counsel failed to investigate a potential mental-health defense or neglected to interview potential defense witnesses.’ Miller v. State, 913 So.2d 1148, 1161 (Ala.Crim.App.2004). Instead, Miller’s mental health was of chief concern, initially trial counsel’s main theory of defense and ultimately became the central focus of Miller’s penalty phase strategy.
“The record demonstrates that trial counsel conducted an extensive and thorough investigation of Miller’s mental health. Miller, through trial counsel, originally pleaded not guilty by reason of insanity. [Direct Appeal, C. 1.] Trial counsel Johnson was familiar with mental disease defenses based on his previous involvement in capital murder cases in which psychological issues had been raised. [February 2008 Rule 32 Hearing, R. 211.] Based on the interviews of his family, Johnson discovered Miller’s family history of mental illness. [February 2008 Rule 32 Hearing, R. 252.] Johnson also was aware that Miller had difficulty early on remembering specific facts relating to the actual shootings and that Miller had been given a mental evaluation at Taylor Hardin Medical Facility. [February 2008 Rule 32 Hearing, R. 42, 44-45.]
“As a result, Johnson motioned the trial court to grant additional funds to hire psychological expert assistance. [Direct Appeal, C. 50-55.] The trial court granted the motion and Johnson retained Dr. Charles Scott to conduct psychiatric and psychological evaluations of Miller in order to determine whether an insanity defense would be justified. [February 2008 Rule 32 Hearing, R. 48.] In preparation for Dr. Scott’s evaluation, Johnson forwarded over ninety three pages of materials to Dr. Scott including numerous witness statements, statements from Miller’s co-workers, police incident reports, and a copy of Dr. James Hooper’s evaluation of Miller at Taylor Hardin. [Direct Appeal, R. 1345; February 2008 Rule 32 Hearing, R. 63, 318.]
“In response to Dr. Scott’s request to interview Miller’s family members who were living with him at the time of the shootings, Johnson arranged for Dr. Scott to interview Miller’s mother Barbara, and his brother Richard, and his sister, Cheryl. [February 2008 Rule 32 Hearing, R. 314-15.] Johnson also attempted to obtain the records of Miller’s grandfather Hubert Miller, but was unsuccessful. [February 2008 Rule 32 Hearing, R. 252.] Dr. Scott never testified that he was not provided with any document that he specifically requested from trial counsel; Johnson confirmed this fact stating that T don’t think that Dr. Scott asked for anything that he was not supplied.’ [February 2008 Rule 32 Hearing, R. 76.]
*379 “After compiling this information, [Scott] interviewed and evaluated Miller over a three day period. [February 2008 Rule 32 Hearing, R. 314.] Dr. Scott also enlisted the services of a psychologist, Dr. Barbara McDermott, who conducted a psychological evaluation of Miller. [February 2008 Rule 32 R. 315-16.] After the evaluation was completed, Dr. Scott diagnosed Miller with having a delusional disorder and a psychiatric personality disorder; however, Dr. Scott concluded that Miller was not unable to appreciate the wrongfulness of his actions and therefore did not qualify under Alabama’s legal definition for insanity. [February 2008 Rule 32 Hearing, R. 325-26, 335.]”
(C. 2009-13.)
With the above in mind, we now direct our focus to the specific information that Miller claims his trial counsel should have provided to Dr. Scott in order for Dr. Scott’s sanity evaluation of Miller to be complete.
(i)
Miller was evaluated by Dr. James F. Hooper at the Taylor Hardin Secure Medical Facility on October 4, 1999, for the purpose of assessing Miller’s competence to stand trial and his mental state at the time of the murders. Hooper concluded that Miller was not suffering from a mental disease or defect at the time of the crimes. Although trial counsel provided Dr. Hooper’s report to Dr. Scott, trial counsel did not provide Dr. Hooper’s entire case file to Dr. Scott. Miller contends that his trial counsel was ineffective for not providing Dr. Hooper’s entire case file to Dr. Scott because the Taylor Hardin file contained documents and notes indicating that Miller suffered from memory loss at the time of the offenses. Miller maintains that without that additional information, Dr. Scott’s evaluation was incomplete. (Miller’s brief, II(B)(2)(a)(i)(A), at 39-41.)
The circuit court found that Miller failed to establish that his trial counsel rendered ineffective assistance for not providing Miller’s entire Taylor Hardin file to Dr. Scott. The circuit court stated:
“Although not alleged in the petition, during the evidentiary hearing Miller questioned Dr. Scott on whether Johnson also provided Dr. Hooper’s backup or underlying file as part of the documents Johnson provided to Dr. Scott. [February 2008 Rule 32 Hearing, R. 320-21.] However, Miller has failed to produce any evidence that Johnson had access to or could have obtained Dr. Hooper’s underlying file. Moreover, Miller has' failed to produce any evidence that a reasonable attorney would have provided another expert’s underlying file to an expert retained to conduct psychiatric evaluations on a defendant.”
(C. 2015.)
The circuit court’s findings are supported by the record.
(Ü)
Miller was also evaluated by Dr. Harry A. McClaren, a psychologist retained by the State of Alabama, who concluded that Miller did not did meet Alabama’s definition of “insanity” at the time of the shootings. Miller argues that his trial counsel rendered ineffective assistance by not sending a copy of Dr. McClaren’s written report and a copy of Dr. McClaren’s file to Dr. Scott. (Miller’s brief, II(B)(2)(a)(i)(B), at 41-45.)
In support of this assertion, Miller contends that Dr. McClaren’s report contained critical information indicating that Miller suffered from periods of amnesia shortly before and during the shootings and that Dr. McClaren hypothesized that Miller may have suffered a period of disso *380 ciation at the time of the shootings. (Miller’s brief at 42, citing Miller’s Rule 32 Exhibit 27-0030 to -0031.) Miller additionally asserts that trial counsel did not apprise Dr. Scott and Dr. McDermott of Dr. McClaren’s hypotheses, nor did trial counsel request that Dr. Scott and Dr. McDermott administer any tests to determine if Miller suffered from a dissociative or trauma-related disorder.
Miller further argues that his trial counsel should have furnished Dr. Scott with Dr. McClaren’s file because the file contained: (1) Dr. McClaren’s annotation that Miller denied any memory of the shootings; (2) Dr. McClaren’s interview notes with the arresting officer who confirmed that Miller was confused at the time of the arrest; (3) Dr. McClaren’s interview notes with a Shelby Chilton Mental Health Center employee who saw Miller a day after the shooting and who indicated that Miller may have been in shock when the employee saw him; and (4) the results of various tests performed by Dr. McClaren that supported the hypothesis that Miller was suffering a period of dissociation at the time of the shootings. (Miller’s brief, at 44, citing Miller’s Rule 32 Exhibit 27.)
In denying relief on this claim, the circuit court wrote:
“Miller has failed to demonstrate prejudice under Strickland because the record indicates that the additional information he claims his trial counsel should have provided to Dr. Scott did not contain any additional information that Dr. Scott was not already made aware of during his evaluation. For instance, Miller claims that his trial counsel was ineffective for failing to provide Dr. Scott a copy of Dr. McClaren’s report of his evaluation of Miller. [Amended Rule 32 petition, C. 297.] During the eviden-tiary hearing, Miller attempted to show [that] Dr. McClaren’s report would have been significant to Dr. Scott because Dr. McClaren documented that Miller claimed amnesia during the shootings, that Dr. McClaren opined that a period of dissociation was possible after Miller reported experiencing ‘tunnel vision,’ and because the report noted that Miller was confused as to why he was arrested.
“However, Dr. Scott was already aware that Miller claimed to have difficulty remembering the events and circumstances of the shootings. Dr. Scott testified during the penalty phase of the trial that Miller ‘had difficulty recalling what happened and questioned the events had even occurred.’ [Direct Appeal, R. 1378.] Dr. Scott also noted Miller’s difficulty remembering the shootings in his report and reported that Miller ‘wondered if it was a bad dream.’ [Miller’s Rule 32 Exhibit 29-0010.] Dr. Scott also was provided with the psychological report of Dr. Hooper, which stated that Miller ‘has no memory of the index events.’ [Miller’s Rule 32 Exhibit 29-0208.]
“Although Miller contends that it was significant that Dr. McClaren listed the possibility of a brief period of dissociation because of Miller’s self-report of experiencing ‘tunnel vision,’ ultimately, Dr. McClaren did not diagnose Miller with any type of dissociative disorder. [Miller’s Rule 32 Exhibit, 27-0039.] Moreover, Dr. Scott was also aware that Miller claimed to experience ‘tunnel vision’ and included this fact in his own report. [Miller’s Rule 32 Exhibit, 29-0010.] Thus, Dr. Scott had access to the very same information that led Dr. McClaren to suggest the possibility of a period of dissociation.
“Finally, Dr. Scott was also aware that Miller had a confused state of mind at the time he was arrested by law *381 enforcement officials. As Dr. Scott stated in his report,
“ ‘[Miller] said that the first time he realized that police were following him occurred when he heard the sirens and he felt that his “thoughts were spinning.” When asked to describe this he said that he had brief thoughts of the shootings and thought that “this didn’t make sense. I couldn’t explain it.” ’
“[Miller’s Rule 32 Exhibit, 29-0010.] Dr. Scott also reported that at the time he was arrested, Miller recalled being ‘somewhat confused and thought that he might go home and wondered “why was I going home’” and that after being taken to jail “when he first woke up, he thought he might be at home but when he recognized that he was in jail he realized that the “[flashes] in my mind might be real.” ’ [Miller’s Rule 32 Exhibit, 29-0010-11.] Because the record indicates Dr. Scott had knowledge of substantially the same information contained in Dr. McClaren’s report, Miller has failed to demonstrate how the failure to provide Dr. McClaren’s report impacted Dr. Scott’s evaluation. Therefore, Miller cannot demonstrate a reasonable probability that the result of his proceeding would have been different.”
(C. 2016-19.)
The circuit court’s findings are supported by the record.
(hi)
After Miller was arrested, he was interrogated by the police. The interrogation was apparently recorded on either an audiotape or videotape.[4] Miller’s trial counsel, Mickey Johnson, was quoted in the press on the day of trial as stating that “he ha[d] studied pictures and videotapes of Miller made at his arrest ‘and there [was] this look of total disconnect or total indifference, one or the other.’ ” (Miller’s brief at 45, citing Miller’s Rule 32 Exhibit 35-0070.) Miller asserts that his trial counsel rendered ineffective assistance because Johnson did not provide Dr. Scott with a copy of the interrogation tape that Johnson was presumably referencing in his comments to the press, despite Dr. Scott’s request that counsel send him any statements Miller made near the time of the shootings. (Miller’s brief, II(B)(2)(a)(i)(C), at 45-46.) Miller contends that the tape recording could have, helped Dr. Scott determine whether “Miller was actually fleeing because he appreciated he had committed wrongful acts or if he was genuinely surprised that he was being apprehended or charged as a result of his alleged actions.” (Miller’s brief, at 45, quoting Miller’s Rule 32 Exhibit, 29-0023.)
The circuit court denied Miller relief on this assertion, stating:
“Although not alleged in his amended petition, Miller attempted to suggest during the evidentiary hearing that trial counsel was ineffective for not submitting to Dr. Scott an audio/videotape of Miller’s statement to the police. [February 2008 Rule 32 hearing, R. 78-80.] However, the audio/videotape of Miller’s statement was not submitted into evidence during the evidentiary hearing. [February 2008 Rule 32 hearing, R. 529-30.] Miller also failed to present any *382 proof of what actual evidence was contained on the audio/videotape. Therefore, because there is nothing in the record indicating what was contained in this evidence, Miller cannot establish how he was prejudiced by his trial counsel not providing the audio/videotape to Dr. Scott.”
(C. 2022-23.)
Miller contends that the circuit court’s conclusion that there was nothing in the record indicating what was contained on the interrogation tape is clearly erroneous. Miller bases this assertion on the fact Dr. McClaren noted in his file that in a taped interview with police, Miller said, “ ‘I’m being charged with something? ... I don’t understand anything you’re saying’ while looking down at the floor without any eye contact.” (Miller’s reply brief, at 16 n. 2, citing Miller’s Rule 32 Exhibit 27-0027.) Even assuming that Dr. McClaren is referencing the same tape that trial counsel Johnson alluded to in his statement to the press, Miller would still be due no relief on this claim for the reasons discussed in Part II.C.l.a(ii), supra.
(iv)
Miller maintains that his trial counsel failed to adequately “investigate the multi-generational history of mental illness in the Miller family, which, if known, would have played a crucial role in Dr. Scott’s evaluation [of Miller’s sanity at the time of the crimes.]” (Miller’s brief, Issue II(B)(2)(a)(i)(D), at 46-48.)
The circuit court stated the following in denying relief on this claim:
“Trial counsel’s investigation into Miller’s mental health was reasonable and Miller has failed to meet his burden of establishing deficient performance. Contrary to Miller’s claims, trial counsel attempted to obtain the mental health records of [Miller’s] grandfather, Hubert Miller, but was unsuccessful. [February 2008 Rule 32 Hearing, R. 252.] Miller has not presented any evidence that trial counsel’s attempts were unreasonable. Even if trial counsel had not attempted to obtain Miller’s family mental health records, Miller cannot demonstrate that trial counsel’s performance in this regard was deficient. Miller failed to present any evidence that Dr. Scott specifically requested such records and Miller failed to prove that a reasonable, competent attorney would have independently obtained and presented the mental health records of a defendant’s extended family. Notably, the evidence indicates a reasonable attorney would not have investigated and presented such records. Miller’s trial counsel, Mickey Johnson and Ronnie Blackwood, as well as his appellate counsel, Billy Hill and Haran Lowe, all testified in their numerous years of criminal experience, none had ever introduced the mental health records or medical records of a defendant’s family. [February 2008 Rule 32 Hearing, R. 253, 872; August 2008 Rule 32 Hearing, R. 68-69, 103.]
[[Image here]]
“This Court also denies this claim because Miller has failed to meet his burden of proof of establishing that he was prejudiced by his trial counsel’s alleged failure to adequately investigate mental health evidence. See, Strickland, 466 U.S. at 687; Ala. R.Crim. P., 32.7(d). Even if Miller could have proven that his trial counsel’s performance were deficient in failing to provide certain records to Dr. Scott, Miller failed to elicit any testimony from Dr. Scott that his report was incomplete or inaccurate due to a lack of necessary records or information. While Dr. Scott testified that additional information ‘could’ have been important in his evaluation, he failed to state how his evaluation was inadequate, *383 specifically in regards to documenting Miller’s mental health problems. [February 2008 Rule 82 hearing, R. 362-65.]
“Furthermore, Miller has faded to demonstrate prejudice under Strickland because the record indicates that the additional information he claims his trial counsel should have provided to Dr. Scott did not contain any additional information that Dr. Scott was not already made aware of during his evaluation....
[[Image here]]
“Dr. Scott ... had a knowledge of Miller’s family history of mental illness. In his report, Dr. Scott devoted a section to Miller’s ‘Family Psychiatric History’ and discussed that Ivan Miller [Miller’s father] exhibited unusual behavior, that Miller’s grandfather, Hubert Miller, had been committed to a psychiatric institution, and that his brother Richard was described as ‘slow.’ [Miller’s Rule 32 Exhibit, 29-0006]. This information was then presented to the jury during Dr. Scott’s penalty phase testimony. [Direct Appeal, R. 1362-63.] During the evidentiary hearing, Dr. Scott testified that a family history of psychotic disorders could impact the vulnerability and likelihood that an individual would have a mental disorder. [February 2008 Rule 32 Hearing, R. 307.] Therefore, because he was aware that Miller’s family had a history of psychiatric problems, Dr. Scott had readily available information suggesting Miller would be more vulnerable to having a mental disorder.
“Although Miller now claims that his trial counsel should have also provided the mental health records of his great-grandmother Victoria Granade, his father, Ivan Miller, and his uncle James Miller, Miller has failed to present any evidence that these individuals were diagnosed or how such undiagnosed mental illnesses could have impacted Miller’s diagnosis. Similarly, although Miller claims the records of his grandfather Hubert Miller, which report a diagnosis of paranoid schizophrenia, and the records of his uncle Perry Miller, which report a diagnosis of bipolar disorder, should have been provided to Dr. Scott, he failed to specifically present evidence regarding how these precise diagnoses specifically impacted Dr. Boyer’s [Miller’s Rule 32 psychologist] diagnosis of post-traumatic stress disorder. [February 2008 Rule 32 hearing, R. 644-48.] Nor did Miller demonstrate how the absence of these specific records specifically distorted or affected Dr. Scott’s evaluation. Therefore, because trial counsel did provide information to Dr. Scott to inform him of Miller’s family history of mental illness and because Miller has failed to establish specific psychiatric diagnoses in his family’s mental records that would have changed Dr. Scott’s evaluation, Miller has failed to demonstrate that he was prejudiced by the failure to provide family mental health records to Dr. Scott.”
(C. 2014-21.)
The circuit court’s findings are supported by the record. In his brief, Miller suggests that, contrary to the circuit court’s finding that there was no evidence regarding how the absence of the records impacted Dr. Scott’s conclusion, Dr. Scott did testify that the missing Miller family health records would have played a “huge” role in assessing Miller’s sanity. (Miller’s brief, at 46-47.) However, an examination of the portion of the record referenced by Miller indicates that Dr. Scott was testifying about the role familial mental health plays in regard to building a mitigation case, not in assessing Miller’s sanity at the time of the crimes.
*384 (v)
Miller maintains that his trial counsel were ineffective because they did not provide Dr. Scott with “comprehensive information concerning the trauma [he] suffered from his father.” (Miller’s brief, II(B)(2)(a)(i)(E), at 49-50.) Thus, Miller contends, Dr. Scott’s sanity evaluation was incomplete because Dr. Scott was not provided with this “crucial information.” (Miller’s brief, at 50.)
In denying relief on this claim, the circuit court stated:
“Miller was also not prejudiced by his trial counsel’s provision of information to Dr. Scott regarding the extent and nature of physical abuse that Miller suffered as a child. Dr. Scott was informed and had knowledge that Ivan Miller physically abused Miller. Dr. Scott noted in his report that Ivan Miller was ‘physically abusive and frequently hit [Miller] on various areas of his body with his hands or with a belt.’ [Miller’s Rule 32 Exhibit 29-0003.] Dr. Scott also testified concerning Ivan’s physical abuse of Miller during the penalty phase of Miller’s trial. [Direct Appeal, R. 1350-51.]
“Miller now claims that his trial counsel was ineffective for not providing Dr. Scott more information on the details of the abuse. However, Dr. Scott was aware of specific incidents of abuse and testified during the penalty phase about an occasion when Ivan tried to stab Miller. [Direct Appeal, R. 1351.] Notably, Miller failed to present any further evidence during the evidentiary hearing of specific details or occurrences of physical abuse. In fact, none of Miller’s reported injures were linked to any form of abuse; Miller’s expert Dr. Boyer testified that there was no indication in Miller’s medical records how any of his injuries occurred and that there were no serious wounds that required overnight hospital stays. [February 2008 Rule 32 Hearing, R. 740.] The record indicates that Dr. Scott was aware of the nature of Ivan’s physical abuse; Miller has failed to provide any evidence of other specific incidents of abuse or how such undocumented incidents would have impacted Dr. Scott’s analysis. Accordingly, Miller has failed to demonstrate that he was prejudiced.”
(C. 2021-22.)
The circuit court’s findings are supported by the record.
b.
Miller argues that he was “severely prejudiced” by his trial counsel’s failure to provide the information addressed in Part II.C.l.a(i)-(v), supra, to Dr. Scott. (Miller’s brief, II(B)(2)(a)(l)(F), at 50-55; Miller’s reply brief at 17-25.) Miller states that when Dr. Catherine Boyer, a psychologist retained for the Rule 32 proceedings, reviewed all the materials that he contends his trial counsel should have provided to Dr. Scott and administered additional tests on Miller, she concluded that Miller suffered from post-traumatic stress disorder with dissociative features. Dr. Boyer testified that she believed Miller had experienced a “dissociative episode” during the shootings that impaired his ability to appreciate the nature and quality or wrongfulness of his acts. (February 2008 Rule 32 Hearing, R. 714-718.) Miller asserts that had trial counsel furnished Dr. Scott ■with the information discussed in Part II. C.l.a(i)-(v), supra, Dr. Scott may have determined that Miller was suffering from a mental disease or defect at the time of the shootings.
The circuit court stated:
“Miller has failed to demonstrate a reasonable probability that the outcome of his proceeding would have been dif *385 ferent had his trial counsel investigated more mental health evidence because he has failed to prove that he met the legal definition of insanity under Ala.Code [1975] § [13A-3-1]. None of the five psychological and psychiatric experts who evaluated Miller during the course of his trial or his Rule 32 proceedings, including Drs. Hooper, Scott, McDer-mott, McClaren, and Boyer concluded that Miller was legally insane. Therefore, even if trial counsel had conducted a more thorough mental health investigation, the result would be the same: Miller could not have proven that he did not appreciate the wrongfulness of his actions and thus could not have sustained a not-guilty by reason of insanity defense.
“Miller’s failure to demonstrate prejudice is highlighted by the testimony of Miller’s own expert, Dr. Boyer, during the evidentiary hearing. Despite her opinion that Miller suffered from post-traumatic stress disorder, incredibly, Dr. Boyer failed to testify that Miller was legally insane. [February 2008 Rule 32 Hearing, R. 757-58.] Notably, Dr. Boyer failed to even provide an opinion. Clearly evading the issue of Miller’s sanity, in response to a question regarding whether she disagreed with Dr. Scott’s testimony during trial that Miller was not insane, Dr. Boyer testified T really don’t know if I can answer it.’ [February 2008 Rule 32 Hearing, R. 757.]
“As Dr. Boyer stated in response to a question from counsel for the State, if she had been called to testify on Miller’s behalf during trial, she would have had no opinion as to whether he could appreciate the wrongfulness of his conduct at the time of the shootings:
“ ‘Q: So in this case it’s fair to say that had you been there you would have said I have no opinion [as to Miller’s sanity] one way or the other?
“‘A: Yes.’
“[February 2008 Rule 32 Hearing, R. 758.] Without offering an opinion, let alone an opinion that conflicted with the evaluations performed during trial, even if a mental health investigation was performed in the manner in which Miller now alleges it should have been conducted, Miller has failed to demonstrate a reasonable probability that additional mental health evidence would have been uncovered that would have affected the outcome of his trial. It is also significant that Dr. Scott failed to state during the evidentiary hearing that his opinion that Miller was not insane at the time of the shootings had changed. No evidence has been presented that Miller was legally insane and ample mental health evidence was already available for trial counsel to effectively argue during the penalty phase that Miller satisfied the requirements for the statutory mitigating circumstances under Ala.Code [1975] § 13A-5-5K2) and (6).
“Three psychologists and one psychiatrist evaluated Miller at the time of trial; none of these four doctors, whether hired by the defense or appointed by the trial court, found that Miller was insane. [February 2008 Rule 32 Hearing, R. 248.] Miller has offered nothing in the testimony of either Dr. Boyer or Dr. Scott to call these evaluations into question. There is no evidence that Dr. Boyer’s testimony would have benefited Miller’s defense, nor would it have impacted the outcome of the proceedings. Miller has failed to meet his burden of proof of demonstrating how he was prejudiced under Strickland by his trial counsel’s investigation into his mental health. Therefore, Miller cannot demonstrate that his trial counsel’s performance in this regard was constitutionally ineffective. ...”
(C. 2023-26.)
The circuit court’s findings are supported by the record. As noted above, to *386 have been entitled to relief, Miller not only had to show that his trial counsel rendered deficient performance by not providing the additional information to Dr. Scott for his consideration in assessing Miller’s sanity at the time of the offenses, but also had to prove that he was prejudiced as a result of his trial counsel’s failure to provide the information to Dr. Scott. The fact that Dr. Scott might have changed his conclusion regarding Miller’s sanity at the time of the offenses had he received the information is not sufficient to establish the requisite prejudice.
“With respect to prejudice, a challenger must demonstrate ‘a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ [Strickland, 466 U.S. at 694], 104 S.Ct. 2052. It is not enough ‘to show that the errors had some conceivable effect on the outcome of the proceeding.’ Id., at 693, 104 S.Ct. 2052. Counsel’s errors must be ‘so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.’ Id., at 687,104 S.Ct. 2052.
“ ‘Surmounting Strickland’s high bar is never an easy task.’ Padilla v. Kentucky, 559 U.S. -, -, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest ‘intrusive post-trial inquiry’ threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under de novo review, the standard for judging counsel’s representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is ‘all too tempting’ to ‘second-guess counsel’s assistance after conviction or adverse sentence.’ Id., at 689, 104 S.Ct. 2052; see also Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney’s representation amounted to incompetence under ‘prevailing professional norms,’ not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S.Ct. 2052.”
Harrington v. Richter, — U.S. -, -, 131 S.Ct. 770, 787-88, 178 L.Ed.2d 624 (2011).
c.
Miller contends that even though his trial counsel withdrew the plea of not guilty be reason of mental disease or defect, his trial counsel should still have presented evidence of Miller’s mental illness during the guilt phase of the trial. (Miller’s brief, 11(B)(2)(a)(ii), at 55-60.) Miller asserts that although Dr. Scott concluded that Miller was not suffering from a mental disease or defect at the time of the shootings, Dr. Scott nevertheless found that Miller was suffering from a mental illness. Thus, Miller asserts that when his trial counsel received Dr. Scott’s equivocal findings regarding Miller’s mental health, his trial counsel could have pursued several options, namely: (1) trial counsel could have had Miller evaluated by another mental-health professional to whom trial counsel had supplied all of the materials discussed in Part II.C.la(i)-(v), supra, to determine if that mental-health expert found Miller to be suffering from a mental *387 disease or defect at the time of the crimes;[5] (2) trial counsel could have had Dr. Scott testify during the guilt phase of the trial that in his opinion Miller suffered from a mental illness; and (8) trial counsel could have presented Miller’s mental-health evidence in support of an argument that Miller lacked the requisite intent to be convicted of the capital offense of killing two or more persons pursuant to one scheme or one course of conduct and that he was guilty only of a lesser-included offense, such as murder or manslaughter.
Although Miller presents this argument in his brief as part of his claim that his trial counsel were ineffective for withdrawing the not-guilty-by-reason-of-mental-disease-or-defect plea, this claim was presented in a different context in his amended Rule 32 petition. (Miller’s Amended Rule 82 petition, C. 319-22.) In his amended Rule 32 petition, Miller claimed that his trial counsel were ineffective for not presenting a defense in the guilt phase of the trial, and that is the context in which the circuit court addressed Miller’s claim.
The circuit court stated the following in its order:
“In paragraphs 173-85 of his amended petition, Miller claims that his trial counsel were ineffective for failing to present a defense theory or evidence during the guilt phase of the trial. [Amended Rule 32 petition, C. 319.] Miller argues that trial counsel could have presented the testimony of Dr. Scott or arguments based on Dr. Scott’s findings that Miller could not form the intent to commit capital murder based on his delusional disorder or that Miller should only be convicted of manslaughter.
“This Court denies Miller’s claim because he has failed to meet his burden of proof of demonstrating that his trial counsels’ performance was deficient under Strickland, 466 U.S. at 687, Ala.R.Crim. P., 32.7(d). Trial counsel Johnson had reasonable strategic reasons for not presenting evidence during the guilt phase of trial. Johnson testified that his trial strategy focused on presenting the best evidence and testimony that would save Miller’s life. [Motion for New Trial hearing, R. 80.] Based on the facts and circumstances of his case, Johnson determined that his best opportunity and most effective method of presenting such testimony would be during the penalty phase. [Motion for New Trial Hearing, R. 80; February 2008 Rule 32 Hearing, R. 219.] Part of this strategy also involved gaining credibility and favor with the jury by not presenting frivolous arguments during the guilt phase such as challenging the blood spatter expert’s testimony. [February 2008 Rule 32 Hearing, R. 219-26.]
“Johnson testified that the prosecution’s evidence was strong, that he could not contest the fact that the shootings were part of a single act, and that he made a strategic decision to not put on frivolous evidence during the guilt phase. [Motion for New Trial Hearing, R. 14; February 2008 Rule 32 Hearing, R. 99, 219.] Johnson felt that any potential testimony about Miller’s mental health during the guilt phase would be less impactful or even frivolous. [Motion for New Trial Hearing, R. 80.] However, Johnson stated that he wanted Miller to testify on his own behalf during the guilt phase and talked with Miller about this possibility, but Miller refused. [February 2008 Rule 32 Hearing, R. 220.] Finally, Johnson acknowledged *388 that it was not uncommon to not present evidence during the guilt phase and to focus solely on the penalty phase. [February 2008 Rule 32 Hearing, R. 228.]
“Johnson’s conclusions on the strength of the prosecution’s case in the guilt phase are well supported by the evidence. As the Court of Criminal Appeals recognized on direct appeal, ‘[g]iv-en the overwhelming evidence of Miller’s guilt — including eyewitness testimony identifying Miller as the shooter — counsel has little choice but to acknowledge Miller’s guilt.’ Miller, 913 So.2d at 1162. Johnson and cocounsel Black-wood faced the daunting task during the guilt phase of defending Miller against strong evidence which included two separate eyewitnesses to the shootings at both Ferguson Enterprises and Post Airgas.
“Despite this evidence, this is not a case in which trial counsel failed to investigate potential guilt phase testimony. As noted above, Johnson initially hired Dr. Scott to investigate Miller’s mental health with the intention of presenting evidence during the guilt phase that Miller could not appreciate the wrongfulness of his actions. [February 2008 Rule 32 Hearing, R. 48.] However, after Dr. Scott determined that Miller did not qualify for the insanity defense under Alabama law, Johnson withdrew the not guilty by reason of mental defect plea. [February 2008 Rule 32 Hearing, R. 91.]
“As the Court of Criminal Appeals noted, this decision was made ‘after a thorough investigation of the relevant law and facts of Miller’s case’ and Johnson’s focus on the penalty phase ‘was part of his strategy to spare Miller’s life.’ Miller, 913 So.2d at 1161 (holding that ‘[u]nder the circumstances of this case, defense counsel made a well-reasoned decision to focus his efforts on that part of the trial that he believed offered the greatest chance of success. We see no reason to second-guess defense counsel’s decisions regarding this strategy.’) Miller has failed to offer any proof that this trial strategy was not the product of a reasonably competent attorney.
“Contrary to Miller’s claims, Johnson also had strategic reasons for not presenting Dr. Scott’s testimony during the guilt phase in an attempt to argue that Miller did not have intent to commit capital murder. [February 2008 Rule 32 hearing, R. 222.] First, Johnson testified that in his opinion, Dr. Scott’s testimony would have had more of an impact during the penalty phase based on the information available for Dr. Scott to present. [February 2008 Rule 32 Hearing, R. 285.] Johnson stated that much of Dr. Scott’s testimony during the penalty phase was based on hearsay and therefore, Dr. Scott would have been more limited in providing testimony in the guilt phase. [February 2008 Rule 32 Hearing, R. 284.] Johnson also determined that Dr. Scott would have been subject to a more stringent cross-examination during the guilt phase. [February 2008 Rule 32 Hearing, R. 284.] Therefore, as Johnson acknowledged, he could not have simply introduced the beneficial, limited parts of Dr. Scott’s report; instead the entire report could have been subject to cross-examination. [February 2008 Rule 32 Hearing, R. 100.]
“Dr. Scott’s own report contained opinions which could have rebutted any argument that Miller did not have the intent to commit murder as a result of a delusional disorder. Despite the fact that Dr. Scott opined that Miller suffered from a delusional disorder, Dr. Scott stated that: *389 “ ‘because Mr. Miller followed a second victim, shot the first victim again before he left Ferguson Enterprises and because he went to a second work site, it is my opinion that the evidence indicates he appreciates the nature and quality of his actions toward each victim.’
“[Miller’s Rule 32 Exhibit, 29-0022.] Miller’s own expert’s opinion was consistent with the very same facts that the prosecution presented during the trial to argue that Miller intended to commit murder. [Direct Appeal, R. 1254-61, 1264-75.] Based on the facts of this case, trial counsel’s decision to not present evidence during the guilt phase and instead focus on the penalty phase was reasonable and Miller has failed to present any evidence demonstrating how this strategy was deficient.”
(C. 2049-54.)
The circuit court also found that Miller failed to meet his burden of proving that he was prejudiced by trial counsel’s decision not to present mental-health evidence during the guilt phase of the trial. The circuit court stated:
“Miller’s expert, Dr. Scott, testified during the penalty phase of trial that Miller was not unable to appreciate the wrongfulness of his actions and therefore did not meet the legal definition of insanity under Alabama law. [Direct Appeal, R. 1384.] The only other possible strategy that Miller has alleged that trial counsel could have pursued during the guilt phase centered on arguing that Miller did not have the intent to commit capital murder.
“However, such an argument would have run contrary to the overwhelming evidence indicating Miller’s intent to commit murder. Johnny Cobb, an employee at Ferguson Enterprises, heard shouting, witnessed Miller walk out of the front door of the office with a pistol towards his truck, and drive away. Miller, 913 So.2d at 1154. Cobb then entered the building and saw Christopher Yancy and Lee Holdbrooks on the floor. Id. Yancy was shot three times and Holdbrooks was shot six times with the fatal shot being fired as Holdbrooks looked up at Miller. Id. at 1156.
“Andy Adderhold witnessed Miller arrive at Post AirGas, walk into the office, specifically call out to Terry Jarvis, and then repeatedly shoot Jarvis. Id. at 1155. Miller then ordered Adderhold out of the office, but Adderhold still heard a final gunshot as he left the building. Id. Jarvis was shot five times with the fatal shot to Jarvis’ heart occurring when Miller was standing directly over him. Id. at 1156.
“Miller cannot demonstrate a reasonable probability that had trial counsel presented evidence in the guilt phase to challenge Miller’s intent that the outcome of his trial would have been different in the face of these brutal facts. Miller specifically sought out two victims, shot them multiple times, proceeded to another location, specifically sought out another victim, and shot him multiple times. Miller’s own expert indicated that such evidence indicates that Miller could ‘appreciate the nature and quality of his actions towards each victim.’ [Miller’s Rule 32 Exhibit 29-0022.] Even if Miller could demonstrate that his trial counsel were deficient during the guilt phase, which he cannot, he has failed to demonstrate how he was prejudiced under Strickland by his trial counsels’ strategy.”
(C. 2054-56.)
The circuit court’s findings are supported by the record. Miller’s trial counsel had four opinions from mental-health experts, each of whom had evaluat *390 ed Miller and concluded that Miller did not meet Alabama’s legal definition of “insanity” at the time of the crimes. Accordingly, Miller’s trial counsel did not render ineffective assistance by not expending valuable, limited resources in pursuit of a fifth mental-health expert who may or may not have found that Miller met Alabama’s legal definition of “insanity” at the time of the shootings.
“ ‘Counsel is not ineffective for relying on an expert’s opinion.’ Smith v. State, 71 So.3d 12, 38 (Ala.Crim.App.2008).
“ ‘[T]rial counsel had no reason to retain another psychologist to dispute the first expert’s findings. “A post-conviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial.” State v. Combs, 100 Ohio App.3d 90, 103, 652 N.E.2d 205, 213 (1994). See also State v. Frogge, 359 N.C. 228, 244-45, 607 S.E.2d 627, 637 (2005). “Counsel is not ineffective for failing to shop around for additional experts.” Smulls v. State, 71 S.W.3d 138, 156 (Mo.2002). “Counsel is not required to ‘continue looking for experts just because the one he has consulted gave an unfavorable opinion.’ Sidebottom v. Delo, 46 F.3d 744, 753 (8th Cir.1995).” Walls v. Bowersox, 151 F.3d 827, 835 (8th Cir.1998).’
“Waldrop v. State, 987 So.2d 1186, 1193 (Ala.Crim.App.2007).”
James v. State, 61 So.3d 357, 368-69 (Ala.Crim.App.2010).
Furthermore, after having made the strategic decision to withdraw Miller’s not-guilty-by-reason-of-mental-disease-or-defect plea which, as discussed, was not unreasonable, trial counsel was not ineffective for declining to introduce evidence of Miller’s mental illness during the guilt phase of the trial. As Miller’s trial counsel explained at the Rule 32 hearing, he thought that “the jury might have considered that [evidence of Miller’s mental-health problems] to be frivolous because ... Alabama does not recognize diminished capacity [as a defense] unless it’s diminished to the point that it becomes the defense of insanity.” (February 2008 Rule 32 Hearing, R. 263.)
Miller’s trial counsel was correct that Alabama does not recognize “diminished capacity” as a defense, as addressed in the case of Barnett v. State, 540 So.2d 810 (Ala.Crim.App.1988):
“Barnett argues that the issue of his mental state should have been submitted to the jury under instructions that it could negate the intent requirement for murder, thereby reducing the killing to manslaughter. This contention embodies the concept of ‘diminished capacity1 or ‘diminished responsibility,’ and was specifically rejected by the draftsmen of our criminal code. See Ala.Code [1975] § 13A-6-3 (Commentary at 158):
“‘Under § 13A-6-3(a)(2), it was originally proposed to replace the “heat of passion” due to provocation criterion with “extreme mental or emotional disturbance,” ... which approach is being adopted by many modern criminal codes.... This standard originated in the Model Penal Code § 210.3 and is discussed in Commentary, (Tent. Draft No. 9) pp. 28-29.
“ ‘However; some members of the Advisory Committee considered the proposal unsound, unclear and susceptible of abuse, so it was not adopted, and § 13A-6-3(a)(2) retains the “heat of passion” under legal provocation defense.’ § 13A-6-3 Commentary (emphasis added).
“See also Neelley v. State, 494 So.2d 669, 682 (Ala.Cr.App.1985), affirmed, Ex *391 parte Neelley, 494 So.2d 697 (Ala.1986) cert. denied, Neelley v. Alabama, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987); Hill v. State, 507 So.2d 554, 556 (Ala.Cr.App.1986), cert. denied, Ex parte Hill, 507 So.2d 558 (Ala.1987).
“Although Alabama adopted the criterion for insanity contained in § 4.01 of the Model Penal Code, it did not adopt the accompanying section of the Model Penal Code, § 4.02(1), which provided that ‘[ejvidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense.’ Compare Model Penal Code § 4.02 (A.L.I.1980) with Ala.Code § 13A-3-1 (1975). See § 13A-3-1 Commentary.
“ ‘The rule applied in this jurisdiction is sometimes referred to as the “all-or-nothing’ approach.” Hill, 507 So.2d at 556. Under this approach, a ‘defendant must either establish his insanity as a complete defense to or excuse for the crime, or he must be held to full responsibility for the crime charged.’ Annot., 22 A.L.R.3d 1228, § 4 at 1236 (1968).
“Accordingly, Barnett was not entitled to a charge on reckless manslaughter on the theory of diminished mental capacity. This court’s conclusion in Hill, 507 So.2d at 556-57, is equally applicable here:
“ ‘If the jury in the present case had found that appellant Hill was suffering from a mental disease or defect at the time she shot the decedent and that that disease or defect produced the act, then she could be found not guilty by reason of mental defect. In that event, a charge on the lesser included offense would not be needed. If, on the other hand, she was found to be sane at the time of the murder, a lesser included offense charge on reckless manslaughter should be given only if the facts of the particular case — facts unrelated to any diminished mental capacity — would warrant the giving of such a charge.... Here, the appellant admitted taking the gun from a dresser drawer, pointing it at the head of the decedent and shooting him in the head repeatedly. Her actions were not consistent with a finding of recklessness. Since there was no evidence in the present case that would support an instruction on reckless manslaughter, the trial court did not err in denying the appellant’s charge.’ 507 So.2d at 556-57 (citation omitted).”
540 So.2d at 812 (some emphasis in original; some emphasis added). See also, Sharifi v. State, 993 So.2d 907, 932-33 (Ala.Crim.App.2008), cert. denied, Sharifi v. Alabama, 555 U.S. 1010, 129 S.Ct. 491, 172 L.Ed.2d 386 (2008) (finding no merit to appellant’s contention that Alabama’s rejection of the diminished-capacity doctrine is unconstitutional).
Miller failed to prove that he was entitled to a charge on the lesser-included offense of manslaughter. The facts in this particular case that are “unrelated to any diminished mental capacity” did not warrant such a charge. In fact, on direct appeal, this Court specifically rejected Miller’s assertion that his trial counsel were ineffective for not presenting evidence during the guilt phase of “Miller’s delusions to show the murders were committed in a heat of passion, rather than as part of a common scheme or plan.” Miller, 913 So.2d at 1161. We reasoned:
“The fact that a victim may have spread rumors about the defendant or ‘smarted off to a defendant is insufficient to mitigate an intentional killing under any doctrine of provocation or *392 heat of passion. See, e.g., Bone v. State, 706 So.2d 1291, 1297 (Ala.Crim.App.1997) (citing Harrison v. State, 580 So.2d 73, 74 (Ala.Crim.App.1991) (mere words or gestures will not reduce a homicide from murder to manslaughter)).”
913 So.2d at 1161.
Miller did not meet his burden of proving that his trial counsel were ineffective for withdrawing his plea of not guilty by reason of mental disease or defect for not presenting evidence of Miller’s mental illness during the guilt phase. Accordingly, because Miller’s underlying claim of ineffective assistance of trial counsel has no merit, Miller failed to prove by a preponderance of the evidence that his appellate counsel were ineffective in the manner in which they presented this claim of ineffective assistance of trial counsel in the post-sentencing proceedings. Payne, 791 So.2d at 401.
2.
Miller contends that his trial counsel rendered ineffective assistance in his opening statement in the guilt phase of the trial. Specifically, Miller maintains that rather than focusing the jury on a defense theory, his trial counsel invited the jury to feel only contempt for him. (Miller’s brief, 11(B)(2)(b), at 68-70; Miller’s reply brief, at 34-35.)
As noted, this claim was raised in the motion for a new trial and was rejected by the circuit court. On direct appeal to this Court, Miller asserted that “his counsel’s opening remarks [in the guilt phase] indicated that counsel was serving ‘more like a second prosecutor’ rather than defense counsel.” Miller, 913 So.2d at 1161. We rejected this claim, reasoning:
“Under the circumstances of this case, defense counsel made a well-reasoned decision to focus his efforts on that part of the trial that he believed offered the greatest chance of success. We see no reason to second-guess defense counsel’s decision regarding this strategy.”
913 So.2d at 1161.
Miller contends that had his appellate counsel effectively argued in the post-sentencing proceedings that his trial counsel’s opening statement was ineffective, Miller would have been entitled to relief.
Defense counsel Johnson’s opening statement was brief. After introducing himself and his cocounsel, Johnson said:
“We are at a part of the process here that the law says is necessary. We all, at this point, have been assigned responsibilities. My responsibility and Mr. Blackwood’s responsibility is to make sure that in this case, as in any other case, that we keep the burdens where the law says the burdens belong, that we challenge any evidence or any statement that is made that we think is wrong.
“Our responsibility, however, is not— and is not ever the responsibility of a lawyer to do things frivolous. And we will not do that in this case.
“Since August the 5th of 1999, I have probably -had dozens, if not hundreds, of cameras and microphones and tape recorders stuck in my face asking me what happened here, I guess presumably on the theory that I would disclose something that would make all of this seem logical.
“I have not said anything that makes this seem logical and reasonable because I don’t know anything. You won’t hear anything coming from the defense that makes this seem logical and reasonable. To present anything in that regard would be frivolous. We will not engage in frivolity.
“The responsibility that Mr. Black-wood and I have we accept and we will do what our responsibility is, but we will
*393 not do anything frivolous. That would be irresponsible.
“I will not offer you any evidence in this case that would make this act seem any less brutal and any less inhumane than it was. If you want to know what happened in this case, I think you just got a pretty good recitation of what happened in this case. I think Mr. Owens [the prosecutor] got most of it right. Some of it seems to me to be a little embellished, but so what. Fundamentally, you heard what happened.
“Now, the most serious responsibility in this case is placed on you. And you have gone through the process of jury selection and you are the ones who survived the process of jury selection.
“And you did not survive because you don’t have opinions about this case. You would be — it would be unnatural, from what most of you have seen and heard, not to have an opinion in this case. You survived because you have said we will not let our opinions affect the responsibility that is placed on us in this case.
“The responsibility that is placed on you in this case will be an awesome one, but I suggest this to you, at the end of this case — you will have to make at least two decisions in this case that places more responsibility on you than I will ever have in any ease I will ever stand for in a courtroom.
“But at the end, if you accept your responsibility in the same way I — that everyone else, not just me, that everyone else in this courtroom is accepting theirs, then at the end of this, when this is all over, you will be proud. You won’t be ashamed, you will be proud of a least what you have done.
“I don’t expect that at any point in this case you will ever be anything but ashamed of what happened that caused us to be here. I’m not going to ask — for me to suggest anything to the contrary would be frivolous. You won’t see anything frivolous done in this case.
‘You will see a lot of meaningful things, though, presented to you. There will be a lot of meaningful evidence and a lot of meaningful arguments made to you. The only thing I ask at this point is that you accept your responsibility as jurors and then we will all be proud that we participated in this. Thank you.”
(Direct Appeal, R. 813-16.)
During the hearing on the motion for a new trial, Johnson said that his primary emphasis was on saving Miller’s life. Johnson indicated that in order to reach that objective, in his opening statement he sought to dispel the resentment the jurors might harbor toward Miller because the jurors felt the trial was a waste of time because of the overwhelming evidence of Miller’s guilt. Johnson explained that during voir dire at trial a veniremember told the court that he had overheard other veniremembers expressing their opinion that the trial was a waste of time.[6]
Johnson testified as follows at the hearing on the motion for new trial:
“I believed that the only thing that the State could possibly do wrong in this case would be to overkill. I was trying to posture to make that seem to be the case, that we could not do anything that would not seem to the jury to be frivolous, especially on the heels of what I would have known, I think, intuitively.
*394 “But this is the only time I’ve ever had a juror sit there and tell me ‘that we all think this is a waste of time’ or something to that effect. So I thought it was important that the jury understand, and I believe I asked the Court to instruct the jury that this trial was not something that the defendant was putting them through, but something that the law was putting them through. So that was just sort of the nature and the context in which [opening statement] was presented.”
(Motion for New Trial Hearing, R. 59.)
Johnson said that he wanted to emphasize to the jurors that the guilt phase of the trial process was very important and that the jurors played a very significant role in that process — a civic duty the jurors should take pride in performing — and that the trial was not a waste of time despite the fact that the “evidence was largely uneontradicted.” (Motion for New Trial Hearing, R. 62-63.) Johnson’s testimony in the Rule 82 hearing was similar in this regard. (February 2008 Rule 32 Hearing, R. 137-43.)
The circuit court held that Miller failed to meet his burden of proving that his trial counsel rendered ineffective assistance in what he said in his opening statement at the guilt phase of the trial. The court stated in its order denying Miller’s Rule 32 claim:
“Trial counsel Johnson’s opening statement was the product of a reasonable, strategic decision to win favor with the jury by not presenting frivolous arguments in order to spare Miller’s life. Miller has not presented any evidence to demonstrate Johnson’s strategy was unreasonable.”
(C. 2048.)
The circuit court also denied relief on this claim because Miller failed to establish the requisite prejudice. The court stated:
“Miller has presented no evidence concerning the impact of Johnson’s statements on the jury, nor has Miller demonstrated a reasonable probability that the outcome of the guilt phase would have been [different] had Johnson not made these statements. In general, statements of counsel ‘are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Minor v. State, 914 So.2d 372, 417 (Ala.Crim.App.2004). Miller has offered nothing more in support of his claim than the bare, conclusory allegation that Johnson’s opening statement was improper and that it prejudiced the jury, without proving specific facts that demonstrate prejudice. Accordingly, Miller has not met his burden of demonstrating prejudice under Strickland and therefore, this claim is denied.”
(C. 2048-49.)
We find no abuse of discretion in the circuit court’s findings.
“Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant’s guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 329 (1983). In such cases, ‘avoiding execution [may be] the best and only realistic result possible.’ ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.1, Commentary (rev. ed.2003), reprinted in 31 Hofstra L.Rev. 913,1040 (2003).
*395 “Counsel therefore may reasonably decide to focus on the trial’s penalty phase, at which time counsel’s mission is to persuade the trier that his client’s life should be spared. Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course. See Lyon, Defending the Death Penalty Case: What Makes Death Different? 42 Mercer L.Rev. 695, 708 (1991) (‘It is not good to put on a “he didn’t do it” defense and a “he is sorry he did it” mitigation. This just does not work. The jury will give the death penalty to the client and, in essence, the attorney.’); Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L.Rev. 1557, 1589-1591 (1998) (interviews of jurors in capital trials indicate that juries approach the sentencing phase ‘cynically’ where counsel’s sentencing-phase presentation is logically inconsistent with the guilt-phase defense); id., at 1597 (in capital cases, a ‘run-of-the-mill strategy of challenging the prosecution’s case for failing to prove guilt beyond a reasonable doubt’ can have dire implications for the sentencing phase). In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in ‘a useless charade.’ See [United States v.] Cronic, 466 U.S. [648], at 656-657, n. 19 [ (1984) ]. Renowned advocate Clarence Darrow, we note, famously employed a similar strategy as counsel for the youthful, cold-blooded killers Richard Loeb and Nathan Leopold. Imploring the judge to spare the boys’ lives, Darrow declared: T do not know how much salvage there is in these two boys.... I will be honest with this court as I have tried to be from the beginning. I know that these boys are not fit to be at large.’ Attorney for the Damned: Clarence Darrow in the Courtroom 84 (A. Weinberg ed.1989); see Tr. of Oral Arg. 40-41 (Darrow’s clients ‘did not expressly consent to what he did. But he saved their fives.’); cf. Yarborough v. Gentry, 540 U.S. 1, 9-10 (2003) (per curiam).”
Florida v. Nixon, 543 U.S. 175, 191-92, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). (Footnotes omitted.)
Miller failed to meet his burden of proving that his trial counsel’s opening statement at the guilt phase constituted ineffective assistance. Therefore, it follows that Miller has also failed to prove by a preponderance of the evidence that his appellate counsel were ineffective in the manner in which they presented this claim of ineffective assistance of trial counsel in the post-sentencing proceedings. Payne, 791 So.2d at 401.
3.
Miller’s appellate counsel argued in the motion-for-new-trial proceedings and on direct appeal that Miller’s trial counsel were ineffective for not adequately investigating and presenting mitigating evidence in the penalty phase of the trial. The circuit court denied Miller’s claim, as did this Court. In rejecting this claim, this Court wrote:
“Miller further contends that trial counsel’s failure ‘to adequately explore all possible mitigating routes’ left counsel unable to make well-informed decisions on the question of mitigation. As set out above, counsel testified at length regarding his representation of Miller, including his investigation of the relevant law and facts, and his strategy to save Miller from a sentence of death. Counsel explained his reasons for presenting evidence regarding Miller’s fam *396 ily and social history through Dr. Scott’s testimony, rather than through various family members. Based on our review of the record, we fail to see what other mitigating evidence counsel could have offered. Moreover, despite Miller’s allegations, he offers no additional mitigating evidence that counsel did not discover during his investigation or that counsel failed to consider in formulating his defense strategy. Accordingly, we are unable to say that counsel was ineffective as to this claim. See Lawhorn v. State, 756 So.2d 971, 986 (Ala.Crim.App.1999).”
Miller, 913 So.2d at 1163 (emphasis added).
Miller alleges that there was a “mountain of compelling mitigating evidence available to trial counsel that was not presented at trial,” and that, because of trial counsel’s “grossly inadequate” investigation, the mitigating evidence was not discovered. (Miller’s brief, 11(B)(2)(c), at 71; Miller’s reply brief, at 23-34.) He argues that trial counsel’s investigation into the mitigating evidence failed to comply with the American Bar Association (“ABA”) guidelines for conducting an appropriate investigation into potential mitigating evidence in death-penalty cases because: (1) trial counsel failed to adequately interview Miller and Miller’s close relatives; and (2) trial counsel did not collect his “employment, educational, and medical records, and medical records of his numerous family members with documented serious mental illness.” (Miller’s brief, II(B)(2)(c)(i)(A) and (B), at 73-82; Miller’s reply brief, at 23-29.) As a result, Miller maintains that his trial counsel did not learn about:
“Mr. Miller’s family, social, and mental health history, including (i) the extent of instability, poverty and hardship Mr. Miller suffered in childhood as a result of his father’s constant uprooting of the family and erratic employment history; (ii) the extreme physical and psychological abuse Ivan [Miller’s father] inflicted on the family, including the particular wrath he reserved for Mr. Miller; (iii) the well-documented history of mental illness of at least four generations of the Miller family; and (iv) Mr. Miller’s strong work ethic, good employment history, financial support for his family, and loving family relationships.”
(Miller’s brief, at 75.)
Miller alleges that had his trial counsel presented this additional mitigating evidence at the penalty phase of the trial, he may not have been sentenced to death. (Miller’s brief, II(B)(2)(c)(ii)(A)-(G), at 82-99; Miller’s reply brief, at 29-34.) Additionally, he asserts that had his appellate counsel properly presented and supported this underlying claim of ineffective assistance of trial counsel in the motion-for-new-trial proceedings and on appeal with this additional information, he would have been entitled to relief. (Miller’s brief, II(B)(2)(c)(v), at 110-17.)
a.
First, we note that whether Miller’s trial counsel’s investigation into potential mitigating evidence adhered to the ABA guidelines is not dispositive of whether counsels’ investigation was reasonable.
“We have held that the ABA Guidelines may ‘provide guidance as to what is reasonable in terms of counsel’s representation, [but] they are not determinative.’ Jones v. State, 43 So.3d 1258, 1278 (Ala.Crim.App.2007).[7]
*397 “The danger of adopting the ABA Guidelines as determinative on the issue of a lawyer’s effectiveness was discussed by the United States Court of Appeals for the Fourth Circuit:
“ ‘[T]o hold defense counsel responsible for performing every task that the ABA Guidelines say he “should” do is to impose precisely the “set of detailed rules for counsel’s conduct” that the Supreme Court has long since rejected as being unable to “satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.” Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052, 80 L.Ed.2d 674. Such a categorical holding would lead to needless and expensive layers of process with the unintended effect of compromising process.... Recognition of the ABA Guidelines as the minimum prevailing community standard would transform defense lawyers’ judgments into mindless defensive reactions to a potential habeas claim, divorced from the individualized needs of professional representation. Those needs call for more nuanced responses than can be provided by following preestablished mechanical rules of representation....
“ ‘While the ABA Guidelines provide noble standards for legal representation in capital cases and are intended to improve that representation, they nevertheless can only be considered as part of the overall calculus of whether counsel’s representation falls below an objective standard of reasonableness; they still serve only as “guides,” Strickland, 466 U.S. at 688, 104 S.Ct. 2052, not minimum constitutional standards.’
“Yarbrough v. Johnson, 520 F.3d 329, 339 (4th Cir.2008). See also Torres v. State, 120 P.3d 1184, 1189 (Okla.Crim.App.2005) (‘[W]e will not find that capital counsel was per se ineffective simply because counsel’s representation differed from current capital practice customs, even where the differences are significant. A defendant must still show that he was prejudiced by counsel’s representation.’). We agree with the United States Court of Appeals for the Fourth Circuit.
“Aso, the United States Supreme Court in Wiggins [v. Smith, 539 U.S. 510 (2003),] stated:
“ ‘[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.... [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.
“ ‘... [0]ur principal concern in deciding whether [counsel] exercised “reasonable professional judgmen[t]” is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel’s decision not to introduce mitigating evidence ... was itself reasonable. In assessing counsel’s investigation, we must conduct an *398 objective review of their performance, measured for “reasonableness under prevailing professional norms,” which includes a context-dependent consideration of the challenged conduct as seen “from counsel’s perspective at the time.” ’
“539 U.S. at 521-23.”
Ray, 80 So.3d at 982-83.
(i)
With the aforementioned principles of law in mind, we turn to Miller’s allegation that his trial counsel failed to adequately interview him and his family. The circuit court stated the following in its order:
“In paragraphs 31-65 of his amended petition [C. 276-88], Miller alleges that his trial counsel failed to adequately investigate facts pertaining to his background and develop a mitigation case to present to the jury. [C. 276.] Miller claims that his trial counsel failed to utilize his family members as a source of information concerning Miller’s unstable childhood and the physical and psychological abuse he received.
“This claim is denied by this Court because it is directly refuted by the record and its therefore -without merit. See Gaddy v. State, 952 So.2d 1149, 1161 (Ala.Crim.App.2006); Duncan v. State, 925 So.2d 245, 266 (Ala.Crim.App.2005). Trial counsel Johnson testified that he met with Miller personally ‘at least half a dozen times.’ [Direct Appeal, Motion for New Trial Hearing, R. 10.] During the evidentiary hearing, Johnson stated that he and co-counsel Bass interviewed Miller on numerous occasions from the beginning of their representation in August of 1999 up until the time of trial. [February 2008 Rule 32 Hearing, R. 32, 41, 45, 46.] Johnson stated that the purpose of these meetings involved conducting ‘continued preparation for trial.’ [February 2008 Rule 32 Hearing, R. 46-47.]
“Johnson also interviewed Miller’s family members such as his father, mother, and his sisters with the specific focus of uncovering general background information and facts concerning his relationship with his father. [Motion for New Trial Hearing, R. 21-22.] Johnson met with the family on the day of the shootings on August 5, 1999, and spoke with his mother Barbara and his brother Richard in order to get family background information. [February 2008 Rule 32 Hearing, R. 38-39.] Bass had a thirty minute phone conversation with Barbara Miller on August 6, and hour long conversation with Lisa Miller, Miller’s sister on August 29, and had discussions again with Barbara Miller on October 24 and November 8. [February 2008 Rule 32 Hearing, R. 40, 42, 44, 45.] Johnson testified that these meetings with Miller’s family were part of an ‘ongoing effort’ to get helpful information and that Bass would have shared this information with him. [February 2008 Rule 32 Hearing, R. 41, 43-44.]
“Johnson himself met with Barbara Miller for a 90 minute conference on March 1, 2000, and also talked with Brian Miller, his cousin, and Lisa Carden, his sister. [February 2008 Rule 32 Hearing, R. 46, 163, 165.] Based on these interviews, Johnson testified that he learned information about Miller’s background and upbringing. [February 2008 Rule 32, R. 165-66.] Additionally, trial counsel discovered from the interviews evidence of a family history of mental illness. [February 2008 Rule 32 Hearing, R. 80.] Johnson also recalled receiving information about Miller’s upbringing and background as well as positive information about Miller from his brother Richard Miller. [February 2008 *399 Rule 32 Hearing, R. 159.] Given that the records of both the motion for new trial hearing and the Rule 32 evidentiary hearing indicate that trial counsel met with Miller and his family numerous time for the purpose of developing information concerning his background and upbringing and therefore directly refutes Miller’s allegation, this claim is denied. See Gaddy, 952 So.2d at 1161.
“This Court also denied Miller’s claim because Miller has failed to meet his burden of proof of demonstrating that his trial counsel’s performance was deficient under Strickland, 466 U.S. at 687. Ala. R.Crim. P. 32.7(d). As noted above, evidence was presented that trial counsel Johnson and Bass repeatedly interviewed Miller and his mother and spoke with his father, brother and sisters for the purpose of discovering information relating to Miller’s upbringing and family background. [Motion for New Trial Hearing, R. 21-22; February 2008 Rule 32 Hearing, R. 38-46.] Miller failed to present any evidence during the eviden-tiary hearing that trial counsel failed to ask a specific question regarding his unstable childhood or his childhood history of abuse. Therefore, because the record is silent, trial counsel’s performance in regard to his investigation and interviews of Miller and his family is presumed to be reasonable. See Williams v. Head, 185 F.3d 1223, 1228 (11th Cir.1999) (‘Where the record is incomplete or unclear about [counsel’s] actions, we will presume that he did what he should have done and that he exercised reasonable professional judgment.’); Chandler v. United States, 218 F.3d 1305, 1315 n. 15 (11th Cir.2000) (En Banc).
“Trial counsel was not deficient in the scope of family interviews conducted during his background information, despite Miller’s laundry list of family members he alleges should have been interviewed: his father, Ivan Miller, his sisters, Lisa Carden and Cheryl Ellison, his brother, Richard Miller, his half-brother, Jeff Carr, his niece, Alicia Sanford, his nephew, Jake Connell, his cousin, Brian Miller, and his uncle, Perry Miller. [Amended Rule 32 Petition, C. 277-78.] Contrary to Miller’s claims, trial counsel met with and interviewed, Ivan Miller, Richard Miller, Lisa Car-den, and Brian Miller. [Direct Appeal, Motion for New Trial Hearing, R. 21-22; February 2008 Rule 32 Hearing, R. 159, 163, 165.] Neither Jeff Carr nor Perry Miller testified during the evidentiary hearing; therefore, there is no record whatsoever of whether these family members could have provided any relevant information.
“Miller has failed to prove that trial counsel’s investigation of his family members was not reasonable, nor has he demonstrated that all reasonably competent counsel would have also interviewed the additional family members Miller claims should have been interviewed.
“Regardless, trial counsel cannot be found deficient for failing to interview the remaining family members concerning information on Miller’s life: Cheryl Ellison, Alicia Sanford and Jake Con-nell. First, information from Cheryl Ellison was ultimately obtained through her interview with Miller’s psychiatric expert Dr. Scott. [February 2008 Rule 32 Hearing, R. 315.] Additionally, the evidence presented during the eviden-tiary hearing demonstrates that Ellison failed to provide any meaningful information. Although Cheryl Ellison stated that she knew of Miller since he was born, she also testified that she did not grow up with the immediate Miller family and stated that she spent ‘very little’ time with the Miller family throughout her childhood. [February 2008 Rule 32 *400 Hearing, R. 501.] Ellison’s testimony during the evidentiary hearing provided virtually no additional, relevant information concerning Miller’s background other than general testimony that Ivan Miller was a bad person and irrelevant testimony concerning Miller’s brother, Ivan Ray Miller’s death and funeral. [February 2008 Rule 32, R. 500-525.]
“Furthermore, trial counsel had no reason to interview Miller’s niece, Alicia Sanford and his nephew, Jake Connell. Alicia Sanford testified that she was 14 years old at the time of trial and did not attend Miller’s trial, nor did she attend any family meetings with trial counsel. [February 2008 Rule 32 Hearing, R. 498-99.] Not only could trial counsel not have been aware of whether Alicia Sanford was available to testify, but it is unlikely that a witness 14 years old at the time of trial could have provided any background information whatsoever pertaining to Miller who was over twice her age. Similarly, trial counsel reasonably had no ability to be aware of Jake Con-nell’s availability as a witness, nor could Connell provide any useful background information. Connell was 18 years old at the time of Miller’s trial, did not spend much time growing up with Miller, and did not attend Miller’s trial. [February 2008 Rule 32 Hearing, R. 584-85.]
“Finally, the investigation into Miller’s childhood background and history of abuse through the interviews of family members was adequately performed by Dr. Charles Scott, the psychiatrist who testified during the penalty phase- of Miller’s trial. See Hall v. State, 979 So.2d 125, 163 (Ala.Crim.App.2007) (‘It is neither unprofessional nor unreasonable for a lawyer to use surrogates to investigate and interview potential witnesses rather than doing so personally’) (referencing Harris v. Dugger, 874 F.2d 756, 762 & n. 8 (11th Cir.1989)). Although Dr. Scott was not originally engaged by trial counsel for the express purpose of conducting a mitigation investigation, Johnson felt that Dr. Scott did ‘a pretty thorough job of getting family history that he felt was relevant, employment history, all of those that you want to present some information about to a jury.’ [February 2008 Rule 32 Hearing, R. 188, 222.] During the penalty phase of the trial, Dr. Scott confirmed the importance of his role in learning as much as he could about Miller’s social background, personal history, as well as facts of Miller’s case. [Record on Direct Appeal, R. 1348.]
“As part of his investigation, Dr. Scott met with Miller over a period of three days and conducted extensive interviews and examinations. [February 2008 Rule 32 Hearing, R. 314.] To confirm background information, Dr. Scott also interviewed Barbara Miller, his brother, Richard Miller, and his sister Cheryl Ellison. [February 2008 Rule 32 Hearing, R. 314-15.] After Dr. Scott’s investigation was completed, Johnson then discussed with Dr. Scott the areas in which Dr. Scott could provide helpful mitigation testimony during the penalty phase of Miller’s trial. [February 2008 Rule 32 Hearing, R. 190, 253-54.] Therefore, because trial counsel, both through his own investigation and through that of Dr. Scott, thoroughly inquired into the background and history of abuse in Miller’s childhood, Miller has failed to meet his burden of proof of demonstrating that his trial counsel’s investigation was deficient and this claim is denied.”
(C. 1992-2000.) The circuit court’s findings are supported by the record.
The circuit court also denied relief on this claim because the court found that *401 Miller failed to establish the requisite prejudice, stating:
“Even if Miller could have demonstrated that his trial counsel’s investigation of his background was- deficient, he cannot prove that he was prejudiced because extensive testimony was nonetheless presented during the penalty phase of his trial regarding his unstable childhood and the physical and emotional abuse Miller suffered.”
(C. 2000.) Miller’s failure to prove prejudice is discussed in more detail, infra.
(ii)
As noted above, Miller also asserts that his trial counsel were ineffective because, he claims, counsel did not gather multiple “important mitigating documents” that could have been presented in the penalty phase of the trial. However, in his claim in his amended Rule 32 petition, Miller asserted only that his trial counsel were ineffective for not gathering and investigating Miller’s medical records. (C. 288-90.)[8] That is the specific allegation the court addressed.
The circuit court denied relief on this claim for several reasons. First the court found that Miller failed to meet the specificity requirements of Rule 32.6(b), Ala. R.Crim. P., because Miller made only the vague allegation that his trial' counsel should have acquired records from three unnamed hospitals and Miller failed to present evidence at the evidentiary hearing of what specific hospital records his counsel should have investigated. (C. 2002.)
The circuit court also denied relief because, it found, Miller failed to meet his burden of proving that his trial counsel’s performance was deficient in this regard, or that he was prejudiced by that performance. Specifically, the court stated:
“Although trial counsel Johnson testified that he did not present Miller’s medical records during trial, Miller failed to elicit any testimony during the evidentiary hearing from Johnson as to whether Johnson investigated or attempted to obtain Miller’s medical records. [February 2008 Rule 32 hearing, R. 184.] Therefore, because the record is silent regarding trial counsel’s investigation of Miller’s medical records, and because trial counsel’s conduct is presumed to be reasonable, this Court should also presume that trial counsel’s investigation of Miller’s medical history was reasonable. Chandler v. United States, 218 F.3d 1305, 1315 n. 15 (11th Cir.2000) (‘An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [because] “where the record is incomplete or unclear about [counsel’s] actions, [the court] will presume that he did what he should have done, and that he exercised reasonable professional judgment.” ’).”
(C. 2003-04.)
The circuit court found that Miller failed to establish the requisite prejudice because, “[t]estimony was presented by Dr. Scott during the penalty phase of trial regarding injuries Miller received as a child — the exact information Miller now claims his trial counsel failed to investigate and provide to Dr. Scott.” (C. 2004.) The court additionally noted that Miller’s own Rule 32 expert, Dr. Boyer, “ ‘testified that she did not have any indication of the cause of Miller’s injuries and was not aware of any medical records indicating that Miller had any overnight hospital *402 stays as a result of his injuries.’ [February 2008 Rule 82 Hearing, R. 739-40.]” The court’s findings are supported by the record.
Miller now expands his list of documents that, he claims, his trial counsel should have gathered and investigated for mitigating evidence to include: (1) Miller’s education records; (2) Miller’s employment records; (3) mental-health records of Miller’s family; and (4) Department of Human Resources records showing the poverty Miller experienced. (Miller’s brief, at 80.) Because of the manner in which Miller presented this claim in his amended petition, the circuit court did not specifically address the additional documents Miller claims his trial counsel should have gathered and investigated for potential mitigating evidence. However, the effect of Miller’s trial counsel’s failure to gather these purportedly mitigating documents was addressed in the context of Miller’s assertion that his trial counsel did not present readily available mitigating evidence, which is discussed later in this opinion.
The circuit court’s conclusion that Miller failed to meet his burden of proving that his trial counsel’s performance in investigating potential mitigating evidence was unreasonable is supported by the record. As this Court has stated:
“ ‘ “[F]ailure to investigate possible mitigating factors and failure to present mitigating evidence at sentencing can constitute ineffective assistance of counsel under the Sixth Amendment.” Coleman [v. Mitchell ], 244 F.3d [533] at 545 [ (6th Cir.2001) ]; see also Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Our circuit’s precedent has distinguished between counsel’s complete failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel’s failure to conduct an adequate investigation where the presumption of reasonable performance is more difficult to overcome:
“ ‘ “[T]he cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have totally failed to conduct such an investigation. In contrast, if a habeas claim does not involve a failure to investigate but, rather, petitioner’s dissatisfaction with the degree of his attorney’s investigation, the presumption of reasonableness imposed by Strickland will be hard to overcome.”
‘“Campbell v. Coyle, 260 F.3d 531, 552 (6th Cir.2001) (quotation omitted) (emphasis added); see also Moore v. Parker, 425 F.3d 250, 255 (6th Cir.2005). In the present case, defense counsel did not completely fail to conduct an investigation for mitigating evidence. Counsel spoke with Beuke’s parents prior to penalty phase of trial (although there is some question as to how much time counsel spent preparing Beuke’s parents to testify), and presented his parents’ testimony at the sentencing hearing. Defense counsel also asked the probation department to conduct a presen-tence investigation and a psychiatric evaluation. While these investigatory efforts fall far short of an exhaustive search, they do not qualify as a complete failure to investigate. See Martin v. Mitchell, 280 F.3d 594, 613 (6th Cir.2002) (finding that defense counsel did not completely fail to investigate where there was “limited contact between defense counsel and family *403 members,” “counsel requested a pre-sentence report,” and counsel “elicited the testimony of [petitioner’s] mother and grandmother”). Because Beuke’s attorneys did not entirely abdicate their duty to investigate for mitigating evidence, we must closely evaluate whether they exhibited specific deficiencies that were unreasonable under prevailing professional standards. See Dickerson v. Bagley, 453 F.3d 690, 701 (6th Cir.2006).’
“Beuke v. Houk, 537 F.3d 618, 643 (6th Cir.2008). ‘[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying heavy measure of deference to counsel’s judgments.’ Wiggins, 539 U.S. at 521-22. ‘A defense attorney is not required to investigate all leads.... ’ Bolender v. Singletary, 16 F.3d 1547, 1557 (11th Cir.1994). ‘A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance.’ Atkins v. Singletary, 965 F.2d 952, 960 (11th Cir.1992). ‘The attorney’s decision not to investigate must not be evaluated with the benefit of hindsight, but accorded a strong presumption of reasonableness.’ Mitchell v. Kemp, 762 F.2d 886, 889 (11th Cir.1985).
“ ‘The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.’
“Strickland v. Washington, 466 U.S. at 691. ‘The reasonableness of the investigation involves “not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.” ’ St. Aubin v. Quarterman, 470 F.3d 1096, 1101 (5th Cir.2006), quoting in part Wiggins, 539 U.S. at 527.”
Ray, 80 So.3d at 983-84.
This is not a situation where Miller’s trial counsel conducted no investigation, or where trial counsel, like counsel in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), had information that alluded to the defendant’s troubled and difficult childhood but failed to conduct a more thorough investigation. Because Miller failed to prove that his trial counsel’s performance in investigating potential mitigating evidence was unreasonable, Miller also failed to prove that the manner in which appellate counsel asserted this claim was deficient. Payne, 791 So.2d at 401.
b.
Miller argues that his trial counsel failed to present readily available mitigating evidence at the penalty phase of the trial. Miller maintains that had his trial counsel conducted a proper investigation into Miller’s background, trial counsel “would have been able to inform the jury about the instability, violence and drug abuse to which [he] was exposed throughout his early life,” and trial counsel could have presented “positive evidence concerning [him], his life, or his character.” (Miller’s brief, II(B)(2)(c)(ii), at 82-99; Miller’s reply brief, at 29-34.)
Specifically, Miller contends that as a result of his trial counsel’s failure to present sufficient mitigating evidence, neither the judge nor the jury learned of: (1) the extent of the physical and emotional abuse inflicted on Miller by his father (Miller’s brief, at 87-90); (2) the poverty and rootlessness Miller experienced as a child (Miller’s brief, at 90-92); (3) the unlawful be *404 havior to which Miller was exposed during his upbringing (Miller’s brief, at 92); (4) the Miller family’s history of mental abuse (Miller’s brief, at 93); (5) Miller’s good employment history (Miller’s brief, at 93-95); (6) Miller’s loving relationship with his family (Miller’s brief, at 95-98); (7) Miller’s unusual behavior immediately before the shootings (Miller’s brief, at 98-99).
In a related vein, Miller contends that his trial counsel were ineffective because they did not retain a mitigation expert, who, Miller claims, could have conducted a comprehensive mitigating investigation and who could have presented the resulting information to the jury “in a way that would allow the jurors to understand what caused [him] to shoot his three co-workers.” (Miller’s brief, II(B)(2)(e)(iii), at 99-104.) In support of this assertion, Miller argues that the testimony of his Rule 32 expert Dr. Catherine Boyer “demonstrated both the type of expert mitigation evidence that Trial Counsel failed to present and the resulting prejudice to [him.]” (Miller’s brief, at 100.)
Miller maintains that had his trial counsel properly presented the readily available mitigating evidence, there is “reasonable probability” that the jury would not have recommended the death penalty and/or that the court would not have imposed the death penalty. Thus, Miller concludes, had his appellate counsel properly argued and supported this claim of ineffective assistance of counsel in the motion for a new trial and on appeal, he would have prevailed.
The circuit court addressed these contentions in its order denying Miller relief on these claims. We quote extensively from the court’s order:
“In paragraphs 238-64 of his amended petition [C. 338^46], Miller claims that his trial counsel were ineffective in presenting a mitigation case on Miller’s behalf. Miller’s claim contained numerous reasons in which he alleges trial counsel’s mitigation presentation was ineffective. First, Miller claims that Dr. Scott’s testimony was insufficient to present a mitigation case because Dr. Scott had not been retained as a mitigation expert. [C. 338.] Miller also claims that ‘the jury never heard about the emotional and physical terror that Mr. Miller’s father, Ivan, had inflicted upon Mr. Miller and his family.’ [C. 339.] Miller alleges that the jury never heard about his troubled childhood, including the extent of the family’s poverty, the family’s frequent relocations, and the unlawful behavior and drug abuse that occurred in the Miller home. [C. 341.] Miller also claims that his trial counsel were ineffective for not presenting mitigation evidence through the following family members: his mother, Barbara, his siblings, Richard, Cheryl, and Jeff, his niece, Alicia, his nephew, Jake, and his cousin Brian. [C. 343.] Finally, Miller claims that the jury never heard positive information about his life such as the fact that he worked to provide money for his family and his good employment history. [C. 343-44.]
“This Court denies Miller’s claim because he has failed to meet his burden of proof of establishing that trial counsel’s performance was deficient under Strickland, 466 U.S. at 687; Ala. R.Crim. P. 32.7(d). The basic thrust of Miller’s claim is that his trial counsel should have done something more — i.e., that more mitigating evidence concerning his mental history, his personal background, and family background should have been presented during the penalty phase. When a claim is raised that trial counsel should have done something more, a court must first look at what trial counsel did. Chandler [v. United States ], *405 218 F.3d [1305] at 1320 [(11th Cir.2000) ]. (‘Although Petitioner’s claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact.’) Moreover, ‘the mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.’ Id. at 1316 n. 20.
“Johnson testified that he made a strategic decision to focus on the penalty phase of Miller’s trial and that his specific theory of defense was that Miller suffered from a diminished capacity. [Direct Appeal, Motion for New Trial Hearing, R. 17, February 2008 Rule 32 Hearing, R. 219.] Accordingly, Johnson presented the testimony of Dr. Scott for this purpose in an effort to establish the existence of two statutory mitigating circumstances: that the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance under Ala.Code [1975,] § 13A-5-51(2) and that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired under Ala. Code [1975] § 13A-5-5R6). [Record on Direct Appeal, R. 1343-91; February 2008 Rule 32 Hearing, R. 186-87.] Johnson had originally retained Dr. Scott to evaluate Miller in regard to an insanity plea; however, after Dr. Scott issued his report and the insanity plea was dropped, Johnson discussed with Dr. Scott the possibility of presenting the mental health evidence from Dr. Scott’s evaluation in support of a mitigation case. [February 2008 Rule 32 Hearing, R. 181,190, 253.]
“At trial, Dr. Scott provided testimony relating to Miller’s psychological background as well as Miller’s verison of the events on the day of the shooting in support of a diminished capacity strategy. Dr. Scott testified that Miller reported that he believed people were watching him and teasing him at work and that these feelings weighed on his mind. [Record on Direct Appeal, R. 1365-66, 1369.] Dr. Scott stated that Miller said the pressure of these thoughts kept building up in his mind and that the ‘straw that broke the camel’s back’ occurred when he arrived at work at Ferguson Enterprises on August 5, 1999. [Record on Direct Appeal, R. 1373-75.] Dr. Scott also testified that Miller reported experiencing ‘tunnel vision’ and that Miller had difficulty recalling the events of the crime. [Record on Direct Appeal, R. 1375,1378.] Based on this evidence, Dr. Scott opined that Miller did have a mental illness at the time of the shootings, specifically a delusional disorder, and that his ability to appreciate his conduct was substantially impaired. [Record on Direct Appeal, R. 1389-91.]
“Although the presentation of testimony supporting a diminished capacity theory was Johnson’s main strategy, contrary to Miller’s claims, Johnson also presented an array of mitigating evidence concerning Miller’s background, family history, and positive information about his life through the testimony of Dr. Scott. Johnson did not hire Dr. Scott with the express purpose of investigating Miller’s background, and in fact, Johnson and Dr. Scott agreed that he was not retained in the capacity of a mitigation expert. [February 2008 Rule 32 Hearing, R. 189, 311.] However, Dr. Scott did state that it was important for him to learn as much as he could about Miller’s social background, educational background, and personal history during his evaluation. [Record on Direct Ap *406 peal, R. 1348.] Johnson testified Dr. Scott did a thorough job of investigating relevant family history and background information and could perform the role of presenting this information he discovered to the jury. [February 2008 Rule 32 Hearing, R. 222, 254.]
“Contrary to Miller’s claims, evidence concerning the physical and emotional abuse inflicted on him personally by Miller’s father, Ivan, and on his family was presented through the testimony of Dr. Scott. Dr. Scott testified that Ivan was ‘verbally abusive’ to Miller, that Ivan told Miller at a young age he would not amount to anything, and that Ivan called him a ‘God damn son of a bitch.’ [Record on Direct Appeal. R. 1350.] Dr. Scott also testified that Ivan was ‘physically abusive’ to Miller and frequently hit Miller which left bruises on him. [Record on Direct Appeal. R. 1350.] Dr. Scott told the jury about specific occurrences of Ivan’s abuse when Ivan threatened to harm Miller with a large butcher knife. [Record on Direct Appeal, R. 1351.] Dr. Scott also noted that Miller witnessed Ivan’s verbal and physical abuse to his mother, in which Ivan called her a “whore’ and frequently hit her ‘very hard.’ [Record on Direct Appeal, R. 1351.]
“Contrary to Miller’s claim, evidence detailing Miller’s impoverished childhood and unstable home environment was presented through Dr. Scott’s testimony. Dr. Scott stated that Miller had ‘an unusual early childhood’ because his family frequently moved between Illinois, Alabama, and Texas as many as 7 to 10 times. [Record on Direct Appeal, 1349.] Dr. Scott testified that Ivan Miller often quit or lost his job and that the family lived ‘on the edge of poverty a lot.’ [Record on Direct Appeal, R. 1349.] Dr. Scott also informed the jury that drug abuse was present during Miller’s childhood, noting that Ivan Miller ‘abused marijuana quiet heavily’ and injected drugs intravenously in Miller’s presence. [Record on Direct Appeal, R. 1350.] Dr. Scott also provided details of Ivan Miller’s eccentric behavior, testifying that Ivan thought he had the power to heal and that his father laid hands on Miller’s brother and walked around the house spraying ‘holy water.’ [Record on Direct Appeal, R. 1350-51.] Additionally, Dr. Scott presented evidence of the family psychiatric history. [Record on Direct Appeal. R. 1362.] Dr. Scott noted Ivan Miller’s erratic behavior and also testified that Miller’s grandfather had been institutionalized and that his brother was considered slow. [Record on Direct Appeal, R. 1362-63.]
“Finally, contrary to Miller’s claims, Dr. Scott provided positive evidence of Miller’s character. Dr. Scott noted that Miller had a great, loving relationship with his mother, Barbara. [Record on Direct Appeal, R. 1351-52.] Dr. Scott told the jury that Miller quit school when he was in the eleventh grade so that he could work and provide money for his family. [Record on Direct Appeal, R. 1349-50.] Dr. Scott noted that Miller did not have a history of aggressive behavior and that Miller eventually graduated from high school. [Record on Direct Appeal, R. 1352-53.] Dr. Scott also testified that Miller did not have a history of any serious drug or alcohol abuse. [Record on Direct Appeal, R. 1356.] Dr. Scott also provided the jury with details of Miller’s employment history, testifying that Miller had several jobs, usually left a job for a job that paid more money, and kept to himself during work. [Record on Direct Appeal, R. 1363.] In total, the scope of Dr. Scott’s testimony was broad and provided many details of events throughout his lifetime *407 and extensively covered various areas of his personal history.
“Based on the record of trial and the evidentiary hearing, this Court finds that trial counsel made a strategic decision to concentrate on presenting evidence during the penalty phase on Miller’s diminished mental capacity that would support a finding of the existence of two statutory mitigating circumstances. Trial counsel also presented a wealth of evidence concerning Miller’s background and family history. Trial counsel’s strategy was successful in that two jurors recommended a sentence of life imprisonment and the trial court found the existence of three statutory mitigating circumstances. Miller, 913 So.2d at 1169.
“Simply because Miller alleges that more mitigating evidence could have been presented does not demonstrate that his trial counsel was ineffective. Trial counsel’s decision was reasonable and strategic, and this Court will not ‘second-guess’ it. See, e.g., Crawford v. Head, 811 F.3d 1288, 1312 (11th Cir.2002) (‘This court agrees that testimony from a mental health expert ... would have been admissible and might be considered to be mitigating. However, trial counsel chose to pursue a strategy of focusing the jury’s attention on the impact of a death sentence on petitioner’s family. This court will not second guess trial counsel’s deliberate choice.’); Boyd v. State, 746 So.2d 364, 398 (Ala.Crim.App.1999) (‘Trial Counsel stated that the defense strategy was to humanize Boyd for the jury ... [W]e do not find counsel’s efforts to be ineffective.’)
“This Court also finds that the trial counsel had tactical reasons for not presenting evidence or witnesses which Miller now alleges should have been presented during the penalty phase. See, Payne v. State, 791 So.2d 383, 404 (Ala.Crim.App.1999) (“When a decision to not put on certain mitigating evidence is based on a ‘strategic choice,’ courts have always found not ineffective performance.’) Miller claims that a host of family members, particularly his mother, Barbara, should have been presented as witnesses during the penalty phase of trial.
“However, both trial counsel testified during the evidentiary hearing that they had specific, strategic reasons for not presenting Barbara Miller as a witness. Johnson testified that he talked with Barbara Miller in preparation for the penalty phase, considered calling her as a witness, and discussed this possibility with cocounsel Ronnie Blackwood. [February 2008 Rule 32 Hearing, R. 158, 229.] Johnson explained that his reason for not calling Barbara as a witness was that he felt she would not be effective as a witness:
“ ‘I ... spent enough time with Alan’s mother to be able to draw some conclusions ... about how effective she might be in that capacity ... I was concerned that with Alan’s mother’s] demeanor that it might diminish that natural sympathy for a mother because I found her ... to be somewhat emotionally detached from the circumstances we were in.’
“[February Rule 32 Hearing, R. 177-78; 230-31.]
“Blackwood confirmed that trial counsel discussed the possibility of putting Barbara Miller on the stand. [February 2008 Rule 32 Hearing, R. 863-64.] Blackwood testified he spoke with Barbara Miller about testifying and that he talked with her about what she might testify to in regard to saving Miller’s life if called. [February 2008 Rule 32 Hearing, R. 864.] During this conversation, *408 Blackwood testified that Barbara Miller was ‘very matter of fact’ and also uttered a racially derogatory word. [February 2008 Rule 32 Hearing, R. 864-65.] Blackwood stated that Barbara Miller’s demeanor and her use of this language contributed to the strategic decision to not call her as a witness. [February 2008 Rule 32 Hearing, R. 865.]
“Johnson provided another reason for not calling Barbara Miller as a witness stating that ‘I didn’t know that she had any background information that might be particularly important that wasn’t already presented by Dr. Scott.’ [February 2008 Rule 32 Hearing, R. 178.] Furthermore, Johnson testified that he decided during the penalty phase that there were not any other members of Miller’s family whose testimony could have made an impact during the penalty phase. [February 2008 Rule 32 Hearing, R. 245.] Moreover, Johnson could not have even been aware of two of the family witnesses Miller now claims should have been called as witnesses during the penalty phase. Miller’s nephew, Jake Connell, and his niece, Alicia Sanford, both testified during the evi-dentiary hearing that neither of them attended Miller’s trial. [February 2008 Rule 32 hearing, R. 498, 585.] Trial counsel had specific, strategic reasons for calling and not calling the witnesses they did during the penalty phase and Miller has failed to establish that trial counsel’s choices were deficient. Miller has not proved that no reasonably competent attorney would have proceed during the penalty phase in the manner in which Miller’s trial counsel did.
“Finally, Miller has failed to demonstrate that his trial counsel were deficient for not retaining and presenting the testimony of a mitigation expert. As noted above, Dr. Scott adequately presented an abundant amount of mitigating evidence. Furthermore, Miller has failed to present any evidence that establishes a reasonably competent attorney practicing at the time of Miller’s trial would have retained and presented a mitigation expert. With over twenty-five years of experience litigating criminal cases and participating in several capital murder trials before Miller’s, Johnson testified that he had never retained a mitigation expert. [February 2008 Rule 32 Hearing, R. 210, 254.]
Blackwood also testified that in his experience as a criminal defense attorney, he had never hired a mitigation expert. [February 2008 Rule 32 Hearing, R. 868-69.] Accordingly, Miller has failed to establish that his trial counsel were deficient in this regard. Furthermore, Miller has failed to meet his burden of proof of demonstrating that his trial counsel’s penalty phase strategy and performance were unreasonable and deficient. Therefore this claim is denied.”
(C. 2073-85.)
The circuit court also denied relief on this claim because, the court found, Miller failed to establish that he was prejudiced by his trial counsel’s penalty-phase performance. The court stated:
“Even if Miller had demonstrated that his trial counsel were deficient for not presenting sufficient mitigation evidence during the penalty phase, Miller has failed to establish a reasonable probability that the outcome of his proceedings would have been different had such information been presented.
“Miller has failed to establish that he was prejudiced by trial counsel’s decision to not retain and present the testimony of a mitigation expert. As noted above, Dr. Scott presented thorough testimony during the penalty phase de *409 tailing Miller’s background and family history and also focused much of his testimony on presenting' evidence of Miller’s mental health problems. [Record on Direct Appeal, R. 1343-91.] Similar to Dr. Scott, Dr. Catherine Boyer testified during the evidentiary hearing in regard to what type of investigation a mitigation expert would conduct. [February 2008 Rule 32 Hearing, R. 592-93.]
“Dr. Boyer also stated that, like Dr. Scott, she met Miller over a period of three occasions. [February 2008 Rule 32 Hearing, R. 598.] However, Dr. Boyer’s testimony during the evidentiary hearing covered essentially the same topics and areas which Dr. Scott presented during the penalty phase. Dr. Boyer testified concerning Miller’s family history of mental illness, that his family lived in poverty, that Miller had a good employment history, that Ivan was physically abusive, and that Miller had a good relationship with his mother and siblings. [February 2008 Rule 32 Hearing, R. 643-75.] Additional evidence concerning Miller’s background and family history provided by Dr. Boyer was simply cumulative of the testimony provided by Dr. Scott during the penalty phase. However, ‘unpresented cumulative testimony does not establish that counsel was ineffective.’ McNabb v. State, 991 So.2d 313, 322 (Ala.Crim.App.2007); see also Dobyne v. State, 805 So.2d 733, 755 (Ala.Crim.App.2000) (cumulative evidence would not have affected appellant’s sentence). Therefore, this Court finds that Miller was not prejudiced by trial counsel’s failure to retain a mitigation expert.
“Similarly, this Court finds that Miller was not prejudiced by his trial counsel’s failure to present more details both of the extent of physical abuse from his father, Ivan, and of the poverty and unstable environment in which Miller lived. Testimony regarding the extensive level of physical and emotional abuse directed toward Miller as well as the extreme level of poverty of Miller’s childhood home was presented during the trial. [Record on Direct Appeal, R. 1349-52.] Miller has failed to present any further significant and specific facts other than cumulative evidence that simply expounds on general examples of Ivan Miller’s abuse and the Miller family poverty. Such cumulative testimony does not demonstrate that Miller was prejudiced by the presentation of testimony concerning the level of abuse and poverty in Miller’s childhood. See McNabb, 991 So.2d at 322, Dobyne, 805 So.2d at 755.
“The record indicates that Miller failed to present any further significant evidence of childhood abuse through the testimony of his family members during the evidentiary hearing. His mother, Barbara Miller, generally testified that Ivan ignored Miller, called him names, and physically abused Miller. [February 2008 Rule 32 Hearing, R. 402-11.] However, she did not provide testimony of any specific incidents of abuse or injuries as a result of abuse. Miller’s sister, Cheryl Ellison provided minimal testimony regarding Ivan’s abuse of Miller, admitting she did not grow up in the same house as Miller. [February 2008 Rule 32 Hearing, R. 501.] Miller’s brother Richard also provided nothing but general statements Ivan would ‘[s]lap [Miller], kick him, sometimes punch him.’ [February 2008 Rule 32, R. 546.] Regardless, even if the family could have provided specific facts, simply the fact that Miller’s family members could have provided more details of the extent of the abuse Miller suffered or of his childhood poverty does not establish ineffective assistance of coun *410 sel. See Payne v. Allen, 539 F.3d 1297, 1317 (11th Cir.2008) (‘The mere fact that the family members could have presented more thorough and graphic detail about the physical abuse Payne suffered and witnessed and his early substance abuse does not render counsel’s performance ineffective.’)
“Moreover, had counsel presented evidence of Miller’s childhood poverty and abuse, it would not have altered the balance of mitigation and aggravation under Strickland. Miller was in his mid-thirties when he committed the murders. [Record on Direct Appeal, C. 79.] It is well established that evidence concerning a middle aged murderer’s childhood poverty, abuse and background would have been entitled to little, if any, mitigating weight. See Callahan v. Campbell, 427 F.3d 897, 937-38 (11th Cir.2005) (value of evidence regarding childhood abuse ‘minimal’ where defendant was thirty-five when he committed crime); Gilreath v. Head, 234 F.3d 547, 551 n. 10 (11th Cir.2000) (petitioner not prejudiced when his attorney failed to present evidence concerning his abusive and difficult childhood where petitioner was forty years old when he committed the offense); Mills v. Singletary, 63 F.3d 999, 1025 (11th Cir.1995) (petitioner not denied effective assistance of counsel because counsel failed to present evidence concerning abusive childhood where petitioner was twenty-six years old); Bolender v. Singletary, 16 F.3d 1547, 1561 (11th Cir.1994) (petitioner twenty-seven years old when committed offense). Accordingly, this Court finds that Miller has failed to establish prejudice under Strickland.
“Miller has also failed to establish that he was prejudiced by his trial counsel’s decision not to present additional evidence of Miller’s positive character through the testimony of his family members during the penalty phase. Trial counsel was not required to present mitigating character evidence at all during the penalty phase. See Gaddy v. State, 952 So.2d 1149, 1170-71 (Ala.Crim.App.2006). However, as noted above, trial counsel did present positive evidence of Miller’s life through the testimony of Dr. Scott. [Record on Direct Appeal, R. 1349-63.] The testimony of Miller’s family members during the evi-dentiary hearing was simply cumulative of the positive evidence presented by Dr. Scott during the penalty phase.
“Barbara Miller essentially offered no significant, positive details of Miller’s character during the evidentiary hearing other than the fact that he helped pay for his younger brother Ivan Ray’s funeral expenses and that he cared for his family and was quiet and hard working. [February 2008 Rule 32 Hearing, R. 424.] Miller’s uncle, George Carr, provided no noteworthy details of Miller’s life and even admitted that he was not around Miller that much as a child. [February 2008 Rule 32 Hearing, R. 462.] Miller’s sister, Cheryl Ellison, gave minimal testimony concerning his positive character, only stating that Miler was like a brother to her son, Jake. [February 2008 Rule 32 Hearing, R. 505.] Miller’s brother, Richard, essentially did not provide any positive character evidence at all during the eviden-tiary hearing. The positive character evidence presented through the testimony of Miller’s family members during the evidentiary hearing was not significant and was merely cumulative to the positive evidence of Miller’s life that was presented during the penalty phase. See McNabb, 991 So.2d at 322; Dobyne, 805 So.2d at 755.
“Miller has also failed to show how he was prejudiced by the failure to present *411 additional mental health evidence during the penalty phase in the form of Dr. Boyer’s diagnosis that Miller suffered from post-traumatic stress disorder. [February 2008 Rule 82 Hearing, R. 714.] Dr. Scott presented testimony that Miller suffered from a mental illness and the trial court found that Miller was under the influence of extreme mental distress and that the capacity to appreciate the criminality of his conduct was substantially impaired. Miller, 913 So.2d at 1169. Therefore, the mitigating circumstances pertaining to Miller’s mental health were found to exist by the trial court and therefore, the presentation of additional mental health evidence would not have proven any additional statutory mitigating circumstances.
“Furthermore, the evidence presented during the evidentiary hearing casts serious doubt on the opinion of Dr. Boyer that Miller suffered from a post-traumatic stress disorder (‘PTSD’) at the time of the offense. Dr. Boyer stated that the principle sources of information that led her to conclude that Miller suffered from PTSD were that Miller was exposed to routine abuse, that Miller routinely zoned out, that Miller had certain elevated MMPI [Minnesota Multiphase Personality Inventory] scales, and that Miller had initial difficulty remembering the events of the shootings. [February 2008 Rule 32 Hearing, R. 714-16.]
“On cross-examination, Dr. Boyer agreed that the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR) is an authoritative text in the field of psychiatry, and she explained that the DSM-IV-TR is a guideline for mental health professionals. [February 2008 Rule 32 Hearing, R. 730-31.] Dr. Boyer agreed that a diagnosis of PTSD must have an extreme traumatic stres-sor as opposed to a generic trauma. [February 2008 Rule 32 Hearing, R. 733.] Specifically, Dr. Boyer noted that with regard to PTSD, the DSM-IV-TR provides, as follows:
“ ‘The essential feature of Post Traumatic Stress Disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to pne’s physical integrity; or witnessing an event that involves death, injury, or a threat to the physical integrity of another person.’
“[February 2008 Rule 32 Hearing, R. 733.] With regard to ‘traumas’ that are experienced directly, Dr. Boyer noted that the DSM-IV-TR provides as follows:
“Traumatic events that are experienced directly include, but are not limited to, military combat, violent personal assault (sexual assault, physical attack, robbery, mugging), being kidnapped, being taken hostage, terrorist attack, torture, incarceration as a prisoner of war or in a concentration camp, natural or manmade disasters, severe automobile accidents, or being diagnosed with a life-threatening illness.’
“[February 2008 Rule 32 Hearing, R. 733-34.] See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, at pp. 463-464.
“However, Dr. Boyer noted that Miller had never experienced military combat, a kidnapping, a sexual assault, been taken hostage, been a prisoner of war, or been involved in a terrorist attack, natural disaster or severe automobile accident. [February 2008 Rule 32 Hear *412 ing, R. 734.] Dr. Boyer also noted that Miller had never watched someone be seriously injured or killed, before the shootings took place. [February 2008 Rule 32 Hearing, R. 736.] Dr. Boyer admitted that none of Miller’s hospital records indicated that his injuries came from specific incidents of abuse and did not indicate that Miller ever received any serious gunshot or knife wounds. [February 2008 Rule 32 Hearing, R. 740.]
“Dr. Boyer stated that Dr. McClaren did not find that Miller suffered from a dissociative disorder such as PTSD. [First Rule 32 Hearing, R. 744.] Dr. Boyer also noted that no other professional had diagnosed Miller with PTSD. [February 2008 Rule 32 Hearing, R. 750.] In fact, none of the other four doctors who examined Miller in connection with his trial or evidentiary hearing determined that he suffered from PTSD. Dr. Boyer also failed to provide any specific examples from the testimony presented during the evidentiary hearing of Miller re-experiencing bad experiences. [February 2008 Rule 32 Hearing, R. 749-50.]
“Dr. Harry McClaren testified during the evidentiary hearing that there was no evidence to indicate that Miller was reliving anything at the time of the murders. [February 2008 Rule 32 Hearing, R. 787.] Dr. McClaren also stated that he originally was of the opinion that Miller’s self-report that he had difficulty remembering events of the shootings was of questionable veracity. [February 2008 Rule 32 Hearing, R. 775.] Dr. McClaren later stated that it was unusual for someone with true amnesia to remember certain events in question months later. [February 2008 Rule 32 Hearing, R. 852.] Finally, Dr. McClaren testified that he was of the opinion that Miller was not suffering from PTSD. [February 2008 Rule 32 Hearing, R. 787-88.] The combination of the lack of a previous diagnosis of PTSD from any mental health professional who examined Miller, Dr. McClaren’s opinion that Miller does not suffer from PTSD, and the dissimilarity between the examples of traumatic events contained in the DSM-IV-TR associated with PTSD when compared to the facts presented during the evidentiary hearing regarding Miller’s life discredits Dr. Boyer’s opinion that Miller suffers from PTSD. Regardless, this Court finds that there is no reasonable probability that the presentation of any evidence regarding Miller’s alleged diagnosis of PTSD would have altered the jury’s recommendation of a death sentence of the trial court’s finding that the aggravating circumstances outweigh the mitigating circumstances.
“Finally, in regard to this entire claim, Miller has not shown a reasonable probability that the result of the penalty phase would have been different had additional mitigation evidence been presented based on the brutal nature of the crime, the overwhelming and convincing evidence of guilt, and the strength of the aggravating circumstances that this murder was heinous, atrocious, and cruel. See Payne, 539 F.3d at 1318. Miller repeatedly and horrifically shot and killed three people. The Court of Criminal Appeals found that the evidence of guilt was ‘overwhelming,’ especially in regard to the multiple eyewitnesses identifying Miller as the shooter. Miller, 913 So.2d at 1162. In this particular case, there is no reasonable probability that additional mitigation testimony about Miller’s background or his mental health problems would have altered the balance of aggravating and mitigating circumstances in this case. See Payne, *413 539 F.3d at 1318 (‘Some more detailed mitigating evidence about Payne’s childhood, family background, and substance abuse would not have negated the aggravating nature of this abhorrent murder proven beyond all doubt by the State.’) Therefore, Miller has failed to establish that he was prejudiced under Strickland and accordingly, this claim is denied.”
(C. 2085-97.)
The circuit court’s findings are supported by the record and law. As the circuit court stated, Miller’s claim that his counsel failed to adequately present mitigating evidence is essentially a claim that his counsel should have presented more mitigating evidence. However, as we have stated:
“ ‘[W]e “must recognize that trial counsel is afforded broad authority in determining what evidence will be offered in mitigation.” State v. Frazier (1991), 61 Ohio St.3d 247, 255, 574 N.E.2d 483. We also reiterate that post-conviction proceedings were designed to redress denials or infringements of basic constitutional rights and were not intended as an avenue for simply retrying the case. [Laugesen ] v. State, [ (1967), 11 Ohio Misc. 10, 227 N.E.2d 663] supra; State v. Lott, [ (Nov. 3, 1994), Cuyahoga App. Nos. 66388, 66389, 66390], supra. Further, the failure to present evidence which is merely cumulative to that which was presented at trial is, generally speaking, not indicative of ineffective assistance of trial counsel. State v. Combs (1994), 100 Ohio App.3d 90, 105, 652 N.E.2d 205.’
“Jells v. Mitchell, 538 F.3d 478, 489 (6th Cir.2008).
“ ‘ “[C]ounsel is not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel’s strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively.” Haliburton v. Sec’y for the Dep’t of Corr., 342 F.3d 1233, 1243-44 (11th Cir.2003) (quotation marks and citations omitted); see Herring v. Sec’y, Dep’t of Corr., 397 F.3d 1338, 1348-50 (11th Cir.2005) (rejecting ineffective assistance claim where defendant’s mother was only mitigation witness and counsel did not introduce evidence from hospital records in counsel’s possession showing defendant’s brain damage and mental retardation or call psychologist who evaluated defendant pre-trial as having dull normal intelligence); Hubbard v. Haley, 317 F.3d 1245, 1254 n. 16, 1260 (11th Cir.2003) (stating this Court has “consistently held that there is ‘no absolute duty ... to introduce mitigating or character evidence’ ” and rejecting claim that counsel were ineffective in failing to present hospital records showing defendant was in “borderline mentally retarded range”) (brackets omitted) (quoting Chandler [v. United States ], 218 F.3d [1305] at 1319 [(11th Cir.2000) ]).’
“Wood v. Allen, 542 F.3d 1281, 1306 (11th Cir.2008). ‘The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy.’ Hill v. Mitchell, 400 F.3d 308, 331 (6th Cir.2005).”
Dunaway v. State, [Ms. CR-06-0996, December 18, 2009] — So.3d -, - (Ala.Crim.App.2009).
Additionally,
“ “When claims of ineffective assistance of counsel involve the penalty phase of a capital murder trial the *414 focus is on “whether ‘the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.’ ” Jones v. State, 758 So.2d 1174, 1197 (Ala.Crim.App.1999), quoting Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir.1992). See also Williams v. State, 788 So.2d 108 (Ala.Crim.App.2000). An attorney’s performance is not per se ineffective for failing to present mitigating evidence at the penalty phase of a capital trial. See State v. Rizzo, 266 Conn. 171, 833 A.2d 363 (2003); Howard v. State, 853 So.2d 781 (Miss.2003), cert. denied, 540 U.S. 1197 (2004); Battenfield v. State, 953 P.2d 1123 (Okla.Crim.App.1998); Conner v. Anderson, 259 F.Supp.2d 741 (S.D.Ind.2003); Smith v. Cockrell, 311 F.3d 661 (5th Cir.2002); Duckett v. Mullin, 306 F.3d 982 (10th Cir.2002), cert. denied, 123 S.Ct. 1911 (2003); Hayes v. Woodford, 301 F.3d 1054 (9th Cir.2002); and Hunt v. Lee, 291 F.3d 284 (4th Cir.), cert. denied, 537 U.S. 1045 (2002).’
“Adkins v. State, 930 So.2d 524, 536 (Ala.Crim.App.2001) (opinion on return to third remand). As we also stated in McWilliams v. State, 897 So.2d 437, 453-54 (Ala.Crim.App.2004):
“ ‘ “Prejudicial ineffective assistance of counsel under Strickland cannot be established on the general claim that additional witnesses should have been called in mitigation. See Briley v. Bass, 750 F.2d 1238, 1248 (4th Cir.1984); see also Bassette v. Thompson, 915 F.2d 932, 941 (4th Cir.1990). Rather, the deciding factor is whether additional witnesses would have made any difference in the mitigation phase of the trial.” Smith v. Anderson, 104 F.Supp.2d 773, 809 (S.D.Ohio 2000), aff'd, 348 F.3d 177 (6th Cir.2003). “There has never been a case where additional witnesses could not have been called.” State v. Tarver, 629 So.2d 14, 21 (Ala.Crim.App.1993).’ ”
Hunt v. State, 940 So.2d 1041, 1067-68 (Ala.Crim.App.2005).
On direct appeal, this Court stated:
“With regard to the application of the aggravating circumstance that the murders were especially heinous, atrocious, or cruel, the circuit court made the following findings of fact on remand:
“ ‘On the morning of August 5, 1999, [Miller] shot and killed three men, namely, Christopher Yancy (‘Yancy”), age 28 years; Lee Holdbrooks (“Hold-brooks”), age 32; and Terry Jarvis (“Jarvis”), age 39 years. Yancy and Holdbrooks were both shot at one location and thereafter Jarvis was shot at another location. Each of those victims sustained multiple wounds.
“Yancy suffered three wounds to his body. It appears the first shot entered his leg and traveled through his groin and into his spine, paralyzing him. He was unable to move, unable to defend himself and was trying to hide from [Miller] under a desk. Yan-cy had a cell phone an inch or two from his hand, but because of his paralysis was unable to reach it and call for help. Yancy had to have been afraid his life was about to be taken. Moments elapsed. [Miller] appeared to have then stooped under the desk and have made eye contact with Yan-cy before shooting him twice more causing his death.
“‘Holdbrooks suffered six wounds to his body. [Miller] shot Holdbrooks several times. Holdbrooks crawled down a hallway for about twenty-five *415 feet. Holdbrooks was uncertain whether he would live or die as he crawled down the hallway and quite possibly his life was flashing by in his mind. [Miller] took his gun and within two inches of Holdbrooks’ head, pulled the trigger for the sixth and final time, the bullet entering Hold-brooks’ head causing him to die in a pool of blood.
“‘Jarvis was shot five times, the last shot being no more than 46 inches away from his body. Before Jarvis was shot, [Miller] had pointed a gun at him in the presence of a witness. [Miller] had accused Jarvis of spreading rumors about him which Jarvis had denied. [Miller] shot Jarvis four times in the chest. [Miller] allowed the witness to leave. No one knows at that point what went through Jarvis’ mind. Having denied he spread any rumors, he must have wondered why [Miller] had not believed him and as the witness was allowed to leave that maybe there would be no more shooting and his life would be spared. [Miller] then shot Jarvis through his heart ending Jarvis’ life.
“ ‘It appears all three of [Miller’s] victims suffered for a while not only physically, but psychologically. In each instance, there appeared to have been hope for life while they were hurting, only to have their fate sealed by a final shot, execution style.
“ ‘Based upon the facts presented at this trial, these murders were calculated, premeditated and callous, with utter disregard of human life. The taking of these lives was among the worst in the memory of this Court and was well beyond the level of being especially heinous, atrocious or cruel.’
[[Image here]]
“... [T]here was sufficient time between the initial gunshot wounds and the final, fatal shots for each of the victims to realize his fate. Given the circumstances, the trial court properly concluded that the murder of the three victims was ‘especially heinous, atrocious, or cruel.’ See Ex parte Clark, 728 So.2d 1126,1140 (Ala.1998).
Miller, 913 So.2d at 1165-67.
This Court has reviewed the mitigating evidence trial counsel allegedly failed to discover and present against the aggravating circumstances presented and we are confident that there would be no change in the result in this case. See Wiggins v. Smith, 539 U.S. at 534.
Accordingly, Miller was due no relief on his claim that his trial counsel were ineffective for not presenting the additional mitigating evidence in the penalty phase of the trial. Thus, it follows that Miller has also failed to prove by a preponderance of the evidence that his appellate counsel were ineffective in the manner in which they presented this claim of ineffective assistance of trial counsel in the post-sentencing proceedings. Payne, 791 So.2d at 401.
4.
Miller contends his trial counsel rendered ineffective assistance during his penalty-phase opening statement. (Miller’s brief, 11(B)(2)(d), at 117-124; Miller’s reply brief, at 34-38.) Specifically, Miller argues:
“Trial counsel made no attempt to outline a coherent mitigation case, to humanize Mr. Miller, or to provide a context for the testimony of Dr. Scott, the only mitigation witness. Instead, Trial Counsel did the opposite: he vilified Mr. Miller, undermined the credibility of Dr. Scott, and effectively conceded the only *416 aggravating factor on which the State relied.”
(Miller’s brief, at 117-18.)
The circuit court rejected appellate counsel’s assertion in the motion-for-new-trial hearing that Miller’s trial counsel “undermined the mitigation case in his opening argument during the penalty phase of the trial.” (Circuit court’s order denying Miller’s motion for new trial, at 17.)
On direct appeal, we affirmed the circuit court’s order, stating:
“Miller contends that trial counsel’s opening statement at the penalty phase prejudiced his defense and any mitigating evidence to be presented during the penalty-phase portion of his trial. Specifically, Miller claims that counsel’s opening statement undermined the credibility of the only defense witness being offered — Dr. Charles Scott. The end result of counsel’s opening statement, Miller claims, suggested to the jury that Miller deserved to be sentenced to death.
“We have reviewed trial counsel’s opening statement in its entirety. Consistent with counsel’s trial strategy — as testified to during the hearing on Miller’s new-trial motion — counsel elected to acknowledge Dr. Scott’s conclusion that there was no basis under Alabama law to support an insanity defense in an effort to retain his credibility before the jury and to secure an advisory verdict of life imprisonment without parole, rather than the death sentence. Given the overwhelming evidence of Miller’s guilt — including eyewitness testimony identifying Miller as the shooter — counsel had little choice but to acknowledge Miller’s guilt. Accordingly, counsel attempted to gain the jury’s sympathy by using Dr. Scott’s testimony to portray Miller as a ‘tortured soul’ whose delusions drove him to commit a series of horrific acts. Indeed, our review of counsel’s argument reveals it to be an impassioned plea that the jury spare Miller’s life.”
Miller, 913 So.2d at 1163.
Miller contends that had his appellate counsel properly presented and argued this claim in the motion-for-new-trial proceedings and on appeal, he would have been entitled to relief. In arguing this claim, Miller merely rehashes his argument that his trial counsel rendered ineffective assistance in his opening statement at the penalty phase of the trial. The circuit court thoroughly addressed the rationale behind Miller’s trial counsel’s opening statement, which “was to convey that no matter what Miller had done, ‘whether [the jury] thought he was atrocious or not’ and ‘whatever their feelings [were] about Mr. Miller’ that Miller did not deserve the death penalty.” (C. 2068, citing February 2008 Rule 32 Hearing, R. 151, 156.) The circuit court concluded that Miller failed to prove that his trial counsel’s strategy was deficient or that he was prejudiced by his counsel’s opening statement. (C. 2067-73.) The circuit court’s findings are supported by the record.
Accordingly, it follows that Miller has also failed to prove by a preponderance of the evidence that his appellate counsel were ineffective in the manner in which they presented this claim of ineffective assistance of trial counsel in the post-sentencing proceedings. Payne, 791 So.2d at 401.
D.
In the fourth part of his argument, Miller presents a number of claims of ineffective assistance of trial counsel that, he contends, his appellate counsel should have presented in the motion-for-new-trial proceedings and on appeal. (Miller’s brief, *417 11(C), at 124-48; Miller’s reply brief, at 39.)
1.
Miller maintains that his trial counsel’s voir dire examination was inadequate because, he claims, “[t]rial counsel made no effort to determine juror bias or improper influence from the prejudicial media coverage of the case” and “[e]ven when bias was apparent, he failed to strike the juror.” (Miller’s brief, at 124.) Thus, he alleges that his appellate counsel were ineffective for not pursuing this claim in the post-trial proceedings and on appeal. (Miller’s brief, at 124-28.)
The circuit court denied Miller’s claim, stating:
“In paragraphs 158-167 of his amended petition, Miller claims that trial counsel Johnson’s voir dire was inadequate. [Amended Rule 32 petition, C. 314-17.] Miller alleges that Johnson did not ask questions related to the jurors exposure to media coverage of the trial and did not effectively ask questions designed to uncover potential bias against Miller.
“This Court denies Miller’s claim because he has failed to meet his burden of proof of demonstrating that his trial counsel’s performance was deficient under Strickland, 466 U.S. at 687. Ala. R.Crim. P., 32.7(d). Because of the extensive publicity in this case, Johnson, along with the District Attorney’s office, developed a written questionnaire that was provided to the entire jury panel. [February 2008 Rule 32 Hearing, R. 236.] Within the questionnaire, question # 68 specifically asked the jurors to answer whether they had seen anything about the case in any newspaper. [February 2008 Rule 32 Hearing, R. 237.] Additional questions were included in the questionnaire to determine whether a particular juror had such strong fixed opinions about the case or could not be fair or impartial as a juror. [February 2008 Rule 32 Hearing, R. 238.]
“Johnson testified that he had an opportunity to review the responses to the questionnaires for all members of the jury panel and that he knew the jurors’ responses identifying what they saw in the newspapers about the case. [February 2008 Rule 32 Hearing, R. 237-38.] During trial, the trial court and counsel for both parties conducted an extensive individual voir dire of the jury panel. [Direct Appeal, R. 130-763.]
As the record indicates, Johnson strategically conducted voir dire to determine whether any juror had a fixed opinion, for any reason, of the case. Johnson alerted the trial court to questions # 68, # 69 and # 70 of the juror questionnaire that pertained to the juror’s opinions of the case and implored the trial court to focus its questions on whether the jurors had ‘fixed opinions’ of the case. [Direct Appeal, R. 146-47.] As a result, the trial court determined that it would examine each juror’s response to question # 68 and if the juror indicated they had heard something about the case, the trial court would inquire what the juror heard and whether the juror could set aside what they had heard. [Direct Appeal, R. 148.]
“During the evidentiary hearing, Miller’s [Rule 32] counsel questioned Johnson about specific newspaper articles and then questioned Johnson on whether he asked eight jurors about what they had read about the case in the newspaper. [February 2008 Rule 32 Hearing, R. 127-34.] However, as the record indicates, as a result of Johnson’s effort, during individual voir dire, the trial court noted each of the eight juror’s responses to question # 68 indicating that the juror had seen or read something about the case and then asked *418 each juror whether they could set what they had learned aside and base their verdict solely on the evidence presented. [Direct Appeal, R. 387-38, 345-46, 376-77, 446-47, 449-50, 625-26, 638-39, 666-67.] All eight jurors indicated that they could set aside what they had learned and sit as a fair and impartial juror. Id.
“Therefore, information about the jurors’ opinions about the case was brought out during the voir dire and Miller has failed to demonstrate that Johnson’s method of conducting voir dire was deficient. Miller has failed to present any evidence that a reasonable attorney would have asked these eight jurors about specific newspaper articles. Furthermore, Miller failed to ask Johnson why he did not strike these eight jurors from the panel, nor did Miller ask any specific question regarding Johnson’s strategy for using the defense’s peremptory strikes. Therefore, because the record is silent, trial counsel’s questioning of the jury panel and the subsequent peremptory strikes is presumed to be reasonable. See Chandler [v. United States ], 218 F.3d 1305,1315 n. 15 [ (11th Cir.2000) ].
“In paragraph 162 of his amended petition, Miller claims that his trial counsel failed to question and remove Juror [G.J.] who Miller alleges was biased because Juror [G.J.] favored the death penalty. [Amended Rule 32 Petition, C. 315.] However, trial counsel’s questioning of Juror [G.J.] was not deficient and the record directly refutes Miller’s claim that Juror [G.J.] was biased. Juror [G.J.] stated during voir dire that he could follow the trial court’s instructions and listen to the evidence in recommending a sentence in Miller’s case. [Direct Appeal, R. 377-78.] Juror [G.J.] also stated that where it was appropriate under the law and evidence he could vote for either life imprisonment or the death penalty. [Direct Appeal, R. 378.] Furthermore, trial counsel Johnson specifically questioned Juror [G.J.] about his views on the death penalty and elicited from Juror [G.J.] that he had no fixed opinions about what an appropriate punishment should be. [Direct Appeal, R. 387-90.] Accordingly, Miller’s claim is directly refuted by the record and is denied. See Gaddy v. State, 952 So.2d 1149, 1161 (Ala.Crim.App.2006).
[[Image here]]
“This claim is also denied because Miller has utterly failed to meet his burden or proof of demonstrating that he was prejudiced by his trial counsel’s performance during voir dire. See Stride-land, 466 U.S. at 695; Ala. R.Crim. P., 32.7(d). Although Miller claims that trial counsel was ineffective for failing to asks eight of the fourteen jurors seated in his case about what they read or remembered about Miller’s case, Miller has failed to present any evidence whatsoever about what these eight jurors actually read or remembered about Miller’s case prior to trial. [February 2008 Rule 32 Hearing, R. 134.] None of the jurors who sat at Miller’s trial testified during the evidentiary hearing. Therefore, no evidence was presented that the eight jurors actually read or were exposed to the newspaper articles introduced into evidence by Miller during the evidentiary hearing. [February 2008 Rule 32 Hearing, R. 127-34, 289-95.] Even if the eight jurors had read these newspaper articles, no evidence was presented that the jurors considered these articles harmful to Miller or that they had fixed opinions about Miller because of these articles.
“There is nothing in the record regarding what the jurors read about Miller’s case; accordingly, ‘[t]he mere fact that some of the jurors that sat for *419 [Miller’s] trial had pretrial knowledge of his case is not enough to establish they were biased against him.’ Duncan v. State, 925 So.2d 245, 267 (Ala.Crim.App.2005). Therefore, because there is no evidence about what the jurors read and whether they were actually biased against Miller because of what they read, Miller has failed to demonstrate that he was prejudiced by this trial counsel’s performance during voir dire. Miller’s claim is denied.”
(C. 2039-45.)
The circuit court’s findings are supported by the record and Alabama law. As we stated on direct appeal:
“[T]he potential for actual juror prejudice was addressed through voir dire during the selection of the jury. Through the use of juror questionnaires and individual voir dire, any potential jurors who may have had fixed opinions regarding Miller’s guilt were excused from service. Nor was there any showing that media coverage created a presumption of actual prejudice. See Ex parte Travis, 776 So.2d 874, 879 (Ala.2000).”
Miller, 913 So.2d at 1162.[9]
Accordingly, “[b]ecause [Miller] failed to establish that his claim of ineffective assistance of trial counsel is meritorious, he has failed to prove by a preponderance of the evidence that his appellate counsel was ineffective for failing to present this claim.” Payne, 791 So.2d at 401-02.
2.
Miller contends that his appellate counsel should have argued that his trial counsel rendered ineffective assistance in his closing argument at the guilt phase of the trial. (Miller’s brief, at 131-33.)
In the circuit court’s order denying Miller relief on this claim, the court stated:
“In paragraphs 209-13 of his amended petition, Miller claims that his trial counsel was ineffective during the guilt phase closing arguments. Miller claims that Johnson conceded guilt and made no attempt to argue that Miller did not have the intent to commit murder. [Amended Rule 32 petition, C. 329-331.] Miller also claims that Johnson was ineffective for stating that he was not ‘proud’ to represent Miller. [Amended Rule 32 petition, C. 330.]
“This Court denies Miller’s claim because he has failed to meet his burden of proof of demonstrating that his trial counsel’s performance was deficient under Strickland, 466 U.S. at 687. Aa. R.Crim. P., 32.7(d). Johnson’s closing argument was reasonable based both on the tactical decision to focus on the penalty phase of trial and his overall strategy of not presenting frivolous arguments in order to win credibility with the jury. [Direct Appeal, R. 1261-64.] As noted above, Johnson continually testified that he strategically chose to focus on the penalty phase of Miller’s trial in order to save Miller’s life. [Motion for New Trial Hearing, R. 80; February 2008 Rule 32 Hearing, R. 219.] In an attempt to bolster his chances of success during the penalty phase, Johnson made a tactical decision to emphasize to the jury that he would not be presenting frivolous evidence or arguments during the guilt phase. [February 2008 Rule 32 Hearing, R. 143, 219.]
“Similar to his comments during opening statements, Johnson echoed to the jury during closing arguments that he was not going to present a frivolous defense such as arguing a second gun *420 man existed or challenging the fact that the prosecution could not match the bullets taken from the victims to Miller’s gun. [Direct Appeal, R. 1261-62.] Johnson reminded the jury of the State’s burden and implored the jury to listen to the judge’s instructions on the law and render a verdict based on the facts and consistent with their oath. [Direct Appeal, R. 1268.] Miller has failed to present any evidence which would establish that [Johnson’s] continual effort during closing arguments to gain credibility with the jury in order to make an effective penalty phase argument was unreasonable.
“Johnson’s decision to not argue that Miller did not have intent to commit capital murder during closing arguments was consistent with his overall trial strategy of focusing on the penalty phase of the trial. [February 2008 Rule 32 Hearing, R. 219.] Moreover, Johnson’s comments about his representation of Miller were consistent with this strategy as well. Johnson told the jury that he was proud of his representation of Miller, but in an effort to win favor with the jury, also stated he was still not proud of what happened during the shootings:
“‘And I at least am proud at this point that I have participated in this. It does not remove any degree the shame of what happened. It does not make me proud that I’m representing someone who the evidence is fairly convincing, I must concede to you, did what he did.’
“[Direct Appeal, R. 1268-64.] During the evidentiary hearing, Johnson explained that this statement could not be viewed in isolation, but as part of a larger goal of not alienating the jury during the guilt phase to attempt to win favor with the jury. [February 2008 Rule 32 hearing, R. 142-43.]
“When viewed in the context of Johnson’s entire trial strategy, Johnson’s closing argument was reasonable attempt to gain credibility with the jury during the guilt phase in order to attempt to get a favorable result in the penalty phase — the focus of Johnson’s strategy. Based on this approach, Miller has failed to demonstrate that trial counsel’s decision was unreasonable or that his performance during closing arguments was deficient under Strickland. Therefore, this claim is denied.
“This claim is also denied because Miller failed to meet his burden of proof of demonstrating that he was prejudiced by his trial counsel’s closing argument. See Strickland, 466 U.S. at 695; Ala. R.Crim. P; 32.7(d). Miller has presented no evidence concerning the impact of Johnson’s statements on the jury, nor has Miller demonstrated a reasonable probability that the outcome of the guilt phase of his trial would have been different had Johnson not conducted his closing argument in this manner. In general, statements of counsel ‘are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Minor, 914 So.2d at 417. Miller offered nothing more in support of his claim of ineffectiveness than the bare, conclusory allegation that Johnson’s closing argument was improper and that it prejudiced the jury, without proving specific facts that demonstrate prejudice. Accordingly, Miller has not met his burden of demonstrating prejudice under Strickland and therefore, this claim is denied.”
(C. 2060-64.)
The circuit court’s findings of fact and conclusions of law are supported by the record. (See this Court’s discussion, supra, addressing and rejecting Miller’s as *421 sertion that his trial counsel’s opening statement at the guilt phase of the trial was ineffective.) Accordingly, “[b]ecause [Miller] failed to establish that his ineffective-assistance-of-trial-counsel claim is meritorious, he has failed to prove by a preponderance of the evidence that his appellate counsel was ineffective for failing to present this claim.” Payne, 791 So.2d at 401-02.
3.
Miller alleges that his appellate counsel should have argued that his trial counsel were ineffective because trial counsel did not move for a directed verdict “based on the State’s failure to present comparative evidence necessary to determine that the killings were ‘especially heinous, atrocious, or cruel compared to other capital offenses.’ ” (Miller’s brief, at 139-42.) Miller suggests that because this particular claim was not addressed in the circuit court’s order denying the Rule 32 petition, that the court’s “silence is a candid admission that trial counsel’s failure to make this argument deprived Mr. Miller of the effective assistance of counsel.” (Miller’s brief, at 142.)
The State maintains that this claim is not properly before this Court because it was not presented in Miller’s amended Rule 32 petition, and the State asserts “ ‘[Miller] cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.’ ” (State’s brief, at 140, quoting Arlington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997).) We agree that this claim was not properly presented to the circuit court and, thus, is not properly before this Court for appellate review.
Although Miller raised numerous grounds of ineffective assistance of trial counsel in his amended Rule 32 petition, as best we can determine, Miller did not present a claim that his trial counsel were ineffective because trial counsel did not move for a directed verdict on the ground the State failed to present comparative evidence for the jury to consider in determining whether the aggravating circumstance that the offense was especially heinous, atrocious, or cruel when compared to other capital cases had been proven. During the Rule 32 evidentiary hearing, the following exchange occurred between Miller’s Rule 32 counsel and Miller’s trial counsel, Mickey Johnson:
“Q. Now, at the conclusion of the penalty phase, Mr. Johnson, you moved for a directed verdict and I believe that you stated on the record that the ground was that the State failed to prove an aggravating statutory circumstance. Do you recall making that motion?
“A. I don’t recall it but, here again, I don’t dispute the record.
“Q. ... But you didn’t explain the basis for that motion to Judge Crowson, did you?
“A. I don’t know.
[[Image here]]
“Q. We have discussed earlier that the sole aggravating factor in this case the State was relying upon was that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses; is that correct?
[[Image here]]
“A. That’s the way I recall it, yes.
[[Image here]]
“Q. So the State didn’t present the jury, which was going to be making this recommendation on the death penalty, with any information that would have permitted the jury to compare the level of heinousness, atrociousness or cruelty of this crime to other capital offenses, isn’t that correct?
“A. I don’t recall any efforts being made by the State in that regard, no.
*422 “Q. And I am correct you did not argue to Judge Crowson that the failure of the State to present such compared evidence meant that the State had failed to prove this aggravating factor as a matter of law? The record contains no such argument. I just want to confirm that.
“A. I would aver to the record.”
(February 2008 Rule 32 Hearing, R. 193-94.)
Given the amount of testimony and evidence presented at the Rule 32 hearings, the variety of issues addressed in the hearing, the often random manner in which the claims were addressed, and the convoluted nature of this claim and the fact that it was not presented as a specific claim in the amended Rule 32 petition, we do not consider Rule 32 counsel’s “confirmation” that trial counsel did not “argue” this ground for a directed verdict to be sufficient to alert the circuit court to the very specific allegation that Miller now presents on appeal. In other words, Rule 32 counsel did not sufficiently present a “material issue of fact” in the Rule 32 hearing that required a finding of fact by the circuit court. See Rule 32.9(d), Ala. R.Crim. P. Therefore, contrary to Miller’s suggestion, we will not interpret from the fact that this claim was not addressed in the circuit court’s order to mean that the circuit court conceded the claim Miller now presents on appeal.
Even so, Miller is entitled to no relief because his underlying claim is without merit. The gist of Miller’s argument is the circuit court’s instructions regarding the aggravating circumstance that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses obligated the jury to consider the facts of other capital cases in order to determine whether the State met its burden of proof. He contends that because the State did not present facts from other capital cases for comparison purposes, the State did not prove the sole aggravating circumstance that the offense in this case was especially heinous, atrocious, or cruel when compared to other capital cases. Thus, Miller argues, he was entitled to a directed verdict imposing a sentence of life imprisonment without the possibility of parole. Miller concludes that because his trial counsel failed to move for a directed verdict on this ground, he was sentenced to death.
In support of his argument, Miller cites the following portion of the circuit court’s instructions to the jury:
“What is intended to be included in this aggravating circumstance is those where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.
“For a capital offense to be especially cruel, it must be a conscienceless or pitiless crime which is unnecessary torturous to the victim. All capital offenses are heinous, atrocious and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinous, atrociousness or cruelty exceeds that which will always exist when a capital offense is committed.”
(Miller’s brief, at 140, citing record on direct appeal, R. 1432~33)(emphasis in Miller’s brief).
The Alabama Supreme Court has stated:
“Bankhead suggests that the jury should have had the opportunity to compare the capital offense in this case with other capital offenses for purposes of § 13A-5-49(8)[, Ala.Code 1975].
“Although a very narrow and literal reading of the statute may suggest that such a comparison is required, it would be virtually impossible for the court to *423 implement. Charging the jury on pertinent facts of ‘other capital cases’ would unduly burden the court. It would be unworkable for the court and would thoroughly confuse the jury.
“This Court has decided upon an approach for the purposes of § 13A-5-49(8). In comparing capital offenses for the purposes of determining whether a capital offense was ‘especially heinous, atrocious or cruel,’ the court uses the [Ex parte ] Kyzer [, 399 So.2d 330 (Ala.1981),] standard. Capital offenses falling under § 13A-5-49(8) are, pursuant to the Kyzer standard, those ‘conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’ Kyzer, 399 So.2d at 334. The trial court clearly followed the Kyzer standard in its instructions to the jury.”
Ex parte Bankhead, 585 So.2d 112, 125 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993).
The State was not required to present pertinent facts from other capital cases for comparison purposes in order to sustain its burden of proving that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Contrary to Miller’s interpretation, the circuit court’s charge did not obligate the jury to consider other capital offenses for comparison purposes when determining if the State met its burden of proof. Rather, the circuit court’s charge followed the standard set out in Ex parte Kyzer, 399 So.2d 330 (Ala.1981). (Record on Direct Appeal, R. 1432-35.) Furthermore, this Court affirmed the circuit court’s finding that the murders were especially heinous, atrocious, or cruel. See Miller, 913 So.2d at 1165-67. Thus, Miller’s counsel would not have been entitled to a directed verdict on the ground that the State did not sustain its burden of proof because it did not present facts from other cases for comparison purposes.
Accordingly, because Miller failed to prove that his underlying claim had merit, he also failed to prove that his trial counsel were ineffective for not moving for a directed verdict on this ground. Therefore, “[b]ecause [Miller] failed to establish that his ineffective-assistance-of-trial-counsel claim is meritorious, he has failed to prove by a preponderance of the evidence that his appellate counsel was ineffective for failing to present this claim.” Payne, 791 So.2d at 401-02.
4.
Miller contends that his appellate counsel should have argued that trial counsel rendered ineffective assistance at the sentencing hearing. (Miller’s brief, at 144-146.) Miller argues that the presen-tence investigative report prepared by the Alabama Board of Pardons and Paroles “woefully understated the abuse [he] suffered from his father.” (Miller’s brief, at 144.) Miller states that his trial counsel reviewed the presentencing report, but that counsel did not present any additional evidence for the circuit court’s consideration. He alleges that had his trial counsel presented the additional mitigating evidence discussed elsewhere in this opinion, there is a “reasonable probability that the trial judge would not have sentenced [him] to death.” (Miller’s brief, at 145.)
In denying relief on this argument, the circuit court stated:
“In paragraphs 277-79 of his amended petition, Miller claims that trial counsel were ineffective for failing to offer any additional evidence or witnesses in support of Miller. [Amended Rule 32 Petition, C. 350-51.]
“The Court denies Miller’s claim because he has failed to meet his burden of proof of demonstrating that his trial
*424 counsels’ performance was deficient under Strickland, 466 U.S. at 687. Ala. R.Crim. P., 32.7(d). Alabama courts have held that ‘counsel does not necessarily render ineffective assistance simply because he does not present all possible mitigating evidence.’ McGahee v. State, 885 So.2d 191, 221 (Ala.Crim.App. 2003). However, as noted above, trial counsel presented a competent mitigating case concerning Miller’s mental health and background during the penalty phase of the trial. The trial court presided over Miller’s trial and heard all of the mitigating evidence presented. Simply the fact that Miller’s trial counsel could have presented more mitigation evidence during the sentencing hearing does not establish deficient performance under Strickland, See McGa-hee, 885 So.2d at 221 (‘Trial counsel could have called more witnesses at the penalty-phase hearing before the trial judge, with the hope that the additional information would have convinced the trial judge to agree with the jury’s recommendation and to sentence McGahee to life imprisonment without parole. The same can be said after any sentencing hearing in a capital case in which a death sentence is imposed after the jury recommended a sentence of life imprisonment without parole.’ (emphasis in original)).
“Miller failed to ask trial counsel any questions regarding the reasons why he did not call any witnesses or present evidence during the sentencing hearing. [February 2008 Rule 32 Hearing, R. 200-01.] Therefore, trial counsel’s performance must be presumed to be reasonable. Furthermore, Miller’s trial counsel could not be ineffective for failing to present additional mitigation evidence during the sentencing hearing because ‘Section 13A-5-47, Ala.Code 1975, does not provide for the presentation of additional mitigation evidence at sentencing by the trial court.’ Boyd v. State, 746 So.2d 364, 398 (Ala.Crim.App.1999). Therefore, Miller has failed to establish that his trial counsels’ performance was deficient and this claim is denied.
“This claim is also denied because Miller has failed to meet his burden of proof of demonstrating that he was prejudiced. See Strickland, 466 U.S. at 695; Ala. R.Crim. P., 32.7(d). Miller failed to establish what additional evidence could have been submitted during the sentencing hearing. Miller asked trial counsel whether he submitted Dr. Scott or Dr. McDermott’s report during the sentencing hearing before the trial court; however, the substance of both reports had already [been] presented during the penalty phase. Furthermore, the trial court found three statutory mitigating circumstances to exist. Miller, 913 So.2d at 1169. Miller has failed to demonstrate what additional mitigating circumstances could have been proven during the sentencing hearing. Accordingly, Miller has failed to establish proof that he was prejudiced and this claim is denied.”
(C. 2103-05.)
The circuit court’s findings of fact and conclusions of law are supported by the evidence. Accordingly, “[b]ecause [Miller] failed to establish that his ineffective-assistance-of-trial-counsel claim is meritorious, he has failed to prove by a preponderance of the evidence that his appellate counsel was ineffective for failing to present this claim.” Payne, 791 So.2d at 401-02.[10]
*425 Miller also asserts that his appellate counsel should have argued that his trial counsel were ineffective for not apprising the trial court of the United States Supreme Court’s decision in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). (Miller’s brief, at 146-48.) This assertion was neither presented in Miller’s amended Rule 32 petition, nor was it addressed in the evidentiary hearing. Accordingly, this claim in not properly before this Court. Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997).
5.
Miller presents several other claims of ineffective assistance of trial counsel that he alleges his appellate counsel should have presented in the post-sentencing proceedings; however, the circuit court determined that Miller abandoned the underlying claims of ineffective assistance of trial counsel because he did not pursue the claims in the evidentiary hearing and/or he did not pose questions or elicit evidence to support his claims. See Brooks v. State, 929 So.2d 491, 497 (Ala.Crim.App.2005) (“We have held that a petitioner is deemed to have abandoned a claim if he fails to present any evidence to support the claim at the evidentiary hearing.”); Chandler v. United States, 218 F.3d at 1314 n. 15 (“An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation.]”); Payne, 791 So.2d at 399 (“Because it appears that Payne did not present evidence at the evidentiary hearing with regard to [Payne’s claims], we will conclude that he has abandoned these claims and we will not review them.”).
Specifically, the circuit court found that Miller abandoned the following underlying claims of ineffective assistance of trial counsel:
a. “Trial counsel was ineffective in cross-examining prosecution witnesses.” (Miller’s brief, at 129-31)(C. 2059-69);
b. “Trial counsel ineffectively failed to request guilt-phase jury instructions.” (Miller’s brief, at 134-35) (C. 2066-67);
c. “Trial counsel was ineffective in his penalty-phase closing argument.” (Miller’s brief, at 135-39) (C. 2098-2100);
d. “Trial counsel failed to request a special penalty-phase verdict form that was necessary to protect Mr. Miller’s rights.” (Miller’s brief, at 142-44XC. 2100-11).
Miller does not dispute the circuit court’s conclusion that he abandoned these claims. Accordingly, because Miller failed to prove his underlying allegations of ineffective assistance of trial counsel had merit, he has also failed to prove that his appellate counsel were ineffective for not presenting these claims in the post-sentencing proceedings. Payne, 791 So.2d at 401-02.
*426 Last, we note that to the extent that Miller asserts he is entitled to relief because of the “cumulative effect of error” of his trial counsel and/or appellate counsel, Miller is due no relief. As discussed above, Miller failed to establish any one instance of ineffective assistance of trial/appellate counsel, let alone cumulative error. See Ex parte Woods, 789 So.2d 941, 943 n. 1 (Ala.2001) (“A correct statement of the law would be that, when no one instance amounts to error at all (as distinguished from error not sufficiently prejudicial to be reversible), the cumulative effect cannot warrant reversal. In other words, multiple nonerrors obviously do not require reversal.”). McNabb v. State, 991 So.2d 313, 333 (Ala.Crim.App.2007), cert. denied, 991 So.2d 336 (Ala.2008).
For the reasons set forth above, the judgment of the circuit court is affirmed.
AFFIRMED.
WELCH, P.J., and WINDOM and BURKE, JJ., concur. JOINER, J., recuses himself.

. Mickey Johnson's first cocounsel, Roger Bass, who withdrew during the pretrial

. This Court initially remanded Miller’s case to the circuit court for that court to enter specific written findings of fact regarding each of the claims Miller raised in the hearing on the motion for a new trial and to enter specific written findings of fact regarding the existence of the aggravating circumstance that the capital murder was especially heinous, atrocious, or cruel, when compared to other offenses. Miller, 913 So.2d at 1153.

. According to the testimony elicited at the Rule 32 hearing, the trial transcript was completed on October 20, 2000, and appellate counsel began reviewing the transcript on November 2, 2000. (August 2008 Rule 32 Evi-dentiary Hearing, R. 23.)

. Miller’s Rule 32 counsel requested that the State produce the recording of the interrogation. The State contacted the Pelham Police Department, the agency that retained the evidence in this case, and requested a copy of the tape. The State told the court hearing the Rule 32 petition that there was no record that the referenced tape ever existed. The State informed the court that it had provided all existing tapes within the district attorney’s files to Miller, and Miller does not dispute that. (February 2008 Rule 32 hearing, R. 529-30.)

. The State argues that this particular assertion is not properly before this Court because it was not presented in the amended Rule 32 petition; however, this contention was addressed in the Rule 32 evidentiary hearing. (Rule 32 Hearing, R. 94.)

. The record from the direct appeal indicates that a veniremember informed the court that he had overheard other veniremembers express that the trial was a waste of time because the facts were "cut and dried.” The veniremember could not identify who made the statements. Johnson moved to quash the venire. The circuit court denied Johnson’s motion to quash the venire; however, the veniremember who told the court what he had overheard was excused from service. (Direct Appeal, R. 691-97.)

. "The ABA Guidelines were revised in 2003 — after [Miller] was tried and convicted in [2000.] 'After Wiggins [v. Smith, 539 U.S. 510 (2003)], these Guidelines have been revised to be even more exacting insofar as they require counsel "to seek information that ... *397 rebuts the prosecution’s case in aggravation,” ... and to “determine at the earliest possible time what aggravating factors the prosecution will rely upon in seeking the death penalty and what evidence will be offered in support thereof.” ’ United States v. Karake, 370 F.Supp.2d 275, 278 (D.D.C.2005). '[W]e recognize that we must measure counsel’s performance in this case against the prevailing standards at the time of [Miller's] trial.’ Hamblin v. Mitchell, 354 F.3d 482, 487-88 (6th Cir.2003).” Ray, 80 So.3d at 982 n. 5.

. At another place in his amended Rule 32 petition, Miller did make the bare assertion that his trial counsel failed to collect and evaluate Miller’s employment, educational, medical records, and his family’s medical records. (C. 275.)

. In the quoted portion of our opinion on direct appeal, this Court was addressing Miller's allegation that his trial counsel was ineffective for not moving for a change of venue.

. To the extent that Miller is attempting to assert a claim that his trial counsel were ineffective for not objecting to the purported inadequacy of the presentence report, this as *425 sertion is not properly before this Court. Miller neither presented this as a claim in his amended Rule 32 petition nor specifically argued this as a ground for relief during the Rule 32 evidentiary hearing. As we have stated earlier in this opinion, the rules of preservation apply in Rule 32 proceedings, even if the death penalty is involved. Thus, even if the presentence report was "woefully inadequate,” which it is not, Miller would be due no relief as he failed to argue this ground to the circuit court. Cf. Ex parte Washington, [Ms. 1071607, April 15, 2011]-So.3d-(Ala.2011) (Supreme Court implied in dicta that a presentence report, to which Washington objected, was inadequate because the report contained almost no information about Washington's troubled upbringing or its effect on him, nor did the report contain sufficient information about Washington’s mental-health problems).